SCANNED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Cazé D Thomas
_____

_____
Write the full name of each plaintiff.

_18_ CV _3691_

(Include case number if one has been
assigned)

-against-

Five Star Electric
Dept of EEOC

Dept of Human Rights
Metropolitian TRansportation Authority
_____
Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

Do you want a jury trial?
☐ Yes   ☑ No

Amended
**EMPLOYMENT DISCRIMINATION COMPLAINT**

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with
the court should therefore *not* contain: an individual's full social security number or full birth
date; the full name of a person known to be a minor; or a complete financial account number. A
filing may include *only*: the last four digits of a social security number; the year of an individual's
birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule
of Civil Procedure 5.2.

---

## I.    PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

_Cace_ _D_ _Thomas_
First Name               Middle Initial        Last Name

_c/o 6545 Parsons Blvd #1M_
Street Address

_Fresh Meadows_                _NY_          _11365_ _Domestic Republic_
County, City                          State              Zip Code

_(347)262-3434_                _Thomasinelectric@yahoo.Com_
Telephone Number                      Email Address (if available)

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:    _Five Star Electric_
                Name
                _101-32  101st_
                Address where defendant may be served
                _Ozone Park_        _NY_        _11416_
                County, City            State          Zip Code

Defendant 2:    _Dept of EEOC_
                Name
                _33 Whitehall 5th Flr_
                Address where defendant may be served
                _NY_              _NY_          _10004_
                County, City            State          Zip Code

Defendant 3:

*Dept of Human Rights*

Name

*55 Hanson Pl # 900*

Address where defendant may be served

*Bklyn*                    *NY*                    *11217*

County, City            State            Zip Code

## II. PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

*Metropolitian Transportation Authority*

Name

*2 Broadway*

Address

*NY*                    *NY*                    *10004*

County, City            State            Zip Code

## III. CAUSE OF ACTION

### A. Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☑ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☐ race: _____

☐ color: _____

☐ religion: _____

☑ sex: _____

☐ national origin: _____

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: _____

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

**B.  Other Claims**

In addition to my federal claims listed above, I assert claims under:

☑ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☑ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☑ Other (may include other relevant federal, state, city, or county law):

_____

## IV.   STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐ did not hire me
- ☐ terminated my employment
- ☐ did not promote me
- ☐ did not accommodate my disability
- ☐ provided me with terms and conditions of employment different from those of similar employees
- ☑ retaliated against me
- ☑ harassed me or created a hostile work environment
- ☑ other (specify): *See Section "B"*

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

*See Attached labeled "Facts"*

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

Page 5

## V.     ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☑ Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?   *exact date is currently unknown to me; The complaintant/petitioner/Plaintiff At this time*

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☑ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?   _____

When did you receive the Notice?   _____

☐ No

## VI.     RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☐ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☐ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

*See Attached titled "Relief*

_____

_____

_____

_____

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| 4/25/18 | Thomasine C1-308 |
| Dated | Plaintiff's Signature |

| | | |
|---|---|---|
| Caze | D. | Thomas |
| First Name | Middle Initial | Last Name |

% 65-45 Parsons Blvd #1M
Street Address

| | | |
|---|---|---|
| Fresh Meadows | NY | Domestic Republic |
| County, City | State | Zip Code |

| | |
|---|---|
| (347) 262-3434 | Thomasinelectric@yahoo.Com |
| Telephone Number | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your
complaint. If you do not consent, please do not attach the form.

(11/16)

## U.S. Equal Employment Opportunity Commission

### Dismissal and Notice of Rights

| | |
|---|---|
| To: **Caze Thomas**<br>**65-45 Parsons Blvd, Apt 1M**<br>**Fresh Meadows, NY 11365** | From: **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16G-2017-02949** | **Holly M. Shabazz,**<br>**State & Local Program Manager** | **(212) 336-3643** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

**Kevin J. Berry,**
**District Director**

January 25, 2018
*(Date Mailed)*

cc:

**Attn: Director of Human Resources**
**FIVE STAR ELECTRIC CORP.**
**101-32 101st Street**
**Ozone Park, NY 11416**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Cazé D. Thomas
_____

Write the full name of each plaintiff.

_____CV_____

(Include case number if one has been assigned)

-against-

Five Star Electric
Dept of EEOC
Dept of Human Rights
Metropolitan Transportation Authority
_____

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

## COMPLAINT

Do you want a jury trial?
☐ Yes  ☒ No

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑  Federal Question  *As Known*

☐  Diversity of Citizenship

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

*Any and all Civil And Human Rights expressed in my,*
*The complaintant/ the Petitioner's complaints.*

_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
                        (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_Cozie_      _D_      _Thomas_
First Name      Middle Initial      Last Name

_C/o 6545 Parsons Blvd #1M_
Street Address

_Fresh Meadows_      _NY_      _Domestic Republic_
County, City      State      Zip Code

_(347)262-3434_      _Thomasinelectric@Yahoo.com_
Telephone Number      Email Address (if available)

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:    *Five Star Electric*

First Name                          Last Name

Current Job Title (or other identifying information)

*101 -02 101ˢᵗ St Ozone Park NY 11416*

Current Work Address (or other address where defendant may be served)

*Ozone park*                    *NY*             *11416*

County, City                          State                   Zip Code

Defendant 2:    *Dept of EEOC*

First Name                          Last Name

Current Job Title (or other identifying information)

*33 Whitehall St*

Current Work Address (or other address where defendant may be served)

*NY*                        *NY*             *10004*

County, City                          State                   Zip Code

Defendant 3:    *Dept of Human Right*

First Name                          Last Name

Current Job Title (or other identifying information)

*55 Hanson Pl #900*

Current Work Address (or other address where defendant may be served)

*BKlyn*                     *NY*             *11217*

County, City                          State                   Zip Code

Defendant 4: _Metropolitan Transportation Authority_

First Name                    Last Name

_____
Current Job Title (or other identifying information)

_2 Broadway_

Current Work Address (or other address where defendant may be served)

_NY_                    _NY_                    _10004_

County, City              State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_See attached labeled "Fact"_

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

~~Financi~~ Financial, Social, And Emotional destress.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

See Attach labeled "Relief"

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated __4/25/18__

Plaintiff's Signature _____

First Name __Caze__   Middle Initial __D__   Last Name __Thomas__

Street Address __46 65 45 Parsons Blvd #1M__

County, City __Fresh Meadows__   State __NY__   Zip Code __Domestic Republic__

Telephone Number __(347) 262-3434__

Email Address (if available) __Thomasinelectric@Yahoo.Com__

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑Yes  ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

"Facts"

harrassment including but not limited to
harrassment based on gender and Sexual orientation
as well as retaliation, Defamation of Character,
illegally disclosing private vital Record information,
Slander, wrongful termination, Falsifying legal
documents, abuse of power and neglect of
duties, And Conspiracy including and in addition
to Any And All other laws, Regulations, And
Statutes that may apply against the abuse
and offenses that were done to the
Complaintant.

Also, Allowing an Electrical Company who has
no jurisdiction or proper authority to take
control and command of the security headquaters
of 2 Broadway NY, NY 10004.

1 of 3

"Relief"

Reverse the decision made by the Dept of EEOC, apply and enforce The False Claim Act, 31 U.S.U. 3729-3733, and all laws Pertaining to harrassment including but not limited to harrassment based on gender and sexual orientation, as well as Retailiation, Deformation of Character, illegally disclosing vital records information, slander, wrongful termination, Falsifying legal documents, abuse of power and neglect of duties, and Conspiracy including and in addition to any and all other laws, Regulations, and statutes that may apply against the abuse and offense that were done to the Complaintant in this case.

Case 1:18-cv-03691-AJN-RWL   Document 9   Filed 07/24/18   Page 18 of 165
Case 1:18-cv-03691-AJN-RWL   Document 1   Filed 04/26/18   Page 19 of 19

2 of 3

"Relief"

Remove Any and all restrictions that would prevent the Complaintant from being allowed to enter 2 Broadway to conduct business, Personal, And or other matters, without uncivil, and unwarranted hinderance.

Grant the complaintant the fair opportunity to take advantage of the procurement procedures And programs that the MTA is offering new contractors... Should one day the complaintant decide to apply to fulfil the Complaintants childhood dream of becoming an Electrical Contractor.

A Sincere public apology from all parties.

The letters of public apology from the MTA [along with the photo of Complaintant in which the MTA previously used to publicly humiliate and falsely accuse the Complaintant] are to be posted in all the locations where the offending post were posted throughout the property of 2 Broadway NY, NY 10004.

3 of 3

"Relief"

Reinstate the employment of any and all security Personnel and Elevator operators of 2 Broadway NYC after 4/13/17, who may have lost their employment after 15 yrs & of service; After of bearing witness to the truth in the Complaintants defense. They too are victims.

Apply and enforce all Safety, Security, and surveillance measures that would be appropriate for the Security Risk level of the 2 Broadway NY, NY 10004

Investigate all cases handled by investigator Mr. Purelli of the Dept of Human Rights.

Instate a person with a title and position who is Knowledgable, Properly trained, and Qualified to handle the sensitivity of the security Ideal for the nature of operations throughout the building 2 Broadway NY, NY 10004.

Award the maximum amount Requested in demand to the Complaintant for being victimized and Subjected to each and every offense and violation in this case, which Cause(s) and effect(s) Result(ed/s) in trauma, grief, Isolation, and obstructions in the Complaintant's Career and pursuit of happiness.

**JUDGE** NATHAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_Cace D. Thomas_

**18 CV 3691**

Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been assigned)

-against-

_Five Star Electric_
_Dept of EEOC_
_Dept of Human Rights_
_Metropolitian Transportation Authority_

Write the full name of each defendant. The names listed above must be identical to those contained in Section I.

Do you want a jury trial?

☐ Yes  ☑ No

## EMPLOYMENT DISCRIMINATION COMPLAINT

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore _not_ contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include _only_: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

## I.   PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

Caze                    D                Thomas
First Name              Middle Initial              Last Name

% 6545 Parsons Blvd # 1M
Street Address

Fresh Meadows                    NY                Domestic Republic
County, City                     State             Zip Code

(347)262-3434                    Thomasinelectric@yhoo.Com
Telephone Number                Email Address (if available)

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:     Five Star Electric
                 Name
                 101-32  101st
                 Address where defendant may be served
                 Ozone Park          NY          11416
                 County, City        State        Zip Code

Defendant 2:     Dept of EEOC
                 Name
                 33 whitehall  8th Flr
                 Address where defendant may be served
                 NY                  NY          10004
                 County, City        State        Zip Code

Defendant ~~Case 1:18-cv-03691-AJN-RWL~~ Transportation Authority
2 Broadway NY, NY 10004

Defendant 3:

Dept of Human Rights
Name

55 Hanson Pl # 900
Address where defendant may be served

Bklyn                    NY                    11217
County, City              State               Zip Code

## II.   PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

Metropolitian Transportation Authority
Name

2 Broadway
Address

NY                       NY                   10004
County, City              State               Zip Code

## III.   CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☑ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☐ race: _____

☐ color: _____

☐ religion: _____

☑ sex: _____

☐ national origin: _____

☐ **42 U.S.C. § 1981,** for intentional employment discrimination on the basis of race

    My race is: _____

☐ **Age Discrimination in Employment Act of 1967,** 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

    I was born in the year: _____

☐ **Rehabilitation Act of 1973,** 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

    My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990,** 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

    My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993,** 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

**B.  Other Claims**

In addition to my federal claims listed above, I assert claims under:

☑ **New York State Human Rights Law,** N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☑ **New York City Human Rights Law,** N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☑ Other (may include other relevant federal, state, city, or county law):

_____

## IV.   STATEMENT OF CLAIM

### A.   Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐ did not hire me
- ☐ terminated my employment
- ☐ did not promote me
- ☐ did not accommodate my disability
- ☐ provided me with terms and conditions of employment different from those of similar employees
- ☑ retaliated against me
- ☑ harassed me or created a hostile work environment
- ☑ other (specify):   _See Section "B"_

### B.   Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

_See Attached labeled "Facts"_

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V.   ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☑ Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?   _Exact date is currently unknown to me; the complainant/petitioner at this time_

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☑ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?   _____

When did you receive the Notice?   _____

☐ No

## VI.   RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☐ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☐ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

_See Attach title "Relief"_

_____

_____

_____

_____

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| _4/25/18_ | _ephrat to CC=508_ |
| Dated | Plaintiff's Signature |
| _Chzé_          _D._ | _Thomas_ |
| First Name          Middle Initial | Last Name |
| _% 65 45 Parsons Blvd # 1M_ | |
| Street Address | |
| _Fresh Meadows_          _NY_          _Domestic Republic_ | |
| County, City          State          Zip Code | |
| _(347)262-3934_ | _Thomasinclectric@yahoo.Com_ |
| Telephone Number | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes   ☐ No

   If you do consent to receive documents electronically, submit the completed form with your
   complaint. If you do not consent, please do not attach the form.

Case 1:18-cv-03691-AJN-RWL   Document 1   Filed 04/26/18   Page 8 of 19

(11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

.o:    **Caze Thomas**                              From:   **New York District Office**
       **65-45 Parsons Blvd, Apt 1M**                       **33 Whitehall Street**
       **Fresh Meadows, NY 11365**                          **5th Floor**
                                                            **New York, NY 10004**

☐   On behalf of person(s) aggrieved whose identity is
    *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2017-02949 | **Holly M. Shabazz,** **State & Local Program Manager** | **(212) 336-3643** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☒   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*[signature]*                                    January 25, 2018

Enclosures(s)                **Kevin J. Berry,**                    *(Date Mailed)*
                             **District Director**

cc:

       **Attn: Director of Human Resources**
       **FIVE STAR ELECTRIC CORP.**
       **101-32 101st Street**
       **Ozone Park, NY 11416**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Cazé D. Thomas

_____

Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been
assigned)

-against-

Five Star Electric

Dept of EEOC

Dept of Human Rights

Metropolitian Transportation Authority

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

## COMPLAINT

Do you want a jury trial?
☐ Yes  ☒ No

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑  **Federal Question**  *As known*

☐  **Diversity of Citizenship**

## A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

*Any and all civil and Human Rights expressed in my,*
*The complaintant / the Petitioner's complaints.*

## B.  If you checked Diversity of Citizenship

### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff, _____, is a citizen of the State of
                        (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
　　　　　　　　(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_Cace_ 　　　　　 _D_ 　　　　　 _Thomas_
First Name 　　　Middle Initial 　　Last Name

_% 6545 Parsons Blvd # 1M_
Street Address

_Fresh Meadows_ 　　　　 _NY_ 　　　 _Domestic Republic_
County, City 　　　　　　　State 　　　　　Zip Code

_(347)262-3434_ 　　　　 _Thomasinelectric@Yahoo.com_
Telephone Number 　　　　Email Address (if available)

Page 3

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:    *Five Star Electric*

First Name _____ Last Name _____

Current Job Title (or other identifying information)

*101-32 101st St Ozone Park NY 11416*

Current Work Address (or other address where defendant may be served)

*Ozone park* _____ *NY* _____ *11416*

County, City _____ State _____ Zip Code

Defendant 2:    *Dept of EEOC*

First Name _____ Last Name _____

Current Job Title (or other identifying information)

*33 Whitehall St*

Current Work Address (or other address where defendant may be served)

*NY* _____ *NY* _____ *10004*

County, City _____ State _____ Zip Code

Defendant 3:    *Dept of Human Right*

First Name _____ Last Name _____

Current Job Title (or other identifying information)

*55 Hanson Pl #900*

Current Work Address (or other address where defendant may be served)

*Bklyn* _____ *NY* _____ *11217*

County, City _____ State _____ Zip Code

Page 4

Defendant 4:   _Metropolitian Transportation Authority_

First Name                         Last Name

Current Job Title (or other identifying information)

_2 Broadway_

Current Work Address (or other address where defendant may be served)

_NY_              _NY_              _10004_

County, City              State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_See attached labeled "Fact"_

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

~~Emotional~~ Financial, Social, And Emotional destress.

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

See Attach labeled "Relief"

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 4/25/18 | Porfedrich.C. P. I-308 |
|---|---|
| Dated | Plaintiff's Signature |

| Caze | D | Thomas |
|---|---|---|
| First Name | Middle Initial | Last Name |

C/o 65-45 Parsons Blvd #1M
Street Address

| Fresh Meadows | NY | Domestic Republic |
|---|---|---|
| County, City | State | Zip Code |

(347) 262-3434          Thomasineelectric@Yahoo.Com
Telephone Number                 Email Address (if available)

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☒ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Facts"

harrassment including but not limited to harrassment based on gender and sexual orientation as well as retaliation, Deformation of Character, illegally disclosing private vital Record information Slander, wrongful termination, Falsifying legal documents, Abuse of power and neglect of duties, And Conspiracy including and in addition to any and all other laws, Regulations, and Statutes that may apply against the Abuse and offenses that were done to the Complaintant.

Also, Allowing an Electrical Company who has no jurisdiction or proper Authority to take Control and command of the security headquaters of 2 Broadway NY, NY 10004.

1 of 3

"Relief"

Reverse the Decision made by the Dept of
EEOC, apply and enforce The False Claim
Act, 31 U.S.U. 3729-3733, and all laws
Pertaining to harrassment including but
not limited to harrassment based on gender
and sexual orientation, as well as Retailiation,
Deformation of Character, illegally disclosing
vital records information, Slander, wrongful
termination, Falsifying legal documents,
Abuse of power and neglect of duties, and
Conspiracy including and in addition to any
and All other laws, regulations, and statutes that
may apply against the abuse and offense
that were done to the Complaintant in
this case.

"Relief"

Remove Any and All Restrictions that would prevent the Complaintant from being Allowed to enter 2 Broadway to conduct business, Personal, And or other matters, without uncivil, and unwarranted hinderance.

Grant the complaintant the FAIR opportunity to take advantage of the procurement procedures And programs that the MTA is offering new contractors... Should one day the complaintant decide to apply to fulfil the Complaintants Childhood dream of becoming An Electrical Contractor.

A Sincere public Apology from All parties.

The letters of public Apology from the MTA [ Along with the photo of complaintant in which the MTA previously used to publicly humiliate and Falsely Accuse the Complaintant ] Are to be posted in all the locations where the offending post were posted throughout the property of 2 Broadway NY, NY 10004.

3 OF 3

"Relief"

Reinstate the employment of any and all security Personel and Elevator operators of 2 Broadway NYC after 4/13/17, who may have lost their employment after 15 yrs + of service; After of bearing witness to the truth in the complaintants defense. They too are victims.

Apply and enforce all safety, security, and surveillance measures that would be appropirate for the security Risk level of the 2 Broadway NY, NY 10004

Investigate all cases handled by investigator Mr. Purelli of the Dept of Human Rights.

Instate a person with a title and position who is knowledgable, Properly trained, and Quatizied to handle the sensitivity of the security Ideal for the nature of operations throughout the building 2 Broadway NY, NY 10004.

Award the maximum amount Requested in demand to the Complaintant for being victimized and subjected to each and every offense and violation in this case, which cause(s) and effect(s) Result(ed/s) in trauma, grief, Isolation, and obstructions in the Complaintants Career and pursuit of happiness.

The Defendants failed to reconize and admit discrimination, Abuse, and violations of the law, in order to favor and protect All offending parties. In doing so, The State Department of Human Rights gives an unjust determination against the plantiff. This is an act that operates outside of the law, in which they have a dutie to abide by and uphobl. This is an obstruction of Justice At the expense of the distressed victim, the Plantiff, And position him into having to defend himself against and withstand the unwarrented attacks that has been confessed yet ignored by those who are numb to their own abuse. Their actions were arbitrary and capricious, and or lacked Rational basis.

On July 19th 2018, Judge Joan Madden of The Supreme Court of the State of New York, Countey of New York expressed favoring the decision of allowing the State Department of Human Rights to Remand the case, However the parties involved has not recieved her written decision. The State Department of Human Rights is the party/office of which The Equal Opportunity Employer adopted their decision.

Within these documents are such that has been presented to entities that refer to each party differently than they would be refered to as in this present court. To avoid confusion and give clarificatication, the following exphination is given:

Where these documents mention the abrieviation (SDHR) they are reffering to The Respondant, The State Department of Human Rights, Which is a Defendant in this court.

Where these documents mention The Respondant Five Star / Five Star Electric Corp, they are reffering to the Defendant Five Star Electric Corp.

Where these document mention The Respondant(s), they are Reffering to The Defendant(s)

Where these documents mention The Complaintant, and petitioner, it is reffering to The Plantiff.

Where these documents mention the nouns of "I", "me", and "my", it is reffering to The Plantiff. Who is representing himself pro Sé.

Facts"

harrassment including but not limited to
harrassment based on gender and Sexual orientation
as well as retaliation, Deformation of Character,
illegally disclosing private vital Record information
Slander, wrongful termination, Falsifying legal
documents, Abuse of power and neglect of
duties, And Conspiracy including and in addition
to Any and all other laws, Regulations, And
Statutes that may apply against the Abuse
and offenses that were done to the
Complaintant.

Also, Allowing an Electrical Company who has
no Jurisdiction or proper Authority to take
Control and command of the security headquaters
of 2 Broadway NY, NY 10004.

1 of 3

"Relief"

Reverse the Decision made by the Dept of EEOC, apply and enforce The False Claim Act, 31 U.S.U. 3729-3753, And all laws Pertaining to harrassment including but not limited to harrassment based on gender and sexual orientation, as well as Retailiation, Deformation of Character, illegally disclosing vital records information, Slander, wrongful termination, Falsifying legal documents, Abuse of power and neglect of duties, And Conspiracy including and in addition to any and all other laws, regulations, and statutes that may apply against the abuse and offense that were done to the Complaintant in this case.

"Relief"

Remove Any and All restrictions that would prevent the Complaintant from being Allowed to enter 2 Broadway to conduct business, personal, And or other matters, without uncivil, and unwarranted hinderance.

Grant the complaintaht the FAIR opportunity to take advantage of the procurement procedures And programs that the MTA is offering new contractors... Should one day the complaintant decide to apply to fulfil the Complaintants Childhood dream of becoming An Electrical contractor.

A Sincere public apology from All parties.

The letters of public apology From the MTA [Along with the photo of complaintant in which the MTA previously used to publicly humiliate and Falsely Accuse the Complaintant] Are to be posted in all the locations where the offending post were posted throughout the property of 2 Broadway NY, NY 10004.

"Relief"

Reinstate the employment of Any and all security Personel And Elevator operators of 2 Broadway NYC after 4/13/17, who may have lost their employment after 15 yrs + of service; After of bearing witness to the truth in the Complaintants defense. They too are victims.

Apply and enforce all Safety, Security, and surveillance measures that would be Appropriate For the Security Risk level of the 2 Broadway NY, NY 10004

Investigate all cases handled by investigator Mr. Purelli of the Dept of Human Rights.

Instate a person with a title and position who is Knowlegdable, Properly trained, and Quatified to handle the sensitivity of the security Ideal For the nature of operations throughout the building 2 Broadway NY, NY 10004.

Award the maximum amount Requested in demand to the Complaintant For being victimized and Subjected to each and every offense and violation in this case, which Cause(s) And effect(s) Result(ed(s) in trauma, grief, Isolation, and obstructions in the Complaintant's Career and pursuit of happiness.

SUPREME COURT:  STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------X
In the Matter of the Application of

CAZE D. THOMAS,

                Petitioner,

           -against-

FIVE STAR ELECTRIC CO.,
NEW YORK DEPT. OF HUMAN RIGHTS,

           Respondents.

---------------------------------------------------------X

ANSWER

Index No.: 0100141/2018

Madden, J.

Return date:
May 1, 2018

        The Respondent STATE DIVISION OF HUMAN RIGHTS (hereinafter "Division"), CAROLINE J. DOWNEY, General Counsel, answering the Petition alleges:

    1.    Admits that the Division issued a Determination and Order After Investigation that found "No Probable Cause to believe that respondent has engaged or is engaging in the unlawful discriminatory practice complained of." See Determination and Order After Investigation dated December 5, 2017, along with the Final Investigation Report and Basis of Determination (hereafter "FIRABOD"), attached as Exhibit A.

## REQUEST FOR REMAND

2.    Petitioner filed a complaint with this agency on June 1, 2017 against

Five Star (hereafter "Star"), alleging unlawful discriminatory practices in relation to

employment because of his sex, sexual orientation, opposed

discrimination/retaliation.

3.    Petitioner alleged in his administrative complaint that

rumors and lies were spread about him to his coworkers and building

employees of the MTA building at 2 Broadway, NY, NY, where "Star" assigned

him to work, because of his sex and sexual orientation.  According to his

complaint, Petitioner "was lied on and falsely accused of causing safety hazards,

disturbances, and making violent threats when he actually sought and executed all

possible safety methods, walked away and stayed to himself as much as possible to

avoid any and all confrontations that were being provoked by supervision and

other employees because of their hate/dislike for his presence because he was of

transgender experience."

(FIRABOD, p.1, attached as Exhibit A).

4.     In his rebuttal to the Division, Petitioner:

.... relates two instances where he overheard people talking about him while they were not aware [Petitioner] was listening. In one instance, he overheard Valerio refer to [Petitioner] as "a female" in a conversation with a male elevator operator. He then states that after this incident building workers started referring to him as a female and asking him if he was a man or a woman. He then realized that whenever he walked into the shanty, the guys would be quiet and started acting differently towards him.

(FIRABOD, p.9, attached as Exhibit A).

5.     On December 5, 2017, the Division dismissed his complaint for lack of probable cause.  Petitioner then brought a petition for judicial review of the Division No Probable Cause Determination with this Court.

6.     Upon review of the administrative record in the instant matter, the Division's Legal Bureau has concluded that the Regional Director's determination of no probable cause should be reopened.  The Division respectfully requests that this Court remand this case to the Division for further proceedings.

7.     9 N.Y.C.R.R. §465.20(a)(2) of the Division's Rules of Practice provides:

No case shall be reopened where an appeal has been taken to court from an order dismissing a case for lack of probable cause or lack of jurisdiction.  However, the division may request the court to remand such a case for good cause.

3

8.    A review of the record reveals that there are outstanding material issues of fact.  These issues include, but are not limited to, whether Petitioner was treated differently with respect to disciplinary actions or subjected to a hostile work environment because of his sex and sexual orientation or terminated in retaliation for his complaint to Star's Foreman about the hostile work environment he was experiencing.

9.    The Division wishes to explore whether Petitioner was discriminated against because he is transgender.  According to the Division's regulations, "the term 'sex' when used in the Human Rights Law includes gender identity and the status of being transgender." 9 N.Y.C.R.R. §466.13(c)(1).  In addition, discrimination on the basis of gender dysphoria, "a recognized medical condition related to an individual having a gender identity different from the sex assigned at birth," 9 N.Y.C.R.R. §466.13(b)(3), constitutes disability discrimination under the Human Rights Law.  9 N.Y.C.R.R. §466.13(c).

10.    In *Richards v. U.S. Tennis Association*, 93 Misc.2d 713, 400 N.Y.S.2d 267 (Sup. Ct., New York Co. 1977), the New York County Supreme Court recognized that sex discrimination claims under the Human Rights Law may be brought by individuals alleging discrimination because of their gender identity. Following *Richards*, this Court in *Maffei v. Koleaton Industry,* 164 Misc.2d 547,

626 N.Y.S.2d 391 (Sup. Ct. New York Co. 1995), held that an employee who has transitioned to a different gender identity at work and is harassed because of her transition has a claim for sexual harassment. *Id.* at 556.

11.    Concluding that no probable cause existed to believe that Five Star did not violate the Human Rights Law, the Division's Regional Director may have overlooked or may have not given full consideration to these issues.

12.    Although the Division does not admit error in the handling of Petitioner's complaint, the Division believes that the need for further consideration of the issues that the Regional Director may have overlooked or not fully analyzed during the investigation constitutes good cause for the remand of this case to this agency.

13.    In accordance with EXEC. LAW §298, the Division submits for filing, along with this answer, a certified transcript of the record of all prior proceedings.

WHEREFORE, the Division respectfully requests that this Court remand the

case to the Division for further proceedings in accordance with 9 N.Y.C.R.R.

§465.20(a)(2) of this agency's Rules of Practice, and grant such other and further

relief that this Court deems just and proper.

Dated:  Bronx, New York
         April 19, 2018


                          Yours, etc.

                          CAROLINE J. DOWNEY
                          General Counsel
                          STATE DIVISION OF HUMAN RIGHTS
                          One Fordham Plaza
                          Bronx, New York 10458
                          Tel. No.: 718-741-8396

                          By: _____
                              MARILYN BALCACER, of Counsel

MARILYN BALCACER, above-named, being an attorney admitted to practice in the State of New York and associated with the General Counsel for the State Division of Human Rights, the Respondent in the within proceeding, affirms subject to the penalty of perjury that she has read and knows the contents of the Verified Answer, that the same is true to her own knowledge, except as to matters therein she states to be alleged on information and belief, and that, as to those matters, she believes them to be true.

Dated: Bronx, New York
       April 19, 2018

MARILYN BALCACER

# NEW YORK STATE

# DIVISION OF HUMAN RIGHTS

TO:   Files

FROM:  Joyce Yearwood-Drury
       Director O.S.H.I.

REGION:  O.S.H.I.

DATE: Ocotber 25, 2017

SDHR CASE NO: 10188276-17-E-SOI-E

Federal Charge No. 16GB702949

SUBJECT:   Caze Thomas v. Five Star Electrical Co., Jeff Thurston, Daniel Greci, Felix
           Valerio

## FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

### I.    CASE SUMMARY

This is a verified complaint, filed by Complainant, Caze Thomas, on Thu 6/1/2017. The Complainant who is a male heterosexual, charges the Respondents with unlawful discriminatory practices in relation to employment because of sex, sexual orientation, opposed discrimination/retaliation.

### II.   SUMMARY OF INVESTIGATION

Complainant's Position:

Complainant states rumors and lies were spread about him to his coworkers and other building employees of the MTA building at 2 Broadway, NY, NY, because of his assumed sexual gender and sexual orientation.

Complaint was lied on and falsely accused of causing safety hazards, disturbances, and making violent threats when he actually sought and executed all possible safety methods, walked away and stayed to himself as much as possible to avoid any and all confrontations that were being provoked by supervision and other employees because of their hate/dislike for his presence because he was of transgender experience.

Complainant was given a warning for being late twice and absent once, while several of his coworkers were absent 3 days or more and late as well. They received no form of disciplinary action. Included in the warning Complainant was given was for leaving work early when in fact he was directed to by the general foreman so that he could take care of a clerical error regarding his union dues.

Complainant states that after being falsely accused of threatening a coworker, he went to the MTA Head Security Office. He was redirected to the building manager. After he explained to

both parties that he had an issue with an employer [sic] and that he would like a point of contact so that his shop steward could request to view security surveillance and building entry records to prove his innocence and facts and matters of truth that he was being discriminated against, he was ignored and redirected to his offending employer. This was allowed by the retaliation of the wrongful termination he received.

The plot against Complainant was to deformate [sic] his character, to sabotage his work assignments, and to label him as incompetent, unsafe and violent.

After his grievance appeal, the termination was deemed "not justified" by his Union. However, the employer continued to lie in their reports to the Dep't of Labor, and after the investigation, they too determined that the wrongful termination was "not justified."

Respondents' Position:

Respondents state Five Star is the largest union electrical contractor in the City of New York, currently employing approximately 1,300 employees, including 955 electricians. All electricians employed by Five Star are members of Local Union #3, IBEW ("Local 3").

Respondent Jeff Thurston is employed by Five Star as an Assistant Superintendent and manages the field labor assigned to eight (8) projects, including the electrical maintenance work for the headquarters of the Metropolitan Transportation Authority located at 2 Broadway in downtown Manhattan, New York, performed by electricians classified as A journeypersons (the "MTA Maintenance/2 Broadway Project") and electricians classified as members of the building maintenance (DBM) division. The field labor for each project is directly supervised by either a General Foreman or Foreman or, in some instances, both.

Respondent Daniel Greci is employed by Five Star as a General Foreman, assigned to the MTA Maintenance/2 Broadway Project and supervises approximately twelve (12) electricians who perform a variety of work. Mr. Greci has been employed by Five Star for 2.5 years; previously, Mr. Greci worked for another Local 3 electrical contractor for 16 years. He has over 20 years of experience in the electrical industry. Mr. Greci reports to Mr. Thurston.

Respondent Felix Valerio is employed by Five Star as a Foreman, assigned to the MTA Maintenance/2 Broadway Project and supervises approximately eleven (11) electricians who perform work on the project. Mr. Valerio has been employed by Five Star for 3 years; previously, Mr. Valerio worked for another Local 3 electrical contractor for 17 years. He has over 20 years of experience in the electrical industry. Mr. Valerio reports to Mr. Greci.

On or about February 27, 2017, Complainant, an electrician, was assigned to work at Five Star by the Employment Department of the Joint Industry Board of the Electrical Industry ("JIB") which, among other things, facilitates the placement of unemployed members of Local 3 with union-affiliated contractors such as Five Star. Complainant was directed by Five Star to report to the MTA Maintenance/2 Broadway Project. At the time he was hired, he received and acknowledged various policies provided by Five Star, including the company's Harassment, Discrimination and Retaliation Prevention Policy. (See Rp. Exh. 1.)

Respondents state during his second day working on the MTA Maintenance/2 Broadway Project (February 28, 2017), Complainant complained to Mr. Valerio that he could do better quality work than his assigned co-worker Andrew Bianco, a 35 year plus veteran of the electrical industry, and did not need to be teamed with anyone. In response, Mr. Valerio explained to Complainant that Five Star electricians work together as a team to perform their work on the project. Later that same week, on March 2, 2017, Complainant was assigned to work with Michael Messineo, a 10 year plus veteran of the electrical industry, terminating wires in a power panel in the elevator machine room in the basement of 2 Broadway. While working around energized panels, Complainant inexplicably began to sprinkle what he said was "holy water" around the power panel area, stating that he felt "strange spirits" in the room and that the "holy water" would address the issue. Following this incident, Mr. Valerio reminded him that sprinkling any liquid around energized power panels was unsafe to both himself and his coworker and directed him not to do so again.

At the beginning of his second week on the project (March 6, 2017), Complainant called Mr. Greci and advised that he would be late to work (scheduled starting time on the project is 7:00am) due to a home maintenance issue. After Mr. Greci followed up with Complainant to determine his whereabouts around 9:00am, Complainant told Mr. Greci that he would not be reporting to work until after 9:30am. Because the express terms of the Collective Bargaining Agreement prohibit an employee from starting the day more than one hour late (See Rp. Exh. 2), Mr. Greci so advised Complainant, who was marked as absent (unscheduled) for the day.

The following day, March 7, 2017, Complainant was assigned to work with Vincent Springvloed, a 15 year plus veteran of the electrical industry. After Mr. Springvloed asked Complainant to get certain materials to complete their work, Complainant became angry and complained to Mr. Valerio (literally screaming in his face) that he felt like Mr. Springvloed was treating him like an apprentice. Mr. Valerio then spoke with both electricians to diffuse the situation so that they could move forward and complete their work together as a team.

During the third week of Complainant's employment, on March 15, 2017, Mr. Valerio received a report via telephone from 2 Broadway building personnel that Complainant was cursing and screaming at his assigned co-worker, a second year apprentice, Marcin Sanik, who had just been assigned to the project. Mr. Valerio went to the basement location where they were working and spoke with both employees. Complainant told Mr. Valerio that he was offended by the second year apprentice asking so many questions about how to perform the work assigned to them. Mr. Sanik explained in a written statement (See Rp. Exh. 3) that he was curious to learn more about the conduit installation they were performing, so he asked Complainant questions regarding the process which he refused to answer. Mr. Sanik further explained that Complainant later began screaming at him and accused him of harassing Complainant by asking too many questions about the electrical work they were performing.

Two days later, on Friday, March 17, 2017, Complainant arrived approximately one hour late without any explanation.

Respondents state that during the fourth week of Complainant's employment, on Tuesday,

March 21, 2017, Mr. Valerio was notified of another incident regarding Complainant involving a co-worker, Lev Shnitkind, a 17 year veteran of the electrical industry. After Complainant and Mr. Shnitkind had pulled cables in conduit from a power panel to receptacle boxes, Mr. Shnitkind sought to assist Complainant in putting the power panel covers back on by holding the corners to make it easier for Complainant to reinsert the screws. Complainant told Mr. Shnitkind that he did not need his assistance, to which Mr. Shnitkind responded that it was safer to perform the task together as a team. In response, Complainant became angry and demanded that Mr. Shnitkind leave the room, repeating that he did not need anyone's assistance. Yet again, Mr. Valerio spoke with both electricians to diffuse the situation, explaining to Complainant that the electricians at 2 Broadway work together as a team, especially when confronted with a task that presents a safety issue such as screwing back on covers to energized power panels.

Later that same day, Complainant asked Mr. Greci if he could leave work early (scheduled quitting time on the project is 2:30pm) to attend a voluntary class being offered at the Electrical Industry Training Center in Long Island City. Mr. Greci granted his request without docking him any time. Three days later, on Friday, March 24, 2017, Complainant again arrived approximately one hour late to work with the excuse that the daylight savings time change — which took place on March 12, 2017— caused him to wake up late. Mr. Greci gave him a verbal warning regarding his repeated late arrivals at work and docked him one hour of time.

During the fifth week of his employment, on Tuesday, March 28, 2017, Complainant again asked Mr. Greci if he could leave work early to attend a voluntary class being offered at the Electrical Industry Training Center. In response to Mr. Greci's question whether this would be the last such request, Complainant informed Mr. Greci that it would not be because the voluntary class he wanted to take would take two years to complete. Mr. Greci then informed him that he would have to dock him time for leaving early that day and that if he arrived late or left early again, he would have to terminate him for failure to adhere to the hours of work. Complainant became angry and began yelling at Mr. Greci. He then left the shanty and returned a few minutes later, shouting across the room to Mr. Greci that he would not be leaving early that day.

Later that week, on March 31, 2017, Mr. Valerio witnessed Complainant performing work in an unsafe manner and instructed him on the proper tool and method to use. Specifically, rather than use an available compass saw to cut a hole in sheetrock to install new receptacles, Complainant was using a drill bit to poke small holes in the sheetrock and then connecting the holes by using a sawzall blade (detached from the reciprocating saw) to cut the sheetrock by hand. Complainant respondent to Mr. Valerio that he was getting the job done and it did not matter how he did so.

Respondents state that twice a year, each member of Local 3 is required to pay their union dues for the upcoming six-month period. Upon payment, Local 3 then issues a new union card to each member which is valid for the next six months. At the beginning of April 2017 (the beginning of one of the six month periods), after repeated reminders to the electricians during March 2017, Mr. Greci checked the union card status of each of the electricians supervised by him on the MTA Maintenance/2 Broadway Project. When Mr. Greci asked Complainant on April 3, 2017 (the first work day of the month) to see his new union card, Complainant did not have one in his possession, nor did he have a receipt from the union hall verifying payment of his dues (which would have been acceptable proof of dues payment in lieu of possessing a valid card). As an

- 4 -

accommodation, Mr. Greci called the union hall to determine whether they had a record of receiving the required dues payment from Complainant. After considerable delay, Mr. Greci was told that Local 3 did not have a record of receiving payment from Complainant. At that point, per the direction of Mr. Thurston, Mr. Greci released Complainant for the day with the direction to come back the following day with either a valid union card or receipt of payment of his dues, or he could not begin work. When Complainant appeared at 2 Broadway the following day, April 4, 2017, without either a valid union card or a dues payment receipt, Mr. Greci did not start him and sent him home, marking him absent (unscheduled) for the day.

On April 5, 2017, Complainant reported to 2 Broadway with a valid union card and was permitted to work. At that time, given his repeated unscheduled absences (March 6, April 4), late arrivals (March 17 and 24) and early departure (April 3) over the six weeks of his employment, Mr. Greci gave him a written warning on a form provided by the JIB's Employment Department (see Rp. Exh. 4) as provided for by the Working Rules of the Collective Bargaining Agreement (see Rp. Exh. 5). Complainant became angry, began shouting at Mr. Greci and refused to sign the form to acknowledge its receipt. He then stormed out of Mr. Greci's office and continued shouting as he left. Mr. Valerio was present for the meeting and signed the warning form as a witness.

Respondents state that the following week, on April 13, 2017, Complainant, Mr. Sanik and another electrician, Michael Messineo, were working together in the mechanical room on the 31st Floor of 2 Broadway. Complainant directed Mr. Sanik (a second year apprentice) to climb a ladder to perform a work task on top of live switchgear, a device used for opening and closing electric circuits, especially those that pass high currents. Given the height and the energized nature of the equipment (see Rp. Exh. 6), as well as his relative inexperience, Mr. Sanik did not feel comfortable performing the task and told Complainant that he did not feel safe doing it. Complainant responded by telling Mr. Sanik that an apprentice is supposed to follow the direction of the journeyman electrician with whom he is working, which led to an argument between Complainant and Mr. Sanik. Complainant then exhibited what Mr. Sanik described as "road-rage" type behavior, bouncing around like a boxer and challenging him to a fight, asking him if he wanted "to take it to the 'hood'". Mr. Valerio happened to be in the area and, after hearing the argument, he intervened to diffuse the situation. Mr. Valerio then brought both electricians up to speak with Mr. Greci, who was leaving the shanty to attend a job meeting. Mr. Greci spoke with both men, then sent Mr. Sanik downstairs to accept a delivery of materials.

After completing his task of accepting the material delivery, Mr. Sanik saw Complainant on the first floor near the freight elevator. Also present at the time were two Five Star electricians working on the MTA DBM/2 Broadway Project, Ronald Shatilla and Patrick Deenihan. According to Mr. Sanik, Complainant appeared angry, was breathing heavy and was staring at him. Mr. Sanik asked Complainant why he was staring at him and commented that it looked like Complainant wanted to hurt or kill him. In response, Complainant told him, "if I wanted to kill you, I would kill you." At that point, Mr. Shatilla intervened to diffuse the situation. Complainant continued to stare at Mr. Sanik and make threats to him after they entered the elevator, stating that "this kid is going to make me punch him."

Respondents state Complainant then left his work area and went to the MTA's Security Office at

2 Broadway to ask about access to the building's turnstile access records and whether the building's security cameras have audio capabilities. Finding the requests odd, the MTA Security Officer asked him if he had discussed these issues with his boss, Mr. Greci. Complainant ignored the question and then asked for the identity and location of the Building Manager. He then proceeded to the Building Manager's office to ask for the same information. At this point, a representative of the Building Manager, Michael Brady, pulled Mr. Greci out of his job meeting to advise him that Complainant was seeking details about the building's security features. Mr. Greci then contacted Mr. Valerio to inquire about Complainant's disruptive conduct.

Shortly thereafter, Mr. Valerio, Complainant and Mr. Sanik went to Mr. Greci's office to address the ongoing situation between Complainant and Mr. Sanik. (By this time, Mr. Greci had been notified by the MTA Security Office about Complainant's request for building security information.) Complainant angrily told Mr. Greci that he felt like Mr. Sanik was disrespecting him by not following his directives and constantly asking questions. Mr. Sanik told Mr. Greci that he was very upset with the situation and broke down in tears. He stated that he believed Complainant had anger issues, and that Complainant constantly screamed at him, demeaned him and threatened him. Mr. Sanik then provided a written statement regarding the day's events (see Rp. Exh. 7), including details about the threat made by Complainant. (A written witness statement signed by Mr. Shatilla supports Mr. Sanik's version of the events; see Exh. 8.)

At this point, Mr. Greci telephoned his supervisor Mr. Thurston to advise him of the situation. Upon his arrival, Mr. Thurston met with Complainant and terminated him for cause. Mr. Valerio then escorted Complainant from the building. A termination slip was prepared by Five Star's Superintendent's Office on the standard form issued by JIB's Employment Department (see Rp. Exh. 9), listing the reason for Complainant's termination for cause ("disruptive to job") along with the other issues involving him which preceded his termination ("lateness", "absenteeism", "leaves job early", "insubordination").

Prior to his termination on April 13, 2017, Complainant never reported to Mr. Thurston, Mr. Greci or Mr. Valerio any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience".

On the date of his termination, April 13, 2017, Complainant filed a grievance with Local 3, followed by a hearing held on April 17, 2017. During his approximately 45 minute presentation at the hearing, Complainant did not testify about any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience". Rather, he testified about a single incident in which a female elevator operator employed by a contractor hired by the MTA asked him whether he was a man or a woman.

Respondents state that by letter dated April 18, 2017 (See Rp. Exh. 10), Local 3's Grievance Committee determined Complainant's termination to be "justified." Complainant appealed that determination to Local 3's Grievance Appeal Committee, which held a hearing on May 9, 2017. No representative from Five Star attended the appeal. In a one-sentence letter dated April 25, 2017 (obviously a typographical error) and mailed on May 11, 2017 (see Rp. Exh. 11), Local 3's Grievance Appeal Committee reversed the Grievance Committee's determination and found that Complainant's termination was "not justified." Five Star was later advised by Local 3 that the

determination was reversed on a "technicality", namely, the April 13 termination slip issued to Complainant listed more issues than the April 5 warning slip issued to Complainant (even though the issues set forth on the April 5 warning slip did not form the basis for his termination for cause on April 13).

To rectify this "technicality" and provide more details regarding the basis for the termination, Five Star reissued a termination slip for Complainant about June 29, 2017, stating the reason for termination as "disruptive to job by harassing and threatening the wellbeing of a fellow employee (Apprentice) which is in violation of Five Star Company Policy" (see Rp. Exh. 12).

On May 10, 2017, Five Star completed the questionnaire regarding Complainant's eligibility for unemployment benefits and returned it to the New York State Department of Labor, Unemployment Insurance Division ("DOL"). This was between the issuance of Local 3 's grievance determination that the termination was justified (on or about April 18, 2017) and Local 3 's grievance appeal determination that the termination was not justified (on or about May 11, 2017). During a subsequent telephone call between Five Star and DOL, Five Star advised DOL about the outcome of the Local 3 grievance appeal.

Despite receiving a written witness statement from Mr. Sanik stating that Complainant threatened to harm or kill him, on May 24, 2017, DOL found that Complainant was eligible for benefits because Mr. Sanik's firsthand statement somehow did "not refute" Complainant's "firsthand" statement that he did not threaten to kill his coworker, but rather made a "sarcastic comment" in response to his co-worker's comment. (See Rp. Exh. 14.)

Respondents state that without citing a single specific fact to support his assertions, Complainant generally alleges that Respondents engaged in unlawful discriminatory practices relating to his employment based on his sex and sexual orientation. According to his complaint, he is a heterosexual male who "was perceived as being homosexual." He further alleges, again without citing any specific facts, that he was harassed and "discriminated against for being of transgendered experience". He also alleges generally that he was harassed or intimidated by Respondents (unrelated to sexual harassment).

Complainant further alleges that Respondents engaged in unlawful discriminatory practices by retaliating against him for asking the MTA's Security Office for a "point of contact" so a "Shop Steward could review surveillance" footage. Last, he alleges that he was discriminated against by receiving a disciplinary notice or negative performance evaluation and by being terminated.

Respondents state that in contrast, as set forth above, they have provided specific factual details concerning Complainant's unsafe work practices; repeated failures to adhere to the hours of work by showing up late, leaving early, or taking unscheduled absences; insubordinate conduct; and disruptive conduct including leaving his work area and disturbing clients, culminating in his threat to hurt or kill a co-worker. Each of the specific facts refutes Complainant's general allegations, which should be taken for what they are — convenient, after-the-fact, excuses that have no substance or validity.

Complainant's general, non-specific allegation that "rumors and lies were spread about me to my

co-workers and other building employees [] because of my assumed sexual gender and sexual orientation" fails to demonstrate that Five Star or any of its employees, including Mr. Thurston, Mr. Greci or Mr. Valerio, engaged in or condoned such conduct.

Similarly, Complainant's general, non-specific allegation that Five Star "supervision and other employees" deliberately provoked confrontations with him "because of their hate/dislike for [his] presence because [he] was of transgendered experience" is not supported by any specific facts and is belied by the detailed facts set forth above which demonstrate that he repeatedly worked in an manner unsafe to both himself and his coworkers, that he repeatedly caused disturbances by arguing with his co-workers and that he threatened the life of a co-worker. Indeed, the detailed facts provided by Respondents directly refute his bald assertion that he "actually sought and executed all possible proper safety methods." and "walked away and stayed to [himself] as much as possible to avoid any and all confrontation."

After acknowledging the facts that he reported to work late, left work early and was absent, Complainant proceeds to argue that those undisputed facts —each of which are a valid basis to receive a written warning — somehow make the written warning he received discriminatory. The fact that Complainant was directed to leave work because he failed to present evidence of payment of his required union dues does not convert his absence from work that day to a scheduled or excused absence. Moreover, he fails to present any factual details about the "several" co-workers he alleges were either absent (presumably unscheduled) or late without consequences.

Complainant again acknowledges the undisputed fact that he left his work area during work hours to pursue a personal issue with the MTA Security Office and Building Manager, then claims they both "ignored" him and directed him to speak with his employer. *The investigator ___ ignores the fact that the Respondent mocks and Reduce the matter to a "personal issue" while ___ by False Aligations A life was threatened In the building & 2 Braodia where the entire by Subway System could be controled from.* Last, although DOL apparently accepted Complainant's assertion that he did not threaten to kill his co-worker and only made a "sarcastic comment" in a response to his co-worker's statement, employers these days sadly don't have the luxury of dismissing those type comments with such ease. The recent tragic killing at Bronx Lebanon Hospital in The Bronx, New York, is the latest in a long-string of workplace incidents throughout the country involving a former employee returning to kill or injure his former coworkers. Based on the statements made by Five Star employees about his threat to his co-worker Mr. Sanik, along with his aggressive behavior on that day, Five Star was fully within its rights to terminate Complainant's employment for cause immediately and without warning.

Investigator's Observations:

In his rebuttal, Complainant denies he had issues with the apprentice, Marcin Sanik, asking Complainant question but states that there was tension between them, i.e. apprentice Sanik's attitude "remained disgruntled" throughout each assignment Complainant gave him after they had an exchange about the way offsets were installed. Complainant states that when he decided not to use Sanik's suggestions, Sanik's attitude got worse and that Complainant had told him several times to go to Mr. Valerio because Complainant had had enough of Sanik's tantrum.

Complainant also relates there was a back and forth between him and Greci over Complainant wanting to leave early to attend voluntary classes. He states that Greci initially agreed but then changed his mind and told Complainant that he would dock him if he left early. Complainant also accepts he did go to work later one day but that his alarm did not go off on time when daylight savings time changed. He states that Greci was "disinterested" in checking with Complainant's cellphone carrier to learn that the carrier had a tower down which caused the delay to work that day for Complainant.

While Complainant denies he told Sanik to work on top of a panel, he states he did imply that Sanik could easily reach it to tighten the screws being that Sanik stood at almost 7 feet tall and Complainant at 5 feet 3.5 inches. He states that Sanik's response was "disrespectful" and "insubordinate," using profanity and saying to Complainant that he was not going to do anything Complainant said. He states that Valerio ignored Sanik's yelling and only asked Complainant why Complainant was yelling. Greci then told both of them to keep a distance from each other. Complainant next states that as he was waiting for the freight elevator, Sanik reentered the building and began staring at Complainant and came into Complainant's "personal space unnecessarily." Complainant looked back at him; Sanik asked him why was he staring at Sanik and Complainant replied why he was staring at Complainant. Sanik then told him that he looked as if he wanted to kill Sanik, to which Complainant replied, "figuratively speaking," "if I wanted to kill you, you would already be dead, and there you stand alive and well."

Complainant states that he did go to security of the building to find out where he can get video and audio records to prove his innocence over the conflict with Sanik. Complainant was "alarmed" when the security, who was not his employer, upon Complainant's request, directed Complainant to go to his employer "instead of adhering to the safety of every person throughout the building they were obligated to secure." He states that the security of the building failed to investigate and falsely accused Complainant and posted Complainant's name and picture throughout the building, labeling him as a threat.

Complainant stated that the Division should not dismiss the possibility that Ronald Shantilla's statement that support Marcin Sanik's statement of events was forged. The Respondent clarified that the statement was written by Greci and signed by Shantilla. *Doesn't confirm with Mr. Shantilla*

In his rebuttal, Complainant relates two instances where he overheard people talking about him while they were not aware Complainant was listening. In one instance, he overheard Valerio refer to Complainant as "a female" in a conversation with a male elevator operator. He then states that after this incident building workers started referring to him as a female and asking him if he was a man or a woman. He then realized that whenever he walked into the shanty, the guys would be quiet and started acting differently towards him.

In the second instance, while Complainant sat in the staircase during break one day, again unaware of his presence, two journeymen mentioned Complainant's name directly in their conversation and were talking about how they "caught a glace [sic] of the shirtless guy on [Complainant's] phone screen saver [...], and how the guy must have been [Complainant's] lover [;] neither referred to [Complainant] as a female."

Refer to Entry titled "Remand pgs" 21
Refer to Entry titled "Grievance of Retaliation"

The Division sent a written request to Complainant to relate all the comments and/or behavior of others towards him because of his transgender status. Again, Complainant related the two incidents described above and no other comment and/or behavior.

The Division asked Respondent to address Complainant's rebuttal since in the rebuttal Complainant more fully talks about him being transgender, which was not clear from the initial complaint. Respondent stated that Complainant failed to offer any specific factual support to the alleged unlawful discriminatory practices. Respondent states that Complainant's exhibit 7, "Grievance of Retaliation," provides no specific facts to support his assertion that he made "complaints of harassment, humiliation, discrimination and over supervision [he] experienced."

Complainant stated to the Division that there are no witnesses that could corroborate his allegations of discrimination because his workers protect one another and would not come forth.

The Division requested from Respondent a list of employees in the same work location as Complainant between September 1, 2016 to the present. The Division spoke to Ashley Castro, the only female in the list. She stated that she worked with Respondent over the summer months of 2017 as a helper electrician through a union program for children of union members. She stated she does not know who Complainant is and that she was not working during the time he was there. She stated that the work environment with Respondent was good and that she had no issues with anyone and that she was treated with respect.

The Division also spoke to James Cronin, an electrician who has worked with Respondent for about three years. He stated that he never worked with Complainant but that he had met Complainant about 2-3 times. He described the work environment with Respondent as "very friendly," "all colleagues, no problems." He described Complainant as "not very friendly," that when he first saw Complainant he greeted Complainant but Complainant ignored him. At other times, he stated that Complainant would just come in and not acknowledge Cronin.

The Division also spoke to Andrzej Malinowski who works for Respondent as an electrician for over three years. He described the work environment as "pretty good, probably the best so far." He stated that he has been on the same job as Complainant but never worked with Complainant. He stated that he had never witnesses people making comments or teasing Complainant but that Complainant would get very upset over little things and "looked like a person who was looking for a law suit." He described Complainant as a person who would not talk. He said that others told him that Complainant threatened Marcin Sanik that he would beat him up. He said that everyone laughed at Complainant because Marcin is very tall and Complainant is short. He also said that he has heard Complainant go on a rage, for something not related to anything. He stated that he was not aware Complainant was transgendered but that Complainant "definitely appeared to be female but wanted to be a male." He added that at his work, they come across all kinds of people but that this presents no problems.

Complainant stated to the Division that video and audio recordings at the building he worked at would show that he was innocent and that in fact it was Sanik who kept provoking him. The Division asked Complainant to identify specific recordings and made a request with Respondent. Respondent informed that it does not have any in its possession or control and is not aware of the

existence of any such videos. Respondent stated that Complainant worked at 2 Broadway, the headquarters of the Metropolitan Transportation Authority ("MTA") and that Respondent has no access to or control over any video surveillance being conducted in or around that building.

Complainant stated to the Division that he is thinking of filing a complainant against the MTA. The investigator informed Complainant of the process and emailed him a blank complaint form. Complainant stated that he inquired with the MTA and that he needs to file a FOIL request in order to get the videos and asked that the Division file such a request. The investigator informed him that the Division cannot do that but that he should go ahead and make the request as soon as possible.

During the Division initiated interview, Complainant stated that he underwent transformation from female to male around 2011 and began to introduce himself as a male in 2011. He said that he had worked for Respondent on and off over the years. The time before the last was in 2014.

Submitted by: _____
Rodlind Purrini
Human Rights Specialist I

## III.    BASIS FOR DETERMINATION

Complainant worked for Respondent as an electrician for about six (6) weeks. Complainant is transgender and stated that he was discriminated against because of his sex and sexual orientation (he is heterosexual but was perceived to be homosexual) when rumors and lies were spread about him to his coworkers and other building employees because of his assumed sexual gender and sexual orientation. He said that he was falsely accused of causing safety hazards, disturbances, and making violent threats when he followed all possible safety methods, and avoided all confrontations. He said that he was retaliated against when Respondent fired him because Complainant went to the MTA Head Security Office to ask for a point of contact so that his shop steward could review surveillance that would prove Complainant was innocent regarding the conflict with apprentice Marcin Sanik.

Respondent denied it discriminated against Complainant and stated that Complainant engaged in unsafe work practices, repeatedly failed to adhere to the hours of work by showing up late, leaving early, or taking unscheduled absences; he engaged in insubordinate and disruptive conduct, including leaving his work area and disturbing clients, culminating in his threat to hurt or kill a co-worker. Respondent stated it terminated Complainant's employment for cause immediately following statements made by Respondent employees that Complainant threatened his co-worker Marcin Sanik, along with Complainant's aggressive behavior on that day.

The Division's investigation does not support Complainant was discriminated against because of his sex and/or perceived sexual orientation. In an effort to identify underlying harassing behavior, the Division gave Complainant the opportunity to list all comments and/or behavior of others towards him because of his transgender status. Complainant listed two incidents. The first one was when he overheard Valerio refer to Complainant as a female in a conversation with a male elevator operator; saying to the operator how Valerio does not like Complainant; that he

*This entire Entry/page along with others of the State Dept of Human Rights Investigation and determination is Arbitrary and capricious, And or lack rational basis*

has Complainant work in the basement alone; that Valerio related details of previous disagreements Valerio had with Complainant; and that Valerio told the elevator operator that Complainant's real name was not Caze. Accepting all of the above as true, it does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough. At most, it is gossiping that, although it could very well be in poor taste, it does not rise to the level to abusive workplace environment.

*12(a)*

The other instance Complainant identified is again a scenario where the speakers were not aware Complainant was overhearing them. Two unidentified journeymen were talking about how they caught a glance at Complainant's telephone screen and saw a topless guy who, they said, must be Complainant's lover. Complainant did not identify who these individuals are and it is not clear whether they are even Respondent employees. Complainant stated that one of them sounded like Mr. Messineo. This example, too, does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough.

*12(b)*

During the Division initiated interview, Complainant stated that he was written up for lateness when others were not. As an example, he stated that Messineo missed several days of work consecutively because of dental reasons and was not written up, whereas Complainant missed a day of work because he needed to help his grandmother with her radiator and was written up. Another example Complainant gave was that Carlos Santiago missed at least four consecutive days because he had marital issues and he was not written up,

*12(c)*

Both examples above clearly show that the situations are dissimilar and insufficient to illustrate differential treatment.

*12(d)*

The third example Complainant gave was that Felix Valerio, who is a supervisor, missed work and was not written up. Complainant stated that he knows about this because he was part of *← False Senten-* team. Besides lacking in detail, Complainant and Valerio are not similarly situated employees, thus, an insufficient and inadequate example of differential treatment. *As per Five Star Electric Cor. the rules apply to all employed by the company.*

*12(e)*

Moreover, Respondent provided a list of employees between September 1, 2016 to the present who were disciplined for similar wrongdoings as Complainant[1]. Out of a list of 28 employees, seven (7) had time docket and received verbal warnings, most for leaving work early and one for arriving late.

*12(F)*

Another differential treatment example Complainant gave was regarding the absenteeism over the union card issue. He stated during the interview with the Division that there were other employees who, too, did not have their union card with them but were not sent home. He stated that like all others, Complainant showed Greci the money order receipt in lieu of the union card and Greci called the union about all the guys who presented the money order receipts. Greci then told Complainant to go and take care of the issue with the Union and marked Complainant as absent. That same day Complainant went to the Union who told Complainant that there was a clerical

*12(G)*

---

*12(H)* [1] Respondent provided copies of Complainant's write ups. On April 5, 2017, he was written up for absences, leaving early, and lateness. On April 13, 2017, he was written up for lateness, absences, leaving early, insubordination and disruptive behavior. *Fraudulent document*

error with Complainant's name. Once everything was resolved, Complainant went back to work the next day and told Greci to call the union and that it was all a clerical error. Greci told him that he would not call and sent Complainant home. Complainant stated that he did not know if others who presented money order receipts also had clerical errors.

The example above shows, as Complainant admits, that there was an error occurring on the union's side and cannot be said that Greci was targeting Complainant for some ulterior motive. And thus, is not an example of differential treatment.

As to retaliation, the Division's investigation does not support Complainant's employment was terminated in retaliation for engaging in protected conduct. Complainant alleged that his job was terminated after he asked the MTA building security for a point of contact so that Complainant's shop steward could review video surveillance. This conduct does not constitute protected conduct under New York State Human Rights Law.

Moreover, during the Division initiated interview, Complainant was asked if prior to filing with the Division he complained of discrimination. He stated that he expressed to Greci concerns about discrimination/harassment and that he wanted to speak to a shop steward. He then said that he spoke with Greci on April 5, 2017 (the date Greci wrote him up because of lateness, absences and leaving work early) and told him that he felt harassed and discriminated against because he was over-supervised and treated differently from his peers and punished for things others were not, such as lateness. Respondent denied Complainant has ever made any complaints of discrimination or perceived discrimination. Besides there being no evidence that would support Complainant complained to Greci about being discriminated against, again what he stated that he complained about (Messineo not being written up when he missed work for dental issues; Santiago missing work because of marital problems and not written up; and Complainant being written up because he missed work due to his grandmother's radiator emergency) is not even perceived discrimination. by him and not the law

13(b)

Given the above, the Division's investigation does not support a discrimination occurred in violation of the New York State Human Rights Law.

Reviewed & Approved: _____
Cynthia B. Mendoza-Garcia
Human Rights Specialist II

## IV.   DETERMINATION

Based on the foregoing, I find No Probable Cause to support the allegations of the complaint.

_____
Joyce Yearwood-Drury
Director O.S.H.I.

REMAND

In their rebuttal to The Respondant, The Department of Human Rights; The Respondant, Five Star Electric Corps includes the forged termination slip that they submitted to the local Union # 3.

Amazingly in **exhibit D of the affirmation of Ernest R Smoltzer**. The Respondant, Five Star Electric Corps includes a copy of the very termination **that the forged copy was forged from**, yet they make the bold assertion to deny The Respondant, The Department of Human Rights the request to remand, as if they don't have substantial amount of reason to investigate more thoroughly.

The Respondant, The Department of Human Rights cannot admit to error when they based their decision on the lack of information provided, fraudulent documents given to them as valid, and the vast amount of evidence withheld (Including The Complaintant's/ Plantiff's entire rebuttal) to make a **JUST** determination.

The Complaintant/ Plantiff , Mr. Thomas was not given the opportunity to have his rebuttal submitted to all investigators involved.  The Respondant, Five Star Electric Corps however was given the opportunity to do so again and again.

Mr. Purrini (SDHR Investigator) typed all of The Respondants, Five Star Electric Corp's hand written statements yet he didn't cite The Complaintant/ Plantiff, Mr. Thomas rebuttal once and as of now it looks like he actually threw it away in its entirety.

Had The Complaintant/ Plantiff, Mr. Thomas not filed with the court, he would've never known the existence of Mr. Purrini (SDHR Investigator) reports and or the lack thereof which was included in The Respondant, The Department of Human Rights **ANSWER TO PETITION**. The Complaintant/ Plantiff, Mr. Thomas wasn't given the opportunity to defend himself from all that was hidden from him.

The Complaintant/ Plantiff, Mr. Thomas make no bold assertion in declaring that there was corruption in the investigation. He present to you proof of his complaint. In his statement Mr. Stanik  says that The Complaintant/ Plantiff, Mr. Thomas was bouncing around like a boxer and challenged him to a fight. Mr. Messineo, who sided with Mr. Stanik's lies in order to keep his employment states in his statement that **both journeyman and apprentice ~~argument~~**. Argued

As you can see from the list of disciplinary actions that was given to Mr. Purrini (SDHR Investigator), shows **NO** forms of physical disciplinary actions. Discriminatorily, Mr. Sanik name is absent for causing a disturbance as well.

In the incident and the freight lobby, Mr. Stanik states in his statement that The Complaintant/ Plantiff , Mr. Thomas simply looked at him. He doesn't make any claims to his body language

1

showing any signs of aggression...And  neither does Mr. Shatilla alleged statement. It also **does not express The Complaintant/ Plantiff, Mr. Thomas body language as being aggressive but again simply states that he stared at Mr. Sanik** (please be advised that in order for someone to witness someone else staring at another, they in turn would have to be staring at them themselves. If Looking  back at someone who's looking at you is an offense, than everyone for that matter is guilty.

Once The Complaintant/ Plantiff, Mr. Thomas submitted his rebuttal and told Mr. Purrini (SDHR Investigator) that neither testimony expressed his body language showing aggression, Therefore to imply by saying  that The Complaintant/ Plantiff, Mr. Thomas looked like he wanted to kill him was unnecessary, an was said for the purpose of provoking Mr. Thomas into a confrontation... **especially after he was told not to speak to  The Complaintant/ Plantiff, Mr. Thomas at all by Mr. Greci and Mr. Valerio.**

It wasn't until **after** The Complaintant/ Plantiff, Mr. Thomas pointed this out in his rebuttal and phone call conversations with Mr. Purrini (SDHR Investigator) that **Mr.Purrini** had written in **HIS** reports that The Complaintant/  Plantiff, Mr. Thomas body language expressed anger. (See Mr. Purrini Report in answer to petition) → *Final Investigation Report page 5 —*
*Marcia Sanik's written statement — 16*
*Mr. Shatilla's written statement — 17*

Again, Mr. Sanik confessed speaking to The Complaintant/ Plantiff, Mr. Thomas after he was told not to and was not disciplined for insubordination or harrassment. (list of disip)(see BB)

The Respondent, Five Star Electric Corps confesses that Mr. Purrini (SDHR Investigator) allowed them to rebute The Complaintant/ Plantiff, Mr. Thomas rebuttal by allowing  them to submit another **rebuttal in addition to the "additional information" Mr. Purrini (SDHR Investigator) ask for. (see Mr.Purrini's request)** This was done outside of The Complaintant's/ Plantiff's agreements or permission. *(See Affirmation of Ernest R Smoltzer )(see Additional Rebuttal)*

In a recorded conversation, Mr. Purrini (SDHR Investigator) was very unprofessional and actually tried to get The Complaintant/ Plantiff, Mr. Thomas to agree to a version of events that just were not true. He continued this for at least 15 minutes. After having no success, he then began saying he didn't understand. The Complaintant/ Plantiff, Mr. Thomas then directed him again to read his rebuttal.

Pay attention, Mr. Purrini (SDHR Investigator) never expresses what exactly isn't clear to him, after having received The Complaintant/ Plantiff, Mr. Thomas rebuttal, and why he would ask The Respondent, Five Star Electric Corps to get a better understanding of something The Complaintant/ Plantiff, Mr. Thomas had  wrote. (see request in five star's answer) → *See Attached H*
*See Additional Rebuttal*

This in turn allowed The Respondent, Five Star Electric Corps to add more false information. Mr.Purrini violates The Complaintant/ Plantiff, Mr. Thomas rights by allowing the offending respondents to **arbitrarily** speak for The Complaintant/ Plantiff, Mr. Thomas , **where his**

**rebuttal speaks for itself.**

Ultimately Mr. Purrini (SDHR Investigator) removed 95% of The Complaintant/ Plantiff, Mr. Thomas rebuttal, and replaced it with one written by The Respondant, Five Star Electric Corps, as if it were The Complaintant/ Plantiff, Mr. Thomas's writing and defense, to give the illusion that he had no substantial complaint or defense.

In attempt to be deceitful, both respondent parties state that The Complaintant/ Plantiff, Mr. Thomas  only listed two incidents in an email to blind the reader from the truth.

When The Complaintant/ Plantiff filed his  initial complaint,  The Complaintant/ Plantiff included a **"Grievence of Retailiation"** and also again in The Complaintant's/ Plantiff rebuttal which clearly states **" I was terminated as a result of retaliation for the complaints of harassment, humiliation, discrimination, and over supervision I experienced which was <u>"MOTIVATED BY"</u> the personal dislike /hate of my as soon sexual orientation, and sexual genitalia by certain coworkers with malicious agendas to sabotage my employment . This led to my natural reaction to defend myself in a hostile environment created for me"**. This including all forms of harassment, including but not limited to sexual harassment concerning the nature of gender or sexual orientation, humiliation, discrimination, defamation of character, and over supervision. (See Grievence of Retailiation)

knowing this Mr. Purrini (SDHR Investigator) removed it completely from his reports so that he may arbitrarily, deceitfully, and even illegally make the false claim that I only relayed to him two instances, in which he felt **wasn't severe enough to make.**

The Complaintant/ Plantiff, Mr. Thomas would like the opportunity to ask the General Counsel of the New York State Department of  Human Rights if there is a difference between someone rubbing your genitals, grabbing your genitals, or smacking your genitals, if you purposely rub someone's genitals opposed to smacking them is it not still sexual harassment?

The Respondant, Five Star Electric Corps acknowledge the grievance of retaliation and its contents.  ((SEE. five star answer to remand))(see Five Star's Affermation of Ernest R. Smeltzer)) (see Grievence of Retailiation)

To further express the corruption between Mr. Purrini (SDHR Investigator) and The Respondant, Five Star Electric Corps, both ignored the fact that Mr. Valerio told The Complaintant/ Plantiff , Mr. Thomas directly, that he had to take his partner to the restroom with him and that they were to use the same stall. Niether Respondants addressed the matter. (see Mr.Thomas Rebuttal page 4)

It is The Complaintant's/ Plantiff's, Mr. Thomas belief, that the security guard that was ordered to follow him around every time he went to the bathroom, was fired in an attempt to obstruct justice.

Mr. Purrini (SDHR Investigator) relays The Respondant's, Five Star Electric Corps accusation oF an alleged **holy water** incident, but failed to relay to other investigators that after Mr. Valerio told Mr.Purrini that  The Complainant/ Plantiff, Mr. Thomas was told to take to his partner with him every time he went to the restroom and we were to use the same stall. ((SEE Mr. Purrini report.))(see State Dept of Human Rights Answer)

Apparently it  was a mutual agreement to ignore between **The Respondant, Five Star Electric Corps** and **The Respondant, The Department of Human Rights.**

Mr. Purrini ignored  The Complainant/ Plantiff, Mr. Thomas  concern of conspiracy between The Respondant, Five Star Electric Corps, and  MTAs building manager Mike Brennan,  and  Mr. Stanik who  The Complainant/ Plantiff, Mr. Thomas states in and added entry on his **"GRIEVENCE OF RETAILATION"** is possibly being related to someone in a high position of the company. (see Affirmation of Ernest R. Smoltzer)(see Five Stars Opposition to verified petition) (see Grievence of Retailiation)

Also, In a telephone conversation  The Complainant/ Plantiff, Mr. Thomas suggested that the relative was possibly Mr. Jeff Thurston who forged his name on  The Complainant/ Plantiff, Mr. Thomas  termination slip to take credit for giving him a bad layoff. (see Grievence of Retailiation)

Currently, The Respondant, Five Star Electric Corps claims the termination was not for cause in the affirmation of Ernest R STOLZER. Confirming the termination had no just cause and wrongful. However in Five Star Electric Corps Rebuttal to SDHR And in all Reports by SDHR States that the termination was for cause (see termination For Cause)

Mr. Purrini (SDHR Investigator) cites  The Respondant, Five Star Electric Corps  rebuttal over 20 times, Retypes all of their false statements and lies that The Complainant/ Mr. Thomas had already exposed. In addition, Mr. Purrini submitted fraudulent documents that he knew were invalid, and present 98% of both of  The Respondant, Five Star Electric Corps 's first rebuttal in addition to 98% of a second rebuttal he illegally allowed them to submit. ((SEE Mr. Purrini's report.))-(see SDHR Answer to petition)

Let the court be advised that the supposed additional information Mr. Purrini (SDHR Investigator) asked The Complainant/ Plantiff, Mr. Thomas concerning what was said about his gender and what was said about his sexual orientation was in fact **NOT** additional information, all is included in his rebuttal. (see entry titled Remand)

After having said to have read  The Complainant's/ Plantiff's, Mr. Thomas rebuttal it wasn't sure why Mr. Purrini (SDHR Investigator) was asking for information that The Complainant/ Plantiff, Mr. Thomas already submitted.  The Complainant/ Plantiff , Mr. Thomas thought he was just trying to organize each aspect of the rebuttal as a whole. The Complainant/ Plantiff, Mr. Thomas later realized that he still had not read his rebuttal and was trying to remove it and its entirety, as he did with removing the MTA from his intial complaint, while allowing The Respondant, Five Star Electric Corps to continue to submit rebuttals, which in fact he did do.

4

As a result The Respondant, Five Star Electric Corps declares that The Complaintant/ Plantiff, didn't cite any specific facts, while failing to mention that The Complaint presented to the other investigating specialists, by Mr. Purrini (SDHR Investigator) doesn't state any specific facts because he removed The Complaintant/ Plantiff, Mr. Thomas rebuttal and its entirety from examination, which gave full detail and specific facts and citations ((SEE Mr. Thomas rebuttal)) (See SDHR Answer to petition)

The Respondant, Five Star Electric Corps would deny that Mr. Purrini (SDHR Investigator) had added 98% of their rebuttal in his report, because his report lacks their hand written statements that they included in their rebuttal. However Mr. Purrini (SDHR Investigator) makes an accommodation for them by typing all of those statements except one, and adding them that way.

Mr. Purrini (SDHR Investigator) includes The Respondant, Five Star Electric Corps entire rebuttal in his report to persuade other specialists reading it to side in favor of The Respondant, Five Star Electric Corps

Although Mr. Purrini (SDHR Investigator) retyped all of their hand written statements to add to his report, he takes special care not to add the statement made by Mr. Valerio, who"s statement clearly shows his disrespect for the claimant being a person of transgender experience. (see Mr. Valerio's Violations )

Be advised that changing names is in fact part of the transition experience, and can be confirmed with the Department of vital records showing the correction of The Complaintant's/ Plantiff's name on The Complaintant / Plantiff birth certificate for reasons relating to being of transgender experience. (see Mr. Thomas Medical )

the other specialists were not granted the opportunity to make a full assessment, so whenever The Respondant, Five Star Electric Corps made the assertion that I didn't cite or present any efficient defense, it appeared to be true.

Even though the two incidents that The Complaintant/ Plantiff, Mr. Thomas expressed to him were of the severity, The Respondants weren't the subjects of the abuse that was imposed on The Complaintant/ Plantiff, Mr. Thomas. It is a fact that the respondant are numb from feeling the effects of it, and lack the ability to formulate a mental construct to understanding having to be a person of trans-experience in an hostile environment specifically created for them. All of The Complaintant's Plantiff's complaints are of valid violations, whom the roles of authority have reduced to the measure of intensity, of those who is numb to feeling, and being a victim of the effects from the abuse. Their opinion, of the matter "lacking severity" is irrelevant and powereless when confronted with actual law.

The Respondent, The Department of Human Rights doesn't deny that the harrassment had taken place, but expressed that they felt it wasn't severe in their eyes, and by doing so, had the audacity to imply that there is a "level of intensity" exist and that the case presented stood

outside of that standard. It is not by any standard but their opinion, this is stated to manipulate the reader into believing otherwise. Mr. Purrini said it wasn't sever based on the opinion of The Respondant, Five Star Electric Corps, not the law. in his report, Mr. Purrini simply copys and paste the writings of The Respondant's, Five Star Electric Corps, legal representative. Discrimination is discrimination, sexual harrassment is sexual harrassment, racism is racism, sexism is sexism, harrassment is harrassment, ablism is ablism. (See page 12)

The matter of not being severe enough is by what standard if not their own, which they appearently think is above the law? this implies that no matter how severe someone may be abused, that if an opposing party says its not THAT bad, than all is dismissed. Mr. Purrini (SDHR Investigator) would not have ignore the same concerns had he been the victim, if someone touched him inappropriately that made him feel uncomfortable. had someone shoved their finger opposed to their fist into his anus unwelcomingly, he would not have denied himself justice claiming the act wasn't severe enough because the object used wasnt a certain height, width, or length.

Beware that The Respondant, Five Star Electric Corps is trying to manipulate this court to create their own "level of intensity" to hide them from the eyes of the law today and in the future by whats recorded in this case.

The Respondant, The Dept of Human Rights is asserting that a level of intensity (**ACCORDING TO THEIR OPINION**) be recognized by the court while dissmissing the laws that are actually in place.

It is common knowledge that if someone scratch another it is assault in the eyes of the law,  if a person punch another it is assault in the eyes of the law, regardless of the level of intensity of how an outside party who doesn't, hasn't, or cant relate to the effects of the assult, to even formulate an opinion about it.  The Complaintant/ Plantiff, Mr. Thomas  asked the court, would said violations not apply to laws concerning discrimination, all forms of harassment, defamation of character, retaliation, forgery, falsifying legal documents, and conspiracy. Mr.Purrini has deceptively attempted to reduce The Complaintant's/ Plaintiff 's entire rebuttal to two incidents, and then after acknowledging the harrassment of the two, tries to reduce them further to an unlawful standard.

It is disappointing in how investigator Mr.Purrini conducted this investigation. According to a level of severity, he would bring an unjust decision in a case where one could have rubbed another's buttock opposing to having smacked it. He is clearly unfit to represent The Respondant, The Department of Human Rights in this case.

In the event Mr. Purrini (SDHR Investigator) tried to assert that he allowed  The Complaintant/, Mr. Thomas to submit "additional information" also, be aware that that is false. The Mr. Purrini (SDHR Investigator) sent  The Complaintant/ Plantiff, Mr. Thomas a request that he made in a

6

telephone call prior our email communication, which was to send him an explanation of what was said about The Complaintant/ Plantiff, Mr. Thomas gender and sexual orientation specifically. Again this was not additional information, even in the telephone call prior  The Complaintant/ Plantiff, Mr. Thomas  reminded Mr. Purrini that what he was asking for was already what in his rebuttal. He wanted  The Complaintant/ Plantiff, Mr. Thomas to send it anyway. Mr. Thomas complied.  (see Entry titled Remand)

In his rebuttal The Complaintant/ Plantiff, Mr. Thomas specifically state that Mr. Valerio told him that he was to take his partner with him every time he felt the need to use the restroom and in doing so they were to use the same stall. After having said this The Complaintant/ Plantiff, Mr. Thomas  was followed into the restroom by work partner and the building security every time he went to the restroom .  (see Rebuttal page 4)

Even though The Complaintant/ Plantiff, Mr. Thomas and stated it in his initial complaint and rebuttal Mr. Purrini (SDHR Investigator) told The Complaintant/ Plantiff, Mr. Thomas that he could not address the bathroom issue because it included the MTA and he had only filed The Complaint for the employer, The Respondant, Five Star Electric Corps.  He completely ignored this form of sexual harassment.  ((see Mr. Thomas rebuttal page 4 ))

The Complaintant/ Plantiff, Mr. Thomas is a man, and a person of transgender experience. The Complaintant/ Plantiff, Mr. Thomas is not transgender, for he has gone through transitional processes.  At no point in these precedings has The Complaintant/ Plantiff, Mr. Thomas ever referred to himself as being **transgendered.**

The Complaintant/ Plantiff, Mr. Thomas emailed the information which he thought was being asked of him in the pre-scripted conversations via telephone call with Mr. Purrini. the response to the emails were to reflect the responses  stated in the telephone calls betweeen The Complaintant/ Plantiff, Mr. Thomas and Mr. Purrini's (SDHR Investigator). Mr. Purrini refers to this matter as  "only two incidents" in his reports.

The Complaintant/ Plantiff, Mr. Thomas reiterated two incidents that were not only already included in his rebuttal, but also discussed via phone call with Mr.Purrini, before answering his email. The response focused on Mr.Purrini's request which was to provide him with inforamtion concerning  what was said about  The Complaintant/ Plantiff, Mr. Thomas gender and what was said about his sexual orientation". Because the answers for Mr.Purrini's email where pre-scripted upon recieving his email,  The Complaintant/ Plantiff, Mr. Thomas **had replied with the ANSWERS THAT HAD ALREADY BEEN DISCUSSED.** After reading Mr.Purrini's actual email request and how it was worded itself,  The Complaintant/ Plantiff, Mr. Thomas  emailed him back and Demanded that he read his entire rebuttal so that nothing would be overlooked... The Complaintant/ Plantiff, Mr. Thomas was under the impression that the information he provided, and was being asked of him, was the information sought.

The bathroom incident  implied that The Complaintant/ Plantiff, Mr. Thomas expose his genitals to his work partner (who another man) every time he felt the need to use the restroom. The Complaintant/ Plantiff, Mr. Thomas did not reiterate this incident because he was led to believe that Mr.Purrini would rejected it, as he already had because the incident could also be linked to the MTA. and also because the incident wasn't specifically what Mr.Purrini asked for in phone the calls prior.

Mr. Purrini (SDHR Investigator) had scold The Complaintant/ Plantiff, Mr. Thomas in several recorded conversations for giving detailed explanations, and had instructed The Complaintant/ Plantiff, Mr. Thomas to answer his questions in the only form that he would accept them.

The complaintant/ Plantiff, Mr. Thomas was unsure why Mr. Purrini (SDHR Investigator) was requesting this information again when it was already included in The Complaintant/ Plantiff , Mr. Thomas rebuttal. He thought Mr. Purrini (SDHR Investigator) was trying to focus on each aspect of the offenses to organize the file as a whole.  Because of his previous experience in communicating with Mr. Purrini (SDHR Investigator), shortly following the  email, The Complaintant/ Plantiff, Mr. Thomas and urged Mr. Purrini (SDHR Investigator) to read his rebuttal so that none of the offenses would be excluded as a whole upon review. Yet Mr. Purrini (SDHR Investigator) insist he was only made aware of two incidents. This is misleading. ((see Mr. Purrini's reports). (see Complaintant's /Plantiffs Rebuttal )(see Entry Titled Remand)

Because  The Complaintant/ Plantiff, Mr. Thomas didn't voluntarily take his work partner to the restroom with him every time he used it, nor did he ever use the same stall with them, he was followed. Which was likely the reason  The Complaintant/ Plantiff, Mr. Thomas  was labeled as insubordinate. By no other means does The Respondant, Five Star Electric Corps give reason as to why the accusation of insubordination was made.

In the case of being accused of leaving his work area, it is a fact that the complaintant/ Plantiff did not have a work assignment at the time of said incident to even have a work area to leave when going to speak with security during his breakfast break, after being accused of threatening the life of a co-worker. Also,  during breakfast break, workers were not required or instructed to stay in any designated area during breakfast break.

Again The Respondant, Five Star Electric Corps will not admit an incident in which they would considered  The Complaintant/ Plantiff, Mr. Thomas to being insubordinate.  When he was told to get the delivery but had turned away from doing so to avoid further interaction with Mr. Sanik. Both Mr. Greci and Mr. Valerio instructed Mr. Sanik and The Complaintant/ Plantiff, Mr. Thomas not to speak to one another and to keep their distance from one another. Their very statements prove that  The Complaintant/ Plantiff, Mr. Thomas followed those instructions.

*after getting the delivery, Mr. Stanik is said to have entered the area where the  The Complaintant/ Plantiff, Mr. Thomas was standing in the freight elevator lobby. Insubordinate to

8

the instructions he was given to keep his distance from  The Complaintant/ Plantiff,  Mr. Thomas .

* The Complaintant/ Plantiff, Mr. Thomas was instructed to get a delivery but turned away to avoid further interaction with Mr. Sanik, the proof of this is the lack of retrieval of the delivery, and or signature for it by The Complaintant/ Plantiff, Mr. Thomas. The Respondant, Five Star Electric Corps acknowledge the fact by expressing that the  The Complaintant/ Plantiff, Mr. Thomas in the area for  the purpose of retrieving delivery.  They do not deny that The Complaintant/ Plantiff, Mr. Thomas  was in his work area prescribed.

What becomes more evident is that after Mr. Sanik and  The Complaintant/ Plantiff, Mr. Thomas  was told to stay away from each other and not to speak to each other, were **given the same job assignment for the purpose of continuing the harassment that had already taken place.**

*The accusation of  The Complaintant/ Plantiff, Mr. Thomas  **not** being in his prescribed work area, was said to have occurred after the incident and during breakfast break when  The Complaintant/ Plantiff, Mr. Thomas went to speak to the head of security office.

*In their rebuttal and in Mr. Sanik statement, shows that not only did Mr. Sanik admit to coming into an area in which  The Complaintant/ Plantiff, Mr. Thomas was after being told not to, but also had spoken to The Complaintant/ Plantiff, Mr. Thomas  after being told not to. Harassing Mr. Thomas with the intentions of provoking him into an interaction he initiated.

*Upon receiving Mr. Sanik confession itself, they failed to discipline him because of their planned conspiracy

Mr. Purrini (SDHR Investigator) obtained from The Complaintant/ Plantiff via email a list of locations and what the video footage would show during the times in question, by doing so, it was not an act of allowing me to submit additional information.

Mr. Purrini (SDHR Investigator), in his report doesn't even express to have ever obtained such information because of what Mr. Purrini (SDHR Investigator) appeared to do instead. Mr. Purrini used the emails that The Complaintant/ Plantiff, Mr. Thomas sent him (cooperating with his requests) to warn The Respondant, Five Star Electric Corps. that the Complaintant/ Plantiff  was goin to put in a complaint with the MTA along with the times locations and events taking place in the footage that  The Complaintant/ Plantiff, Mr. Thomas would request to prove his innocence and Five Star Electric Corp's abuse to give them the opportunity to destroy, alter, and or removed the data from the system... but  because of the sophistication and level of **SECURITY RISK** of the building 2 Broadway itself ALL surveillance should be save to a micro compression file.

Mr. Purrini (SDHR Investigator) knew that part of  The Complaintant/ Plantiff, Mr. Thomas

complaint was that he was terminated for retaliation after requesting such surveillance from The Respondant, Five Star Electric Corps. Furthermore it is a fact that after he had given Mr. Purrini the information sought concerning surveillance, that he distributed that information to the offending Respondant, Five Star Electric Corps knowing they were not the party in which to request the suveillance and admitted in his report that he would not make THE F.O.I.L requests with the MTA after being told that this was the entity and route in which to obtain the information he pretended to seek in order to obtain undisputable truths.

In the proceeding you will see that The Respondant, Five Star Electric Corps. contacted security to assure that The Complaintant/ Plantiff, Mr. Thomas would not be permitted back in the building, yet claimed to have made no attempt to requests the viewing of the surveillance videos after a man who is 7ft tall,who felt like his life was threaten to the point that he cried. In a building where the entire NYC subway system could be controlled.

The building of 2 Broadway which is believed to be federally funded for its security and surveillance being located only blocks away from the World Trade Center, Ground Zero.

Before The Complaintant/ Plantiff, Mr. Thomas rebuttal the only people who claimed he showed any form of aggression was Mr. Sanik, and supervision. Mr. Purrini (SDHR Investigator) was made aware, Mr. Stanik may be the relative of someone of high rank in the company. It wasn't until after The Complaintant/ Plantiff, Mr. Thomas made Mr. Purrini (SDHR Investigator) was aware of this that he obtain statements stating that The Complaintant/ Plantiff, Mr. Thomas showed expressions of anger from regular employee.

These "so-called" additional witnesses who have never worked with The Complaintant/ Plantiff, Mr. Thomas or have ever been in the same area at the same time. This includes a statement made stating that The Complaintant/ Plantiff, Mr. Thomas was perceived as a negative person because he didn't say hello to someone when they greeted me. Mr. Cronin does not confirm he was even sure if whether The Complaintant/ Plantiff, Mr. Thomas actually heard him.

James Cronin is said to have stated that The Complaintant/ Plantiff, Mr. Thomas wasn't very friendly because the complaint and didn't say hello to him when he greeted him. Mr. Cronin doesn't state if the the complaintant/ Plantiff heard his greeting, or knew for a fact that the complaintant/ Plantiff was purposely ignoring him and or the reason thereof before labeling the complaintant's/ Plantiff 's character as unpleasant.

Reading the New York State Department of Human Rights **ANSWER TO THE PETITION** was the first time The Complaintant/ Plantiff, Mr. Thomas heard of Mr. Cronin's concerns. Had it been brought to the complaintant's/ Plantiff's its attention he would've made sure he greeted Mr. Cronin with a smile.

James Cronin is said to be night worker. He does not work in the day and The Complaintant/

Plantiff, Mr. Thomas has never met him. The Complaintant/ Plantiff, Mr. Thomas initially listed him as one of his offenders when filing his complaint accidentally. The correct name was actually supposed to had been Vincent. ((see. The Complaintant/ Plantiff, Mr. Thomas originally got the name from a list that he learned later was for all that were given the opportunity to work overtime during the night shift after their shift in the day. The Complaintant, Mr. Thomas was also excluded from this opportunity as well).

Mr. Cronin told Mr. Purrini (SDHR Investigator) that The Complaintant/ Plantiff, Mr. Thomas personality was that of isolation which actually supports his claim of trying to avoid all possible confrontations.

If Mr. Andrzej Malinowski actually exist, his said perception of the complaintant/ Plantiff is unfair and without merit.

States a manipulative tactic to associate complaintant/Plantiff to a negative aspect, while in fact, doesn't even give one example or description of the complaintant/ Plantiff actually being upset outside of his assumptions. An example isn't described because The Respondant, Five Star Electric Corps can't name any incident in which complaintant/ Plantiff was upset for no reason. Also it doesnt describe contents of what the complaintant/ Plantiff said, or did that would lead him to believe that the complaint and get mad over nothing. In addition he states that the Complaintant/ Plantiff doesn't talk to people. This gives a description of the complaintant/ Plantiff being a quiet person, after stating he was a person of rage, again another auto suggested mental block. Being a night worker, he wouldn't know whether or not if the clomplaintant was a quiet person, if he were not told this by someone who works in the day. Mr. James Cronin (if in fact he does exist), is said to have stated also, that the complaintant/ Plantiff didn't talk to people, again he also would not know this if he too were not told this by someone who works in the day.

Be advise that Mr. Andrzej Malinowski and The Complaintant/ Plantiff, Mr. Thomas have never been at the same location, or in the same area, at the same time, for him to have ever observed the complaintants/ Plantiff behavior to inject his opinion about it, and/or the severity of any issues he claim to know nothing about or claiming to have experienced, himself to make the claim that any issue the Complaintant/ Plantiff complained about was of no real concern. When in fact, the complaintant/ Plantiff was accused of threatening the life of another employee.

Mr. Andrzej Malinowski demonstrates here a manipulative method to create a mental block for the reader. The Complaintant/ Plantiff, Mr. Thomas points out and relieve the reader from the mental block of trying to comprehend "being in a rage... over nothing." The being in a rage is an attempt to associate his character to a negative aspect the over nothing is the actual blockage the mind doesn't comprehend a reaction without causation. Ultimately leaving the mind to focus on the only part of the thought that it could process the, the association of the

11

complaint and being in a rage. One cannot be any rage ....over nothing, no more than a person can be insanely in love, with absolutely no one.

In his statement Mr. Andrzej Malinowski states that he NEVER witnessed people MAKING COMMENTS or TEASING the complaintant/ Plantiff. Attached to this statement is a copy of what Mr. Purrini (SDHR Investigator)reports of Mr. Andrzej Malinowski statement that expressed the opposite of his initial statement. If he was told the lie that the complaintant/ Plantiff threatened to beat up Mr. Sanik and they all **laughed** (both actions express comments made and teasing), surely he was told about the false accusation of threat of life. Both false accusations of incidents were said to have occurred of the same day.

While working with Mr. Carlos Santiago, the complaintant/ Plantiff was made aware of a manipulative tactic called verbal judo. These same tactics used by Mr. Andrzej Malinowski can be identified throughout the viewing of YouTube videos titled "verbal judo"

The Respondant, Five Star Electric Corp state that The Respondant, The Department of Human Rights shouldn't be granted the request for remand for reasons listed in their answer to petitioner. Mr. Purrini (SDHR Investigator) withheld key vital essential information from other specialists and investigators. Mr. Purrini (SDHR Investigator) did not give them a chance to make a full assessment. Based on what was presented to them, they could not conduct a proper investigation.

The Respondant, Five Star Electric Corps is confident in stating that the complaintant/ Plantiff failed to cite a specific facts, which is false, however what was reported does not reflect the fact. It appears that The Respondant, Five Star Electric Corps knew that Mr. Purrini (SDHR Investigator) would not be presenting The Complainant, Mr.Thomas case to other investigators with all specific facts that he provided in his rebuttal concerning all matters. The Respondant, Five Star Electric Corps appear to have known that Mr. Purrini (SDHR Investigator) would be presenting the case to other specialists as if he was actually their legal representation himself and not a neutral party.

In their rebuttal to The Respondant, The Department of Human Rights, The Respondant, Five Star Electric Corps include the fraudulent forged termination slip, yet have the audacity to demand that this justice system deny The Respondant, The Department of Human Rights as a whole the opportunity to withdraw, forcing them to become a part of the conspiracy while denying them the right to remand. (See Termination For Cause

Presenting this The Respondant, Five Star Electric Corps would declare that The Complainant, Mr.Thomas make this statement without reason or proof. However Mr. Purrini (SDHR Investigator) in his investigation report, includes The Respondant, Five Star Electric Corp's entire rebuttal without The Complaintant's/ Plantiff's rebuttal opposing it to persuade the investigators reading it to side in their favor and towards their behalf.

12

In their response to The Respondant, The Department of Human Rights request for remand (page 16) its stated that The Respondant, Five Star Electric Corps submitted additional information, to hide the fact that The Respondant, Five Star Electric Corps was allowed to submit another rebuttal. In the "affirmation of Ernest R. Stolzer submitted to Justice Joan Madden (page 2, # 8,9,10) it shows that The Respondant, The Department of Human Rights allowed The Respondant, Five Star Electric Corps to submit additional information upon requests as well as an entire additional rebuttal in response to the complaintant's/ Plantiff's rebuttal. (See Additional Rebuttal)

Be advised, that it wasn't until The Respondent, The Department of Human Rights submitted their answer to the court, that the petitioner was made aware of Mr. Purrini's (SDHR Investigator) full report in its entirety and what was presented to other investigators. As I have already stated Mr. Purrini (SDHR Investigator) claimed to not have read The Complaintant's/ Plantiff's rebuttal because according to him it was too long, however Mr. Purrini (SDHR Investigator) cites The Respondant's, Five Star Electric Corps. rebuttal over 20 times in addition to retyping all statements made against me to fully represent The Respondant, Five Star Electric Corps, He rewrote every complaint except the one that showed a physical evidence of The Respondant, Five Star Electric Corps. Mr. Valerio's harassment. (See The SDHR Answer)

Mr. Purrini (SDHR Investigator) spoke with workers who didn't work with the complaintant / Plantiff and nor did they work on the same project. It is said that Mr. Thurston has eight projects in total, but does not specify if those projects are within the same location, 2 Broadway New York City. However because they were in communication with workers who did work under those conditions stated above as the complaintant/ Plantiff. They do include that his personality was that of isolation. This supports his claim of trying to avoid all possible confrontation by not even speaking unless it was absolutely necessessarily. let alone cause a disturbance, and even in doing so I was perceived as unfriendly. Adding to the already a hostile work environment.

In the report, The Respondant, Five Star Electric Corp continues to show lack of integrity to the Department of Labor by reporting working hours were from 7 AM to 4 PM. This was not so. Everyday the whole work crew was instructed to skip lunch so that everyone could leave at 2:30 PM, except for those who were ganted the opportunity to work the night shift; which I was also deprived the opportunity to partticipate in. (See Disrimination and Harrassment in General but not limited to) �★This entry dies not sum all Discriminations and Harrassments Proof that The Respondant, Five Star Electric Corps knowingly gave false report to the state Department of labor (( SEE A,B)) they acknowledge knowing Complaintant/ Plantiff had an appeal, but states the results were in their favor when in fact it was not. Proof of The Complaintant's/ Plantiff previous statement in The Complaintant's/ Plantiff's rebuttal concerning this matter. ((see        ))(See Entry titled Rebuttal)

The appeal was reported **NOT JUSTIFIED** on May 9, 2017.  The Respondant, Five Star Electric

Corps submitted this false information on May 10, 2017 and state in their defense state that The Complaintant/ Plantiff, Mr.Thomas appeal wasn't until May 11, 2017. The day after their dishonesty, after claiming to know the outcome. (see Discrimination and Harrassment in general but not limited to)

The Respondant, Five Star Electric Corps continue to show lack of integrity by saying they don't know of any other actions The Complaintant/ Plantiff. Mr.Thomas taken regarding the harassment. ((SEE)) — (additional lack of integrity)

There is information in The Complaintant/ Plantiff. Mr.Thomas rebuttal and undisputable truths that led local union #3 to rule in The Complaintant's/ Plantiff's favor in the appeal. — (See additional lack of integrity)

The Complaintant's/ Plantiff's entire rebuttal cites and states specifically each offense in violation The Complaintant/ Plantiff experienced during The Complaintant/ Plantiff time of employment of 2017.

In The Complaintant/ Plantiff. Mr.Thomas rebuttal, he expose every single lie and malicious intent within the statements of all The Respondant, Five Star Electric Corps witnesses, along with fraudulent pieces of evidence submitted by both The Respondants, Five Star Electric Corps and The Dept of Human Rights specialist, Mr.Purrini (see Entry titled Rebuttal)

Throughout The Complaintant/ Plantiff. Mr.Thomas rebuttal he prove the truth, by exposing the lies of every single conspirator. The Complaintant's/ Plantiff's integrity remains unquestionable and speaks volumes. While The Respondant, Five Star Electric Corps expressed the notion that no matter how much the truth is exposed, if you ignore the facts long enough you may be able to convince others that it was never revealed to them.

The investigation was mishandled, improper, predetermined, and failed to acknowledge specific facts.

May The Respondant, Five Star Electric Corps be advised that they have eluded authority and have impeded justice for the duration of this case. The Complaintant/ Plantiff, Mr.Thomas is entitled to justice and after being denied proper due process, he hereby demand it along with the maximum award allowed by the court for his sufferings

according to the matter of conspiracy, a party is allowed to **WITHDRAW** for relief.

Mr. Felix Valerio was not a foreman during The Complaintant/Plantiff. Mr.Thomas employment. He was a **Sub-formen** in who apparently, as expected has since been promoted after April 13, 2017. Do not be deceived by the title **Sub-Foremen** And Foreman, **sub-foremen** ranks lower than a foreman. Once a work crew, exceeds the number of (7) employees, by union rules and our bargaining agreement, a sub-foremen is placed to relieve the Foremen from being overwhelmed with the work force. As stated in The Respondant, Five Star Electric Corps rebuttal(s) and statements, the work crew exceeded 7 employees having 12 employees. The

14

Respondant, Five Star Electric Corps claims that in some projects they are allowed to have both General Foreman and Foreman on the job, what he fails to express is that the general foreman and the foremen are supposed to be two different people. Throughout the duration of this process, it will be revealed to all if in fact Mr. Greci was assuming the role of both general foreman and foreman while only getting compensated for holding one title. On the termination slip in which Mr. Jeff Thurston ( The Respondant, Five Star Electric Corps  Assistant Super), Mr. Greci writes in his title of being a **GENERAL FORMAN** and then adds both his name in print and signature underneath the title.

let the court be advised that in a recorded conversation the Complaintant/ Plantiff, Mr.Thomas **DOES RECALL TO AGREEING** to Mr.Purrini's request of a list of employees between certain dates. However after further consideration and recalling of events, The Complaintant/ Plantiff. Mr.Thomas  and Mr.Purrini agreed that the request be for the same dates for both list of employees, and employer workers. In Mr.Purrini's report that The Complaintant/ Plantiff. Mr.Thomas have been made aware of, the employers list is ommitted, along with other discrepencies)+. The following expresses the Complaitants disposition and  to point out that The Respondant, Five Star Electric Corps took advantage of Mr.Purrini lack of specificticity)+

The list of **RESPONDANT EMPLOYEE** electricians is requested from **SEPTEMBER 1, 2016** but oddly the request for **RESPONDANT EMPLOYERS** electricians were only requested for dates between **JANUARY 1, 2017** and is completely missing.

This date allows The Respondant, Five Star Electric Corps from having to lists supervision who may have been proven guilty of, and or involved with cases concerning sexual harassment, discrimination, retaliation, sexism, ableism, racism... between the dates of **SEPTEMBER 1, 2016** to **OCTOBER 6, 2017**.

Mr. Purrini (SDHR Investigator) requested a list of employees in the same **"Location"** as a Complaintant/ Plantiff between **SEPTEMBER 1, 2016** to **OCTOBER 6, 2017**.

**\*THE LOCATION BEING 2 BROADWAY NYC IN IT'S ENTIRETY, NOT NECESSARILY THE PROJECT, WORK CREW, HOURLY SHIFT, FOREMAN, SUB-FOREMAN, OR USE OF THE SAME SHANTY.**

Mr. Purrini (SDHR Investigator) failed to specify in his request, a complete list of all employees and employers at the same job location, work shift, project, as well as foreman and subforman, use of shanty, and work crew; along with the complete list of all their relates absences , lateness, and left early.

By  doing so gaves The Respondent, Five Star Electric Corp the opportunity to be selective in

the incidents they chose to disclose, including the opportunity to omit any employee who's testimony would be vital in regards to the investigation, but against The Respondent's, Five Star Electric Corp's favor.

Mr. Purrini (SDHR Investigator) also failed to specify in his request, that those employees listed should also have worked for the same presence and structure of supervision, project, working hours, work crew, and Shanty use as complaintant/ Plantiff; for this portion of his investigation concerned employees who worked in the same environment as complaintant/ Plantiff. If that were not the case, then Mr. Purrini (SDHR Investigator) could have spoken with an **ACTUAL EXPERIENCED FEMALE ELECTRICIAN, AN EXPERIENCED FEMALE ELECTRICAL APPRENTICE, OR AN EXPERIENCED ELECTRICIAN WHO IS A PERSON OF TRANSGENDERED EXPERIENCE** among the 900+ electricians, The Respondent, Five Star Electric Corp claim to employ, on any jobsite. Mr.Purrini appearently opted not to. Instead, in his reports Mr. Purrini (SDHR Investigator) spoke with Ms. Ashley Castro, a **COLLEGE HELPER** and the only female on the list. (PAGE 10 ). (See SDHR Answer to petition)(See State Dept of Human Resource Answer)

Temporary Summer Helpers are the children of electricians who are members of local three. This program is meant to relieve financial strains from their parents who are paying for their college expenses. Because these helpers are going to college for professions such as becoming brain surgeons, they are giving special privileges. A few examples: they are not allowed to climb ladders, they are not allowed to lift anything over 10 pounds, ect.  The ultimate goal is for them to attend school and continued their academic studies for their chosen careers, which is normally in a field outside of the electrical industry. They are not permitted to perform certain task, This is to keep them safe from any possibilities of getting injured or hurt on the job. Some may ask to do tasks more strenuous, to evade pure boredom.

Ms. Ashley Castro, already being a privileged worker and having special favor, would not experience the same treatment as an experienced female apprentice, an experienced female journeyman, or a journeyman who is a person of transgender experience would; Especially if said person's doesn't have family in the business.

Ms. Ashley Castro may very well be unaware of the normality's concerning any matter of having been in the position of being an experienced female apprentice, an experienced female journeyperson, and or a journeyman who is a person of trendsgender experience, and works continuously throughout the year. It is not clear if any part of her statement was omitted.

Also, Summer helpers usually work for the company's that their parents are working for, so that they may be accessible to be closely monitored by their parents.

Ms. Ashley Castro statement does not reflect, nor do they speak for, nor do they represent the voices of those who are in the position of being an experienced female apprentice, an experienced female journey person, and or a journeyman who is a person of transgender

experience who lack her privileges. Again out of 900+ workers, Ms. Ashley Castro, a college helper was who Mr. Purrini (SDHR Investigator) decided to interview. Because of how he has conducted this investigation it is uncertain if anything was added to, or subtracted from her statement as well as others whom he interviewed personally.

The list of employees provided would lead an investigator to believe the following:

*Mr.Lev Shnitkin is accused of leaving early on date 11/18/2016. He is not accused of being late, or absent on said date. Because his first offense is **said** to have occurred on 11/18/2016 (*See  AA, BB     ) it implies that Mr. Lev Shnitkin had not been late, absent, or left early, from and between the date of his hire 8/2014 (*See  AA, BB    ) to 11/17/2016 (the date **before** his **said** first offense). It also implies that he had not been late, absent, or left early from 11/19/2016 (the day **after** his **said** first offense), to the date of 10/06/2017 (the date of when the list of offenses in disciplines were provided to the Department of human rights investigator, Mr. Purrini). The disciplines of being given a verbal warning is non- provable, and the discipline of being docked 2 hours of pay, also does not prove that this action was executed for reasons of leaving work early. The result would be the same in the event an employee is 2 hours late for work.

* Mr. Vinny Springvloed is accused of leaving early on date 4/3/2017. He is not accused of being late, or absent on said date. Because his first offense is **said** to have occurred on 4/3/2017 (*See               ) it implies that Mr. Vinny Springvloed had not been late, absent, or left early, from and between the date of his hire 8/2014 (*See  AA, BB     ) to 4/2/2017 (the date **before** his **said** first offense). It also implies that Mr. Vinny Springvloed had not been late, absent, or left early from 4/4/2017 (the day **after** his **said** first offense), to the date of 10/06/2017 (the date of when the list of offenses and disciplines were provided to the Department of Human Rights investigator, Mr. Purrini). The disciplines of being given a verbal warning is non-provable, and the discipline of being docked 2 hours of pay, also does not prove that this action was executed for reasons of leaving work early. The result would be the same in the event an employee is 2 hours late for work.

* Mr. Micheal Messineo is accused of leaving early on date 9/28/2017. He is not accused of being late or absent on said date. Because his first offense is **said** to have occurred on 9/28/2017 (*See   AA, BB     ) it implies that Mr. Micheal Messineo had not been late, absent, or left early, from and between the date of his hire 12/2014 (*See  AA, BB    ) to 9/27/2017 (the date **before** his **said** first offense). It also implies that he had not been late, absent, or left early from 9/29/2017 (the day **after** his **said** first offense), to the date of 10/06/2017 (the date of when the list of offenses in disciplines were provided to the Department of human rights investigator, Mr. Purrini). The disciplines of being given a verbal warning is non-provable, and the discipline of being docked 2 hours of pay, also does not prove

17

that this action was executed for reasons of leaving work early. The result would be the same in the event an employee is 2 hours late for work.

* Mr. Andrzej Malinowski is accused of leaving early on date 10/13/2016. He is not accused of being late or absent on said date. Because his first offense is **said** to have occurred on 10/13/2016 (*See $AA, BB$     ) it implies that Mr. Andrzej Malinowski had not been late, absent, or left early, from and between the date of his hire 12/2014 (*See $AA, BB$   ) to 10/12/2016 (the date **before** his **said** first offense). It also implies that he had not been late, absent, or left early from 10/14/2016 (the day **after** his **said** first offense), to the date of 10/06/2017 (the date of when the list of offenses in disciplines were provided to the Department of human rights investigator, Mr. Purrini). The disciplines of being given a verbal warning is non-provable, and the discipline of being docked 2 hours of pay, also does not prove that this action was executed for reasons of leaving work early. The result would be the same in the event an employee is 2 hours late for work.

* Mr. Andrzej Malinowski is accused of being late on date 4/11/2017. He is not accused of being absent, for leaving early on said date. Because his first offense is **said** to have occurred on 4/11/2017 (*See $AA, BB$     ) it implies that Mr. Andrzej Malinowski had not been late, absent, or left early, from and between the date of his hire 8/2014 (*See $AA, BB$   ) to 4/10/2017 (the date **before** his **said** first offense). It also implies that he had not been late, absent, or left early from 4/12/2017 (the day **after** his **said** first offense), to the date of 10/06/2017 (the date of when the list of offenses in disciplines were provided to the Department of human rights investigator, Mr. Purrini). The disciplines of being given a verbal warning is non-provable, and the discipline of being docked 2 hours of pay, also does not prove that this action was executed for reasons of leaving work early. The result would be the same in the event an employee is 2 hours late for work.

* Mr. Kenshwar Singh is accused of leaving early on date 10/21/2016. He is not accused of being late, or absent on said date. Because his first offense is **said** to have occurred on 10/21/2016 (*See $AA, BB$     ) it implies that Mr. Kenshwar Singh had not been late, absent, or left early, from and between the date of his hire 8/2014 (*See $AA, BB$   ) to 10/20/2016 (the date **before** his **said** first offense). It also implies that he had not been late, absent, from 10/22/2016 (the day **after** his **said** first offense), to the date of 10/06/2017 (the date of when the list of offenses in disciplines were provided to the Department of human rights investigator, Mr. Purrini). Mr. Kenshwar Singh is accused of leaving early for a second time on date 4/13/17 ( he is not accused of being late, or absent on this date), meaning that from 10/22/2016 (the date **after** his last offense) to 4/12/2017 (the day **before** his most recent offense) Mr. Kenshwar Singh was not late, absent, nor did he leave early. And he had not been late, absent, or left early from 4/14/2017 (the day **after** his recent offense) to 10/06/2017 (the date of when the list of offenses in disciplines were provided to the Department of human rights investigator, Mr. Purrini).  however he was not given a written warning for the same

offense twice, which is normal proceedure.  Instead, Mr.Kenshwar Singh is given another non-provable warning.  The disciplines of being given a verbal warning is non-provable, and the discipline of being docked 2 hours of pay, also does not prove that this action was executed for reasons of leaving work early. The result would be the same in the event an employee is 2 hours late for work.

* The 23 employees listed (plus the number of employees who's names were ommitted from the lists) in Exhibit "B", other than 5 employees who names are listed in Exhibit "A" who worked at **2 BROADWAY NYC 10004,  appear** to have not been absent, late, or have left early, **FROM** 8/2016 to October 6, 2017.

In addition to this, in the event where offending employees listed (and non-listed) were said to have committed different offenses on separate occasions, as well as committing the same offenses on separate occasions, shows undeniable proof that the complaintant/ Plantiff, Mr. Caze Thomas, was discriminated against.

The offending employees weren't given written warnings for their offenses, the complaintant/ Plantiff, Mr. Thomas was given a written warning.

Offending employees were not terminated for repeated offenses, and multiple offenses occurring on separate occasions, after being warned. The complaintant/ Plantiff, Mr. Thomas was terminated for imposed offenses even though he did not repeat those same offenses after he was given written warning.

The evidence between the two documents proves that out of all of the 24 employees who were said to have worked at the location of 2 Broadway from 8/2014 to 4/13/2017, the complaintant/ Plantiff, Mr. Caz'e Thomas was the only employee who was given written warning, and was terminated for offenses in the written warning, even though he did not repeat those offenses after the warning was given.

It is the complaintant's/ Plantiff's beliefs that Mr. Lev Shnitkin, Mr. Andrzej Malinowski, Mr. Micheal Messineo, Mr. Kenshwar Singh, and Mr. Vinny Springvloed, was docked two hours for being two hours late for work. The complaintant/ Plantiff Mr. Caz'e Thomas believes that Five Star Electric Corp submitted false information to further hide the fact that they in fact did discriminate against the complaintant/ Plantiff by not allowing him to work after being two hours late, as they had allowed others (listed and not listed) to work after being two hours late. in addition, the complaintant/ Plantiff makes the court aware that all employees who caused disturbances, and were insubordinate, late, absent, and left early were not listed, disciplined, or penalized for said offenses. With the help of a court subpoena the complaintant/ Plantiff  would like to prove that this in fact was the case.

The Department of human rights investigator, Mr. Purrini,  is misleading in his reports concerning the list of disciplinary actions. I have pointed out these facts in  The Complaintant's/

19

Plantiff's initial filings with the court.

Included in The Complaintant's/ Plantiff's evidence is documentation submitted by Five Star Electric Corp. to The New York State Department of Labor, which proves that the entire work crew was instructed to leave early, opposed to the allotted time prescribed to leave according to contract. No one in the work crew was penalized, disciplined, or terminated for following the instructions supervision to leave early; Yet as another display of discrimination, the complaintant/ Plantiff Caźe Thomas was penalized, discipline, and terminated for following the instructions of supervision to leave early. This was an act to sabotage the complaintant/ Plantiff, Caz'e Thomas, to accuse him of leaving early in the event he followed instructions, or to accuse him of insubordination had he not followed supervision's instructions. This act of discrimination is confessed in Five Star Electric Corps rebuttal.

Having both list in his possession Mr. Purrini (SDHR Investigator) was made aware that all employees who's names were included in statements submitted by Five Star Electric Corp, were still employed, appearently came to work on time, and in attendance every workday without having left early. (*See $BB$          )

Mr. Vinny Springvloed, Mr. Kenshwar Singh, Mr. Andrew Bianco, Mr. Ronald Shatilla, and Mr. Patrick Denihan names were included in statements made,  in which Five Star Electric Corp. submitted as witness statements and/or testimonies.

Instead of requesting to speak to Mr.Vinny Springvloed, Mr. Kenshwar Singh, Mr. Andrew Bianco, Mr. Ronald Shatilla, and Mr. Patrick Denihan to verify if they would agree with the contents of the statements which included them, Mr. Purrini did not. Knowing these employees fit and best described the empoyee of his requests (*See $SDHR$ $Answer$), he  chose to speak to Mr. James Cronin, Ms. Ashley Castro, and Mr. Andrzej Malinowski, employees who did not fit the description of his **Said** request. Ultimately adding to the distribution of more false reports. This was done to add negative statements against the complaintant/ Plantiff  unjustly, and to give the illusion that all employees are/were treated with respect, dignity, and in accordance within the law.

 The list shows that Mr. Vinny Springvloed, Mr. Kenshwar Singh, Mr. Andrew Bianco, Mr. Ronald Shatilla, and Mr. Patrick Denihan  were still employee up to the date the list is given. The employees who were selected to be on the list of those discipline for offenses were strategically chosen, 4 out of 5 listed were employees who did not partake in the conspiracy against the complaintant by writing false statements.

The Respondant, Five Star Electric Corps knew that the complaintant/ Plantiff  would point out the discrepancies of the lists  to prove and support his defense.  A defense that would appear to be against those who hadn't written false statements against the complaintant/ Plantiff to further create hostility between the complaintant/ Plantiff and his peers, so that those who had

not submitted to the will of the employer, and those who have never met him would dislike him for his defence. **BOLDLY** causing a hostile environment in this very court proceeding.



**NEW YORK STATE** | **Division of Human Rights**

ANDREW M. CUOMO
Governor

HELEN DIANE FOSTER
Commissioner

September 27, 2017

Five Star Electric Corp.
Attn: Robert J. Saville, President,CEO, General Counsel
101-32 101st Street
Ozone Park, NY 11416

     Re:   Caze Thomas v. Five Star Electrical Co., Jeff Thurston, Daniel Greci, Felix
           Valerio
           Case No. 10188276

Dear Mr. Saville:

     The above-captioned complaint has been assigned to me for investigation.  Toward that
end, the following information is currently required:

1. List of employees in the same work location as Complainant between September
   1, 2016 to the present who were disciplined for similar wrongdoings as
   Complainant. Provide their full name, gender, date of hire, title, type of
   wrongdoing, date, and type of discipline.

2. List of Respondent electricians between January 1, 2017 to the present in the
   same work location as Complainant. Provide full name, gender, date of hire, title,
   current employment status and telephone number. If no longer employed, date of
   separation, reason, and the last known telephone number.

3. Confirm who wrote the statement on exhibit 8 and whose signature appears at the
   bottom of that statement.

4. Confirm if Complainant, besides filing with the Division, has filed or otherwise
   complained about discrimination or perceived discrimination either with
   Respondent or with the Union. If yes, inform if an internal investigation was
   conducted and provide copy of investigation including witness statements.

     Please provide this information **by October 6, 2017.**

You may transmit the information to me by e-mail at **Rodlind.Purrini@dhr.ny.gov**.  Please
note, however, if you are submitting any documentary evidence, photocopies must be delivered
to our office in addition to any e-mail submission of those documents.

*This entire Entry/page along with others of the State Dept of Human Rights Investigation and determination is Arbitrary and capricious, and or lack rational basis*

has Complainant work in the basement alone; that Valerio related details of previous disagreements Valerio had with Complainant; and that Valerio told the elevator operator that Complainant's real name was not Caze. Accepting all of the above as true, it does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough. At most, it is gossiping that, although it could very well be in poor taste, it does not rise to the level to abusive workplace environment.

12(a)

The other instance Complainant identified is again a scenario where the speakers were not aware Complainant was overhearing them. Two unidentified journeymen were talking about how they caught a glance at Complainant's telephone screen and saw a topless guy who, they said, must be Complainant's lover. Complainant did not identify who these individuals are and it is not clear whether they are even Respondent employees. Complainant stated that one of them sounded like Mr. Messineo. This example, too, does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough.

12(b)

During the Division initiated interview, Complainant stated that he was written up for lateness when others were not. As an example, he stated that Messineo missed several days of work consecutively because of dental reasons and was not written up, whereas Complainant missed a day of work because he needed to help his grandmother with her radiator and was written up. Another example Complainant gave was that Carlos Santiago missed at least four consecutive days because he had marital issues and he was not written up.

12(c)

12(d) Both examples above clearly show that the situations are dissimilar and insufficient to illustrate differential treatment.

The third example Complainant gave was that Felix Valerio, who is a supervisor, missed work and was not written up. Complainant stated that he knows about this because he was part of *←False Senten-* team. Besides lacking in detail, Complainant and Valerio are not similarly situated employees, thus, an insufficient and inadequate example of differential treatment. *As per Five Star Electric Cor the rules Apply to All employed by the company.*

12(e)

Moreover, Respondent provided a list of employees between September 1, 2016 to the present who were disciplined for similar wrongdoings as Complainant[1]. Out of a list of 28 employees, seven (7) had time docket and received verbal warnings, most for leaving work early and one for arriving late. *Mr. Purrini (SDHR Investigator) lead other Investigators into believing there was 7 (seven) different employees, when in fact 2 were repeating offenders who were*

12(f)

Another differential treatment example Complainant gave was regarding the absenteeism over the union card issue. He stated during the interview with the Division that there were other employees who, too, did not have their union card with them but were not sent home. He stated that like all others, Complainant showed Greci the money order receipt in lieu of the card and Greci called the union about all the guys who presented the money order receipts. Greci then told Complainant to go and take care of the issue with the Union and marked Complainant as absent. That same day Complainant went to the Union who told Complainant that there was a clerical

12(G) *terminated for cause After bein warned ←*

12(H) [1] Respondent provided copies of Complainant's write ups. On April 5, 2017, he was written up for absences, leaving early, and lateness. On April 13, 2017, he was written up for lateness, absences, leaving early, insubordination and disruptive behavior. *Fraudulent document*

| Full Name | Gender | Date of Hire | Title | Employment Status | Telephone # |
|---|---|---|---|---|---|
| Daniel Greci | Male | 2/9/2015 | A General Foreperson | employed | |
| Felix Valerio | Male | 8/1/2014 | A Foreperson | employed | |
| Vinny Springvloed | Male | 8/1/2014 | A Journeyperson | employed | |
| James Cronin | Male | 8/1/2014 | A Journeyperson | 4 week Furlough/returns 10-30-17 | |
| Radames Castillo | Male | 8/1/2014 | A Journeyperson | 4 weeks Furlough/returns 10-9-17 | |
| Keshwar Singh | Male | 8/1/2014 | A Journeyperson | employed | |
| Andrzej Malinowski | Male | 8/1/2014 | A Journeyperson | employed | |
| Brian Sanders | Male | 8/1/2014 | A Journeyperson | employed | |
| Carlos Santiago | Male | 12/1/2014 | A Journeyperson | Reduction in work force 5-19-17 | |
| Michael Messineo | Male | 12/1/2014 | A Journeyperson | employed | |
| Lev Shnitkin | Male | 8/1/2014 | A Journeyperson | employed | |
| Andrew Blanco | Male | 1/3/2017 | A Journeyperson | employed | |
| Steve Bazile | Male | 5/22/2017 | A Journeyperson | employed | |
| Joseph Melville | Male | 9/25/2017 | A Journeyperson | employed | |
| Ashley Castro | Female | 5/19/2017 | 4th yr summer College helper | back to college | |
| Michael Loria | Male | 6/19/2017 | 4th yr summer College helper | back to college | |
| Jaraslow Wencewicz | Male | 5/1/2017 | A Journeyperson | Reduction Furlough replacement 9-8-17 | |
| Steven Seales | Male | 9/13/2017 | A Journeyperson | employed | |
| Tony Zeng | Male | 8/14/2017 | 2nd year Apprentice | employed | |
| Kevin Haney | Male | 9/11/2017 | 2nd year Apprentice | employed | |
| Edwin Dolmo | Male | 9/8/2017 | A Journeyperson | employed | |
| Marcin Sanik | Male | 1/1/2017 | A Journeyperson | Transferred 8-11-17 | |
| Frank Reale | Male | 8/1/2014 | DBM Foreperson | employed | |
| Salvatore Ingui | Male | 8/1/2014 | DBM Mechanic | employed | |
| Ronald Shattila | Male | 1/7/2016 | DBM Tech | employed | |
| Nicholas DeMarco | Male | 8/1/2014 | DBM Tech | employed | |
| Robert Ingui | Male | 2/21/2017 | DBM Helper | employed | |
| Patrick Denihaan | Male | 6/9/2015 | DBM Helper | employed | |

AA

| Full Name | Gender | Date of Hire | Title | Type of wrong doing/date | Type of discipline |
|---|---|---|---|---|---|
| Andrzej Malinowski | Male | 8//2014 | A Journeyperson | Left early/ 10-13-2016 | Docked 2 hrs pay/ 1st verbal warning |
| Keshwar Singh | Male | 8//2014 | A Journeyperson | Left early/ 10-21-2016 | Docked 2 hrs pay/ 1st verbal warning |
| Lev Shnitkin | Male | 8//2014 | A Journeyperson | Left early/ 11-18-2016 | Docked 2 hrs pay/ 1st verbal warning |
| Vinny Springvloed | Male | 8//2014 | A Journeyperson | Left early/ 4-3-2017 | Docked 2 hrs pay/ 1st verbal warning |
| Keshwar Singh | Male | 8//2014 | A Journeyperson | Left early / 4-13-2017 | Docked 2 hrs pay/ 2nd verbal warning |
| Andrzej Malinowski | Male | 8//2014 | A Journeyperson | Came in 10min late/4-11-17 | Docked 1/2 hr pay/ 1st verbal warning |
| Michael Messineo | Male | 12//2014 | A Journeyperson | Left early / 9-28-2017 | Docked 2 hrs pay/ 1st verbal warning |

## CAZE THOMAS v. FIVE STAR ELECTRICAL CO., ET AL.
## CASE NO. 10188276

### PRELIMINARY STATEMENT

This is submitted in response to the complaint filed by Caze Thomas under the referenced case number. By letter dated June 21, 2017, the NY State Division of Human Rights granted an extension of time to respond to the complaint until July 17, 2017.

### RELEVANT FACTS

**The Parties**

**Respondent Five Star Electric Corp.** (named herein as "Five Star Electrical Co.") is the largest union electrical contractor in the City of New York. Five Star currently employs approximately 1,300 employees, including 955 electricians. All electricians employed by Five Star are members of Local Union #3, IBEW ("Local 3").

**Respondent Jeff Thurston** is employed by Five Star as an Assistant Superintendent. In that capacity, Mr. Thurston manages the field labor assigned to eight (8) projects, including the electrical maintenance work for the headquarters of the Metropolitan Transportation Authority located at 2 Broadway in downtown Manhattan, New York, performed by electricians classified as A journeypersons (the "MTA Maintenance/2 Broadway Project") and electricians classified as members of the building maintenance (DBM) division (the "MTA DBM/2 Broadway Project"). The field labor for each project is directly supervised by either a General Foreman or Foreman or, in some instances, both.

**Respondent Daniel Greci** is employed by Five Star as a General Foreman. Mr. Greci is assigned to the MTA Maintenance/2 Broadway Project and supervises approximately twelve (12) electricians who perform a variety of work including monitoring and maintaining equipment providing permanent and emergency power to the building, and setting up office and retail space throughout the building, among many other tasks. Mr. Greci has been employed by Five Star for 2.5 years; previously, Mr. Greci worked for another Local 3 electrical contractor for 16 years. He has over 20 years of experience in the electrical industry. Mr. Greci reports to Mr. Thurston.

**Respondent Felix Valerio** (named herein as "Felix Doe") is employed by Five Star Electric as a Foreman. Mr. Valerio is assigned to the MTA Maintenance/2 Broadway Project and supervises approximately eleven (11) electricians who perform work on the project. Mr. Valerio has been employed by Five Star for 3 years; previously, Mr. Valerio worked for another Local 3 electrical contractor for 17 years. He has over 20 years of experience in the electrical industry. Mr. Valerio reports to Mr. Greci.

Five Star, Mr. Thurston, Mr. Greci and Mr. Valerio are collectively referred to herein as "Respondents."

1

On or about February 27, 2017, **Complainant Caze Thomas**, an electrician, was assigned to work at Five Star by the Employment Department of the Joint Industry Board of the Electrical Industry ("JIB") which, among other things, facilitates the placement of unemployed members of Local 3 with union-affiliated contractors such as Five Star. Mr. Thomas was directed by Five Star to report to the MTA Maintenance/2 Broadway Project. At the time he was hired, Mr. Thomas received and acknowledged various policies provided by Five Star, including the company's Harassment, Discrimination and Retaliation Prevention Policy. The policy and Mr. Thomas' signed acknowledgment of same are collectively attached hereto as **Exhibit 1**.

## The MTA Maintenance/2 Broadway Project

During his second day working on the MTA Maintenance/2 Broadway Project (February 28, 2017), Mr. Thomas complained to Mr. Valerio that he could do better quality work than his assigned co-worker Andrew Bianco, a 35 year plus veteran of the electrical industry, and did not need to be teamed with anyone. In response to the complaint, Mr. Valerio explained to Mr. Thomas that Five Star electricians at 2 Broadway work together as a team to perform their work on the project. Later that same week, on March 2, 2017, Mr. Thomas was assigned to work with Michael Messineo, a 10 year plus veteran of the electrical industry, terminating wires in a power panel in the elevator machine room in the basement of 2 Broadway. While working around energized panels, Mr. Thomas inexplicably began to sprinkle what he said was "holy water" around the power panel area, stating that he felts "strange spirits" in the room and that the "holy water" would address the issue. Following this incident, Mr. Valerio reminded Mr. Thomas that sprinkling any liquid around energized power panels was unsafe to both himself and his co-worker and directed him not to do so again.

At the beginning of his second week on the project (March 6, 2017), Mr. Thomas called Mr. Greci and advised that he would be late to work (scheduled starting time on the project is 7:00 a.m.) due to a home maintenance issue. After Mr. Greci followed up with Mr. Thomas to determine his whereabouts around 9:00 a.m., Mr. Thomas told Mr. Greci that he would not be reporting to work until after 9:30 a.m. Because the express terms of the Collective Bargaining Agreement prohibit an employee from starting the day more than one hour late (attached hereto as **Exhibit 2**), Mr. Greci so advised Mr. Thomas, who was marked as absent (unscheduled) for the day. On the following day, March 7, 2017, Mr. Thomas was assigned to work with Vincent Springvloed, a 15 year plus veteran of the electrical industry. After Mr. Springvloed asked Mr. Thomas to get certain materials to complete their work, Mr. Thomas became angry and complained to Mr. Valerio (literally screaming in his face) that he felt like Mr. Springvloed was treating him like an apprentice. Mr. Valerio then spoke with both electricians to diffuse the situation so that they could move forward and complete their work together as a team.

During the third week of Mr. Thomas' employment by Five Star, on March 15, 2017, Mr. Valerio received a report via telephone from 2 Broadway building personnel that Mr. Thomas was cursing and screaming at his assigned co-worker, a second year apprentice named Marcin Sanik who had just been assigned to the project. (As an apprentice, in addition to his work with Five Star, Mr. Sanik attends two weeks of hands-on training per year at the Electrical Industry Training Center in Long Island City and classes in Manhattan to learn about electrical theory.) Mr. Valerio went to the basement location where they were working and spoke with both

2

employees.  Mr. Thomas told Mr. Valerio that he was offended by the second year apprentice asking so many questions about how to perform the work assigned to them.  Mr. Sanik explained in a written statement (attached hereto as **Exhibit 3**) that he was curious to learn more about the conduit installation they were performing, so he asked Mr. Thomas questions regarding the process which Mr. Thomas refused to answer.  Mr. Sanik further explained that Mr. Thomas later began screaming at him and accused him of harassing Mr. Thomas by asking too many questions about the electrical work they were performing.   Again, Mr. Valerio diffused the situation so that the electricians could move forward and complete their work together as a team. Two days later, on Friday, March 17, 2017, Mr. Thomas arrived approximately one hour late without any explanation.

During the fourth week of Mr. Thomas' employment by Five Star, on Tuesday, March 21, 2017, Mr. Valerio was notified of another incident regarding Mr. Thomas involving a co-worker, Lev Shnitkind, a 17 year veteran of the electrical industry.  After Mr. Thomas and Mr. Shnitkind had pulled cables in conduit from a power panel to receptacle boxes, Mr. Shnitkind sought to assist Mr. Thomas in putting the power panel covers back on by holding the corners to make it easier for Mr. Thomas to reinsert the screws.  Mr. Thomas told Mr. Shnitkind that he did not need his assistance, to which Mr. Shnitkind responded that it was safer to perform the task together as a team.  In response, Mr. Thomas became angry and demanded that Mr. Shnitkind leave the room, repeating that he did not need anyone's assistance.  Yet again, Mr. Valerio spoke with both electricians to diffuse the situation, explaining to Mr. Thomas that the electricians at 2 Broadway work together as a team, especially when confronted with a task that presents a safety issue such as screwing back on covers to energized power panels.

Later that same day, Mr. Thomas asked Mr. Greci if he could leave work early (scheduled quitting time on the project is 2:30 p.m.) to attend a voluntary class being offered at the Electrical Industry Training Center in Long Island City.  As an accommodation to Mr. Thomas, Mr. Greci granted Mr. Thomas' request without docking him any time.  Three days later, on Friday, March 24, 2017, Mr. Thomas again arrived approximately one hour late to work with the excuse that the daylight savings time change — which took place on March 12, 2017 — caused him to wake up late.  Mr. Greci gave Mr. Thomas a verbal warning regarding his repeated late arrivals at work and docked him one hour of time.

During the fifth week of Mr. Thomas' employment by Five Star, on Tuesday, March 28, 2017, Mr. Thomas again asked Mr. Greci if he could leave work early to attend a voluntary class being offered at the Electrical Industry Training Center.  In response to Mr. Greci's question whether this would be the last such request, Mr. Thomas informed Mr. Greci that it would not be because the voluntary class he wanted to take would take two years to complete.  Mr. Greci then informed Mr. Thomas that he would have to dock him time for leaving early that day and that if Mr. Thomas arrived late or left early again, he would have to terminate him for failure to adhere to the hours of work.  Mr. Thomas became angry and began yelling at Mr. Greci.  He then left the shanty and returned a few minutes later, shouting across the room to Mr. Greci that he would not be leaving early that day.

Later that week, on March 31, 2017, Mr. Valerio witnessed Mr. Thomas performing work in an unsafe manner and instructed him on the proper tool and method to use.  Specifically, rather than

3

use an available compass saw to cut a hole in sheetrock to install new receptacles, Mr. Thomas was using a drill bit to poke small holes in the sheetrock and then connecting the holes by using a sawzall blade (detached from the reciprocating saw) to cut the sheetrock by hand. In response to Mr. Valerio's direction to not to perform that task in that manner because it could injure him, Mr. Thomas told Mr. Valerio that he was getting the job done and it did not matter how he did so.

Twice a year, each member of Local 3 is required to pay their union dues for the upcoming six month period. Upon payment, Local 3 then issues a new union card to each member which is valid for the next six months. At the beginning of April 2017 (the beginning of one of the six month periods), after repeated reminders to the electricians during March 2017, Mr. Greci checked the union card status of each of the electricians supervised by him on the MTA Maintenance/2 Broadway Project. When Mr. Greci asked Mr. Thomas on April 3, 2017 (the first work day of the month) to see his new union card, Mr. Thomas did not have one in his possession, nor did he have a receipt from the union hall verifying payment of his dues (which would have been acceptable proof of dues payment in lieu of possessing a valid card). As an accommodation to Mr. Thomas, Mr. Greci called the union hall to determine whether they had a record of receiving the required dues payment from Mr. Thomas. After considerable delay, Mr. Greci was told that Local 3 did not have a record of receiving payment from Mr. Thomas. At that point, per the direction of Mr. Thurston, Mr. Greci released Mr. Thomas for the day with the direction to come back the following day with either a valid union card or receipt of payment of his dues, or he could not begin work. When Mr. Thomas appeared at 2 Broadway the following day, April 4, 2017, without either a valid union card or a dues payment receipt, Mr. Greci did not start him and sent him home, marking him absent (unscheduled) for the day.

On April 5, 2017, Mr. Thomas reported to 2 Broadway with a valid union card and was permitted to work. At that time, given his repeated unscheduled absences (March 6, April 4), late arrivals (March 17 and 24) and early departure (April 3) over the six weeks of his employment by Five Star, Mr. Greci gave Mr. Thomas a written warning on a form provided by the JIB's Employment Department (attached hereto as **Exhibit 4**) as provided for by the Working Rules of the Collective Bargaining Agreement (attached hereto as **Exhibit 5**). Mr. Thomas became angry, began shouting at Mr. Greci and refused to sign the form to acknowledge its receipt. He then stormed out of Mr. Greci's office and continued shouting as he left. Mr. Valerio was present for the meeting and signed the warning form as a witness.

The following week, on April 13, 2017, Mr. Thomas, Mr. Sanik and another electrician, Michael Messineo, were working together in the mechanical room on the 31st Floor of 2 Broadway. Mr. Thomas directed Mr. Sanik (a second year apprentice) to climb a ladder to perform a work task on top of live switchgear, a device used for opening and closing electric circuits, especially those that pass high currents. Given the height and the energized nature of the equipment (see photos attached hereto as **Exhibit 6**), as well as his relative inexperience, Mr. Sanik did not feel comfortable performing the task and told Mr. Thomas that he did not feel safe doing it. Mr. Thomas responded by telling Mr. Sanik that an apprentice is supposed to follow the direction of the journeyman electrician with whom he is working, which led to an argument between Mr. Thomas and Mr. Sanik. Mr. Thomas then exhibited what Mr. Sanik described as "road-rage" type behavior, bouncing around like a boxer and challenging him to a fight, asking him if he wanted "to take it to the 'hood". Mr. Valerio happened to be in the area and, after hearing the

4

argument, he intervened to diffuse the situation.   Mr. Valerio then brought both electricians up to speak with Mr. Greci, who was leaving the shanty to attend a job meeting.   Mr. Greci spoke with both men, then sent Mr. Sanik downstairs to accept a delivery of materials.

After completing his task of accepting the material delivery, Mr. Sanik saw Mr. Thomas on the first floor near the freight elevator.  Also present at the time were two Five Star electricians working on the MTA DBM/2 Broadway Project, Ronald Shatilla and Patrick Deenihan.  According to Mr. Sanik, Mr. Thomas appeared angry, was breathing heavy and was staring at him.  Mr. Sanik asked Mr. Thomas why he was staring at him and commented that it looked like Mr. Thomas wanted to hurt or kill him.  In response, Mr. Thomas told Mr. Sanik that "if I wanted to kill you, I would kill you."  At that point, Mr. Shatilla intervened to diffuse the situation.  Mr. Thomas continued to stare at Mr. Sanik and make threats to him after they entered the elevator, stating that "this kid is going to make me punch him."

Mr. Thomas then left his work area and went to the MTA's Security Office at 2 Broadway to ask about access to the building's turnstile access records and whether the building's security cameras have audio capabilities.  Finding the requests odd, the MTA Security Officer asked Mr. Thomas if he had discussed these issues with his boss, Mr. Greci.  Mr. Thomas ignored the question and then asked for the identity and location of the Building Manager.  Mr. Thomas then proceeded to the Building Manager's office to ask for the same information.  At this point, a representative of the Building Manager, Michael Brady, pulled Mr. Greci out of his job meeting to advise him that Mr. Thomas was seeking details about the building's security features.  Mr. Greci then contacted Mr. Valerio to inquire about Mr. Thomas' disruptive conduct.

Shortly thereafter, Mr. Valerio, Mr. Thomas and Mr. Sanik went to Mr. Greci's office to address the ongoing situation between Mr. Thomas and Mr. Sanik.  (By this time, Mr. Greci had been notified by the MTA Security Office about Mr. Thomas' request for building security information.)  Mr. Thomas angrily told Mr. Greci that he felt like Mr. Sanik was disrespecting him by not following his directives and constantly asking questions.  Mr. Sanik told Mr. Greci that he was very upset with the situation and broke down in tears.  He stated that he believed Mr. Thomas had anger issues, and that Mr. Thomas constantly screamed at him, demeaned him and threatened him.  Mr. Sanik then provided a written statement regarding the day's events (attached hereto as **Exhibit 7**), including details about the threat made by Mr. Thomas.  (A written witness statement signed by Mr. Shatilla supports Mr. Sanik's version of the events; attached hereto as **Exhibit 8**.)

At this point, Mr. Greci telephoned his supervisor Mr. Thurston to advise him of the situation.  Upon hearing that Mr. Thomas had threatened to harm or kill a fellow employee, Mr. Thurston advised Mr. Greci that Mr. Thomas should be terminated for cause and told him that he would come to 2 Broadway to address the issue in person.  Upon his arrival, Mr. Thurston met with Mr. Thomas and terminated him for cause.  Mr. Valerio then escorted Mr. Thomas from the building.  A termination slip was prepared by Five Star's Superintendent's Office on the standard form issued by JIB's Employment Department (attached hereto as **Exhibit 9**), listing the reason for Mr. Thomas' termination for cause ("disruptive to job") along with the other issues involving Mr. Thomas which preceded his termination ("lateness"; "absenteeism"; "leaves job early"; "insubordination").

Prior to his termination on April 13, 2017, Mr. Thomas never reported to Mr. Thurston, Mr. Greci or Mr. Valerio any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience".

**Local 3 Grievance Proceedings**

On the date of his termination, April 13, 2017, Mr. Thomas filed a grievance with Local 3. A hearing was held before Local 3's Grievance Committee on April 17, 2017. Mr. Thomas appeared on his own behalf; Mr. Thurston and Mr. Greci appeared on behalf of Five Star. During his approximately 45 minute presentation at the hearing, Mr. Thomas did not testify about any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience". Rather, Mr. Thomas testified about a single incident in which a female elevator operator employed by a contractor hired by the MTA asked him whether he was a man or a woman.

By letter dated April 18, 2017 (attached hereto as **Exhibit 10**), Local 3's Grievance Committee determined Mr. Thomas' termination to be "justified." Mr. Thomas appealed that determination to Local 3's Grievance Appeal Committee, which held a hearing on May 9, 2017. No representative from Five Star attended the appeal. In a one-sentence letter dated April 25, 2017 (obviously a typographical error) and mailed on May 11, 2017 (attached hereto as **Exhibit 11**), Local 3's Grievance Appeal Committee reversed the Grievance Committee's determination and found that Mr. Thomas' termination was "not justified." Five Star was later advised by Local 3 that the determination was reversed on a "technicality", namely, the April 13 termination slip issued to Mr. Thomas listed more issues than the April 5 warning slip issued to Mr. Thomas (even though the issues set forth on the April 5 warning slip did not form the basis for Mr. Thomas' termination for cause on April 13).

*[handwritten right margin: The Union Reconfirms the termination is not Justified on July 28 2017.  (15)]*

*[handwritten: False. Mr. Thurston Reconfirms cause of termination by forging his signature on it.]*

To rectify this "technicality" and provide more details regarding the basis for his termination, Five Star reissued a termination slip for Mr. Thomas on or about June 29, 2017 stating the reason for termination as "disruptive to job by harassing and threatening the wellbeing of a fellow employee (Apprentice) which is in violation of Five Star Company Policy" (attached hereto as **Exhibit 12**). *[handwritten: False, Five Star Electric foras Asst. Super Jeff Thurston forged his name on the termination claiming to be the Author of it in order to take credit for the wrongful termination, In an attempt to sabatage my career and Harrass me. An act of defermant of Character.]*

**NY State Department of Labor, Unemployment Insurance Division**

On or about May 3, 2017, the New York State Department of Labor, Unemployment Insurance Division ("DOL"), mailed a questionnaire to Five Star concerning Mr. Thomas' termination in order to make a determination as to his eligibility for unemployment insurance benefits. Five Star completed the questionnaire and returned it to DOL on May 10, 2017 (attached hereto as **Exhibit 13**), between the issuance of Local 3's grievance determination that Mr. Thomas' termination was justified (on or about April 18, 2017) and Local 3's grievance appeal determination that Mr. Thomas' termination was not justified (on or about May 11, 2017). *[handwritten: False, The appeal was held on May 9, 2017 and Five Star Electric return ized to the DOL on May 10, 2017]* During a subsequent telephone call between Five Star and DOL, Five Star advised DOL about the outcome of the Local 3 grievance appeal.

6

Despite receiving a written witness statement from Mr. Sanik (attached hereto as **Exhibit 6**) stating that Mr. Thomas threatened to harm or kill him, DOL issued a Notice of Determination on May 24, 2017 (attached hereto as **Exhibit 14**) finding that Mr. Thomas was eligible for benefits because Mr. Sanik's firsthand statement somehow did "not refute" Mr. Thomas' "firsthand" statement that he did not threaten to kill his coworker, but rather made a "sarcastic comment" in response to his co-worker's comment.

## ARGUMENT

Without citing a single specific fact to support his assertions, Mr. Thomas generally alleges that Respondents engaged in unlawful discriminatory practices relating to his employment based on his sex and sexual orientation. According to Mr. Thomas' complaint, he is a heterosexual male who "was perceived as being homosexual." Mr. Thomas further alleges, again without citing any specific facts, that he was harassed and "discriminated against for being of transgendered experience". Mr. Thomas also alleges generally that he was harassed or intimidated by Respondents (unrelated to sexual harassment).

Mr. Thomas further alleges that Respondents engaged in unlawful discriminatory practices by retaliating against him for asking the MTA's Security Office for a "point of contact" so a Local 3 "Shop Steward could review surveillance" footage.

Last, Mr. Thomas alleges that he was discriminated against by receiving a disciplinary notice or negative performance evaluation and by being terminated.

In contrast, as set forth above, Respondents have provided specific factual details concerning Mr. Thomas' unsafe work practices; repeated failures to adhere to the hours of work by showing up late, leaving early, or taking unscheduled absences; insubordinate conduct; and disruptive conduct including leaving his work area and disturbing clients, culminating in his threat to hurt or kill a co-worker. Each of the specific facts refutes Mr. Thomas' general allegations, which should be taken for what they are — convenient, after-the-fact, excuses that have no substance or validity.

Mr. Thomas' general, non-specific allegation that "rumors and lies were spread about me to my co-workers and other building employees [] because of my assumed sexual gender and sexual orientation" fails to demonstrate that Five Star or any of its employees, including Mr. Thurston, Mr. Greci or Mr. Valerio, engaged in or condoned such conduct.

Similarly, Mr. Thomas' general, non-specific allegation that Five Star "supervision and other employees" deliberately provoked confrontations with him "because of their hate/dislike for [his] presence because [he] was of transgendered experience" is not supported by any specific facts and is belied by the detailed facts set forth above which demonstrate that Mr. Thomas repeatedly worked in an manner unsafe to both himself and his coworkers, that Mr. Thomas repeatedly caused disturbances by arguing with his co-workers and that Mr. Thomas threatened the life of a co-worker. Indeed, the detailed facts provided by Respondents directly refute Mr. Thomas' bald assertion that he "actually sought and executed all possible proper safety methods," and "walked away and stayed to [himself] as much as possible to avoid any and all confrontation".

After acknowledging the facts that he reported to work late, left work early and was absent, Mr. Thomas proceeds to argue that those undisputed facts — each of which are a valid basis to receive a written warning — somehow make the written warning he received discriminatory. The fact that Mr. Thomas was directed to leave work because he failed to present evidence of payment of his required union dues does not convert his absence from work that day to a scheduled or excused absence. Moreover, Mr. Thomas fails to present any factual details about the "several" co-workers he alleges were either absent (presumably unscheduled) or late without consequences.

Mr. Thomas again acknowledges the undisputed fact that he left his work area during work hours to pursue a personal issue with the MTA Security Office and Building Manager, then claims they both "ignored" him and directed him to speak with his employer.

Last, although DOL apparently accepted Mr. Thomas' assertion that he did not threaten to kill his co-worker and only made a "sarcastic comment" in a response to his co-worker's statement, employers these days sadly don't have the luxury of dismissing those type comments with such ease. The recent tragic killing at Bronx Lebanon Hospital in The Bronx, New York, is the latest in a long-string of workplace incidents throughout the country involving a former employee returning to kill or injure his former coworkers. Based on the statements made by Five Star employees about Mr. Thomas' threat to his co-worker Mr. Sanik, along with his aggressive behavior on that day, Five Star was fully within its rights to terminate Mr. Thomas' for cause immediately and without warning.

## CONCLUSION

For all of the reasons set forth above, Respondents submit that there is no probable cause to believe that Mr. Thomas' complaint of unlawful discrimination has any merit and the complaint should therefore be dismissed in its entirety.

Dated: July 14, 2017
      Ozone Park, New York


Respectfully submitted,

Robert J. Saville, Esq.
President, CEO & General Counsel
Five Star Electric Corp.



Rebuttal

Caze Thomas- Complaint

case number. 10188276

RECEIVED

AUG 2 1 2017

O.S.H.I.

In my rebuttal I have included a copy of five stars rebuttal as my evidence I've labeled each paragraph as a section alphabetically ordered on each page this copy can be used to cross reference my own rebuttal to point out key factors and other relevant information that may otherwise go unnoticed.

## RELEVANT FACTS

During my 2017 employment with five-star at the two Broadway MTA jobsite Mr. Felix Valerio was not a foreman, his title was Sub-foreman and Mr. Daniel Greci's title was General Foreman. In fact, when Mr. Valerio brought myself and Mr. Stanik to report to Mr. Greci. Mr. Greci mentioned in his response to the issue at hand that he being the general foreman, shouldn't have been the next in line to deal with the matter. I'm assuming he was referring to the proper chain of command, however there was no one with the title Foreman above Mr. Valerio's position of Sub-foreman. It is possible that Mr. Valerio was promoted for the part he played in harassing me and supporting the lies in my unjust termination on April 13, 2017. In Five Star's rebuttal introduction of relevant facts, it is shown that even though Mr. Greci was with the company for a shorter period of time, having lesser years with his previous company, and both of them having 20 years in the electrical business, Mr. Valerio worked under Mr. Greci's General foreman position and still wasn't given the title Foreman. However, it is to my recollection that Mr. Greci had work for Five Star for a longer period than stated. The department of labor would have record of if whether or not this is true.

Mr. Sanik (the apprentice), was already a part of the work crew at 2 Broadway when I was assigned to the job site. Oddly he was the only apprentice for the "A" Division journeyman. This is against the ratio set in The collective bargaining agreement. Five Star has given the false impression that they strictly uphold The Collective Bargaining Agreement throughout their rebuttal, when in fact they only used it to their convince when trying justify their actions against me. Also in their rebuttal, Five Star shows entrys from the business agreement, but failed to include ratio that for every apprentice there should be no more than two journeymen. On the first page of the rebuttal it states that there were 11 "A" journeyman (not including the journeyman and apprentice from the DBM division). I should have never been assigned to the job site due to the imbalance in the ratio and Mr. Stanik shouldn't have been the only apprentice. See Exhibit __5

Even though the journeymen who were in the work crew were not Five Star employees for the entire duration of the careers, Five Star recognizes all of the years of experience they have. They'd neglected to do the same when introducing me as their employee. They blatantly refuse to acknowledge me as an "A" Journeyman. This is the third occasion I have worked for this company. See Exhibit 1

This statement failed to express the truth about how we weren't provided with proper safety equipment to work on live panels. Details and its entirety are as follow: While installing a conduit with Mr. Mike Messineo (an "A" journeyman) in the basement by the storage cages, I proceeded to hang a straight





(Cont's)
Pg 2
section
3

length of conduit on kindoff straps to attach to the 90° bend that Mr. Messineo was installing (example in Exhibit  4 __). Mr. Valerio came down to check on our progress and I immediately told him that the condition of the panel looked hazardous and that Mr. Messineo and I both felt like we would feel safer if we had an electrical arc saftey suit to do the work we needed to do in the panel. An example of an electrical arc safety suit and regulation details is shown in Exhibit_ 6 ___. He'd said that they didn't have an electrical arc safety suit, and to just be careful. This is the reason they never mention giving any of the men an electrical arc safety suit. After my inquiry, he told me that he wanted Mr. Messineo and I to work together as a team, as in for me to just pass Mr. Messineo the materials he needed. My thoughts or skill weren't needed. His reason was that there wasn't a lot of work to do so to keep guys working, we needed to work at a slower pace unless we were told that the task had a time frame, or was a rush to have completed. I continued the assignment after Mr. Messineo went on vacation.

Pg 2
section
C

Mr. Valerio played no part in diffusing or settling any differences between Mr. Springvloed and I. Details and it's entirety are as followed: I started working for Five Star electric on February 27, 2017 my first work partner was an "A" journeyman by the named of Mr. Vincent Springvleod. After we were given our assignments by the Sub Forman Mr. Valerio, Mr. Springvleod proceeded to work on one part of the assignment. I asked him if he needed any help, he snapped at me and said "no", so I started to get the measurements to prep the other part of the assignment. Mr. Springvleod yelled at me telling me not to touch anything. I asked him if he knew I was a journeyman, he responded "yes.". Then I said you're acting like this couldn't get done if you weren't here. He calmed down and changed his tone. We worked out our differences and decided to call it a misunderstanding. We shook hands and continued to work in peace throughout the day. Mr. Valerio played no part in our resolve.

Pg 2
section
D

Pg 3
section
A

Never have I had an issue with an apprentice asking questions to learn the trade. In his statement containing false testimony, Mr. Valerio is trying to portray as if he addressed the issue at hand, but fabricated much of his story to make me the villain of it. Details and it's entirety are as followed: On one occasion, Mr. Valerio had (The Apprentice) Mr. Marcin Sanik work with me on the task I started with Mr. Messineo and continued. Mr. Valerio looked at the work I had done up to that point, and though there was nothing wrong with one of the offsets I installed (example of an offset in Exhibit 4 __), Mr. Valerio didn't like the way it looked; so at that point I made it my business to make the runs look more visually attractive. Mr. Sanik was upset that we had to reinstall the offset. I told him not to worry about it, Mr. Valerio just wanted it a different way. Mr. Sanik then said that's going to take up time, and that we were wasting time. Again, I told him not to worry about it, that Mr. Valerio told me that they didn't have much work so we needed to work a little slower than usual. He then asked "well what if the sub foreman or foreman is wrong?" I answered, "well he's running the job, it's his way of creating more work for us". While we were working together, I had Mr. Sanik bend 90° bends (example in Exhibit 4 __), offsets (example in Exhitbit  4 __), box sets (example in Exhibit  4 __, and install Kindoff and Kindoff straps (example in Exhibit _4_ _). He had a suggestion about a path we could take. I agreed that he had a good idea, and we made an installation according to his suggestion. His attitude remained disgruntled throughout each assignment I gave him, however he made the bends I requested correctly without asking for help or instructions. Once I saw he did it properly, I knew he had acquired the skills. When I decided not to use his suggestions his attitude got worse, he criticized everything I had done, became insubordinate, and said I didn't know what I was doing. I told him that if he felt that way that he shouldn't waste time asking Mr.Valerio to assign him to someone who he felt could teach him, but harassing me because I didn't accept his next suggestion wasn't an option. I told him several times to go

P₂

(3)

(Cont's)
pg 3
section
A

to the Mr.Valerio because I had had enough of his tantrum. Mr. Sanik refused to leave and said that he wanted to work. His negative attitude seemed to lessen. Though I was tired of unnecessary and unprovoked arguments I just wanted to get through the day. We continued to work. After break I had him install a piece of kindoff while I went to the restroom. when I returned he wasn't there. I then went to the shanty to get some materials we needed (a shanty is a breakroom for the crew, ours just happen to have tools and materials also), when I came back Mr. Sanik was sitting down. I thought maybe he was just having a rough day, so I let him sit there while I went to check the storage cages for other materials. When I came back to the area we were working in I told him to come so we could get back to work. Mr.Sanik then pointed to a small paper cup that fell out of the small bag of garbage bag that I had under my push cart (example of the exact same cup in Exhibit _12_), and yelled "you threw that on the floor! do you do that at home!" I asked him if he saw me throw the cup on the floor, he yelled "No, but you threw it on the floor." I then asked him to look around the area we were working in, there were several small pieces of garbage on the floor. The janitors had brought the garbage of the building in the vicinity of the area we were working in to break down recycles. Knowing that the only eyes other than my own present when I took break in the area was the one's watching behind the nearby camera, I asked him what made him think the cup even belonged to me. He yelled louder and louder in an attempt to embarrass me in front of passing MTA workers; screaming about how I threw the cup on the floor, and said that I was disrespecting him by throwing the cup on the floor. Curious I asked, "All of this garbage and you're worried about this cup in particular. Do you see the garbage bag under my cart? Why would you think this cup even belongs to me?" He then started yelling "you're yelling at me, you're yelling at me, and you're disrespecting me by throwing the cup on the floor. I then said " am not yelling at you, and you're still accusing me of throwing the cup on the floor. Did you see me throw the cup on the floor?" He said "No." I then reminded him that his job wasn't to worry about a paper cup on the floor that posed no threat or obstacle, that his job as an apprentice at that moment was to assist the journeyman he was working with, and that I had told him to get up so that we could continue the run. He said "I'm not worried about the other garbage. If you threw the cup on the floor..." I had then cut him off and said that I didn't throw the cup on the floor, but because he was so worried about the cup that he should pick it up and throw it away. He picked it up and threw it away. After the dust was settled Mr. Valerio asked us what happened, I told him what happened however after hearing of Mr. Sanik's behavior the result wasn't a resolution that would correct the apprentice's actions. Instead, Mr.Valerio gave a description of the responsibilities of both a journeyman and apprentice. The apprentice's behavior was ignored. Never did I ever tell Mr. Sanik, Mr. Valerio, or anyone else that I had and issue with Mr. Sanik asking questions related to electrical work. I welcomed and answered all the questions Mr. Sanik had asked. I pointed out to Mr. Valerio that I was aware of what he was speaking of, something which wasn't the issue, the issue was Mr. Sanik's behavior. Mr.Valerio ignored me. By lunchtime Mr. Valerio assigned Mr.Sanik to another task, and I continued to work alone. Shortly after a security guard came up to me and said sometimes it's better to work alone. I agreed with him.

I've taught many apprentices a lot about electrical work. Before getting hired by Five Star electric in February I'd been in the process of voluntarily teaching apprentices through the electrical joint industry board to help them become better electricians, and give them the opportunity to learn what they may not learn in the field. I know what it's like to be neglected and abused as an apprentice, I would not treat an apprentice the way that I was treated in those cases. Luckily I had journeymen who taught me unbiasedly. They inspired me. To give an example of my character that is absent from Five Star's rebuttal and their introduction of me, on the Harry Van Arsdale memorial (the founder of the Union Local in



which all parties of this case are members of), I chose to have written in stone, "Do onto others as you would have them do unto you" quoted next to my name.

Afterwards I worked with an "A" journeymen named was Mr. Lev Shnitkind. We ran two circuits from a live panel in the basement, to supply power to the outlets by the storage cages that I was installing. We were working well together, until he started asking me questions about high security clearance information concerning my military experience, saying how the Russian Army and the U.S. military had ships side by side so there were no real level of confidentiality. I told him I didn't experience nothing he was speaking of and that my experience was confidential enough for me to want to keep to myself. He had gotten a little agitated and had expressed that after pulling the wire, he was looking forward to going back to his original assignment. Before he went, he wanted to put the panel doors back on because he felt like it would take the two of us to put it up safely, also he wanted to protect any one from any possible hazards because the panel was live. I completely understood, but because the panel was wired very sloppily, and we weren't ready to dress and install the wires we had just pulled into the panel, I suggested that we could just lock the door to the room itself instead of putting ourselves in danger by shoving a bulky coal coil of wire into a live panel. To further assure Mr. Shnitkind that it would be be okay to just lock the door, I told him that I was going to monitor the room, because I was going to be in the area throughout break. Knowing that he wanted to go back to his original assignment instead of returning after break. I demonstrated that I was capable of lifting the door myself if he wasn't available later. He insisted so he got the approval from Mr. Valerio before. Again Mr. Valerio did not provide a required electrical arc safety suit to protect us. Even though I felt like I was being put in an unsafe environment because of the condition the panel was in, after having had previous disagreements I just wanted to get along with everyone so I went with the flow to be a team player.

Still working on the task, I went to the 30th floor to get some more conduit (pipe) which was right next to the freight elevators (example of floor plan in Exhibit _10_ ). Unaware of my presence, I heard Mr.Valerio telling a male elevator operator details about the previous events that had occurred between myself and other workers while referring to me as a female. When he turned the corner he was shock to see me standing there. I got the conduit I needed, and avoided saying anything to him. It wasn't until after this happened that building workers started referring to me as a female, and asking if I was a man or a woman. I then realized that whenever I walked into the shanty the guys would get quiet. The guys started acting different towards me. I stayed to myself as much as possible. After noticing this Mr. Valerio said that excluding break or lunch, I had to stay with my partner at all times. Even if it was to go get a screw or lock nut, tasks that did not take two people to do. (examples of bolt and nuts are in Exhibit _12_ ), he added that if we had to use the bathroom that we were to use the same stall. A total violation of my space. Knowing what he thought of me, it was no laughing matter. Sure enough, whether it was something as small as a locknut, my partner followed me or wanted me to follow him. Ironically I noticed that when I used the restroom, the security guard who had mentioned to me earlier that said "sometimes it was best to work alone", would follow me in the restroom as if he was ordered to do so. While I sat alone in the staircase during break one day, again unaware of my presence, two journeymen (who mentioned my name directly in their conversation) were talking about how they caught a glace of the shirtless guy on my phone's screen saver while standing next to me, and how the guy must have been my lover, neither referred to me as a female. However The shirtless man on my screensaver that they spoke of was a picture of one of my best friends who pasted away in January.



Pg 3
section
C

Mr. Greci who originally said it was ok for me to leave a few minutes early to make it to class on time, had changed his mind and threatened to dock me if I left early. After I told him that I would make the sacrifice to further my education, he told me that he would give me a bad layoff for leaving early. Details and its entirety is as follows: March 14, 2017 was the second week of my Cisco Academy classes. Though it's a voluntary class, it's conducted by the Union Hall to educate fellow union electricians, so that they can prosper in the electrical business and become more of an asset. I had asked Mr.Greci if I could start 15-20 minutes early so that I could leave at 2 PM to make my class on time. He told me that I didn't have to start early and that I could still leave at 2 PM. Mr. Valerio turned to him and gave him a funny look. The following week, March 21st I told my work partner Mr. Carlos Santiago (an "A" Journeyman) that I was leaving early for class. When I got to the shanty at 2 PM to let Mr.Greci know that I was leaving he said that he wasn't going to allow me to leave early every week, and that he needed me to be there to work. I told him that I had only asked him because he had the guys coming back to the shanty at 2:05pm and we just sat there for 20 minutes, and that I wasn't trying to cheat him out of a worker which is why I had asked to start work a little early so I could make my class on time. As we were talking the men started walking into the room. He had told me that he wasn't going to allow me to work early, and if I left early that he was going to dock me. I told him that I was willing to make the sacrifice for my education. He then said that if I did so the following week that he would lay me off for leaving early, so I stayed. The whole crew sat there from 2:06-2:20pm. The next day, March 22 , 2017 Mr. Valerio was about an hour late. After break Mr.Valerio came to me and told me that Mr.Greci wanted to talk to me and that it was nothing negative. When I came to Mr. Greci's office, we sat down and he'd told me that my work ethics were impeccable, that I knew what I was doing, and that he wanted me to be a part of the team. He had even referred to himself as my friend. He said that I could come talk to him if I felt uncomfortable working with someone. He mentioned that he knew that I had some unpleasant experiences because of some people's personal opinions of me which made me want to be off to myself. He said that he understood and didn't want to try to force me to sit with the guys at break or interact but he was letting me know the door was open. In others letting me know that I was welcomed. As he spoke about knowing of certain experiences I encountered in my work environment, I remembered working with him for about eight months at the new annex of John Jay College around 2009 or 2010, before my gender transition. I was a 2nd year going on 3rd year apprentice for EGG Electric. My foremen at the time had so much confidence in my skill and ability, they gave me the prints and materials, and had me install all of the BMS work by myself. My foreman Frank Lapadula terminated the panels because I wasn't permitted to do so. For a few of my installations I had to cross reference with Five Star Electric who were covering the electrical power aspect of the job. I believe Mr.Greci was in the foreman at the time who had his apprentice by the name of David assist me. That apprentice was in my electrical theory class for four years. He continued saying that if I needed to step back and to take a break I could do so because everyone goes through thing's, and how when the guys have their moments they go have a cigarette, go to the bar, or go have a coffee to clear their heads, and it was cool. He said that he wanted me to ride the wave and be a part of the team, and that we were going to start fresh. I told him that I had been through a lot, and that I stay to myself to avoid any problems. I added how I don't smoke cigarettes but instead I was into my books.

Coming back to the shanty at the end of the day I saw that Mr.Greci told everyone to start coming back to the shanty later than 2:05pm except me, while my partners stood outside the door I walked into the room at 2:10pm. Once I saw the room was empty, I walked back out and waited with my partner Mr. Santiago.

3 3
section
C

P5



*Pg 3 section C* My isolation was becoming noticeable to the MTA's building maintenance workers who had saw that I had preferred to sit on the floor in the hallway alone then to had sat in the room with the rest of the work crew.

*Pg 3 section C* Referring to Mr. Greci statement of when I arrived late, I told him that I used the alarm on my phone to wake up, I didn't know of any of the reason for it to lag in time besides daylight savings time and thought that was the reason, but when I called my phone provider they told me a tower was down in my area and could fax me something stating so. When I told Mr. Greci of the actual cause a malfunction he was disinterested

*Pg 3 section E* After completing the assignment of installing the outlets in the basement by the caged storage areas, on or around March 27th, Mr. Valerio gave me my next assignment which was also in the basement but in a storage room. It had the same set up as the previous one. The task included removing the panel doors off of an energized panel, installing new wires, dressing and terminating the wires in the same energized panel, and putting the panels door covers back onto the panels by myself. Before going on furlough, Mr. Santiago helped me install one of the wires that I needed help pulling from the energized panel to the pull box just outside of the electrical closet. Toward the end of the assignment being completed he assigned Mr. Sanik (the same apprentice who he accused me of neglecting earlier), to help me finish the project. Being an apprentice, I did not allow Mr.Sanik to work in the electrical closet nor did I allow him to work any energized circuits. Mr.Sanik gave me no problem working in this area. Once again, I had asked Mr. Valerio for an electrical arc safety suit and was told that there still wasn't one on site. Mr. Valerio had no safety concerns and did not provide me with nor Mr. Santiago with an electrical arc safety suit as required to work on an energized panel.

Both the Occupational Safety and Health Administration (OSHA) and the National Fire Protection Association (NFPA) have written standards and regulations that build on one another and help keep workers safer from electrical hazards in the workplace. In this case, the OSHA regulations and NFPA standards work so well together it's been said that OSHA provides the "shall" while NFPA provides the "how." It is important to note that the NFPA 70E is a national consensus safety standard published by NFPA primarily to assist OSHA in preparing electrical safety standards. Federal OSHA has not incorporated it into the Code of Federal Regulations.

OSHA bases its electrical safety standards (found in 29 CFR Part 1910 Subpart S and 29 CFR Part 1926 Subpart K) on the comprehensive information found in NFPA 70E. It focuses on protecting people and identifies requirements that are considered necessary to provide a workplace free of electrical hazards. Here's an example of how the OSHA regulations and NFPA 70E electrical safety standards work together. OSHA mandates that all services to electrical equipment be done in a de-energized state. "Working live" can only be done under special circumstances. NFPA 70E defines those special circumstances and sets rigid electrical safety limits on voltage exposures, work zone boundary requirements and necessary personal protective equipment (PPE). (See NFPA 70E Article 130 and OSHA subpart S part 1910.333(a)(1) for complete details.)

⑦

**29 CFR 1910.333(a) states that employers must employ safety-related work practices to prevent electrical shock or other injuries resulting from either direct or indirect electrical contact. NFPA 70E is the tool employers can use to meet this OSHA requirement. It will help evaluate electrical risk and document an overall electrical safety program that directs activity appropriate for electrical hazards, voltage and energy level and circuit conditions. One major element of an electrical safety program is a hazard identification and risk assessment to determine protective equipment needs including PPE. This risk assessment must be done before any work is started within a shock or arc flash boundary. Two basic methods can be employed to complete the PPE risk assessment:**

**Table**

**Refer to NFPA 70E-2015 Article 130, tables: 130.4(D)(a) or (b) for shock risk assessment\***

**130.7(C)(15)(A)(b) or (B) for arc flash assessment**

Pg 4 section D

Work assignments are given by supervision. Myself along with others were assigned to work in the machine room on the 31st floor by Mr.Valerio. In this statement is also the vicious lie that I told Mr. Sanik to work on top of **an energized switchgear with high currents**. This is a display of their efforts to sabotage me and destroy my career and reputation. Given the very description of the electrical state of the equipment in the mechanical room itself, Mr. Valerio having 20 years in the electrical business should have never permitted Mr. Stanik who is an inexperienced apprentice to enter the room as stated in the collective bargaining agreement that Five Star allude to uphold in their rebutall (See Exhibit 5.12. In his false statement, Mr. Stanik says that I told him to get on top of a VFD. An example of a VFD is shown in exhibit 12. Details and it's entirety are as followed: It took the work crew a few days to pull the conductors out of the galvanize conduit run that ran from the roof to a panel in the mechanical room on the 31st floor. In the mechanical room on the 31st floor, Mr. Lev Shnitkind (an "A" journeymen), and Mr. Sanik (the previous mentioned apprentice) bolted a wire puller to the floor in front of the panel, prepared a hitch notch around the wire using a rope, and wound the rope around the grounded wire puller, to extract the wires from the conduit which was attached to the de-energized panel. See Exhibit 3 Also.

Pg 4 section D

The power to the panel was de-energized to prevent, and remove any and all electrical hazards because of the potential dangers that would have been caused by necessary maneuvers that had to be done inside of the panel by hand as well as the potential dangers of using a grounded wire puller. After they set up, the entire crew helped in removing the wire and conduit (pipe).

Pg 4 section D

After we pulled the wires out of the conduit (pipe), Mr.Valerio did not re-energize the panel again because we were replacing the conduit altogether and needed to use the same force to replace the wires. There was no need to turn the power back on after we had **removed the main circuits** that were being powered, **the VFD circuit.**

Pg 4 section D

After seeing how supervision and other journeymen allowed Mr. Sanik in the mechanical room where there was both live (energized) and dead (non-energized) panels, I refrained from saying anything opposing his presence in the area to avoid being attacked by being labeled disruptive, and not conducting myself as a team player.

Pg 4 section D

In his statement Mr. Sanik says that I told him to stand on top of a live VFD. There are two The VFD's in that room, both stand mounted at the height of 3 ½ ft. tall. Mr. Sanik's natural height stands about an

P 7

⑧

pg H
section
D

inch or two shy from 7ft tall. Neither VFD was having conduit installed on top of them. In Fact, the VFD was one of the circuits who's wires were being replace, then re-powered by the de-energized panel that we were working on. Having no power from the panel to power it, it too was de-energized. Also in this false statement, Mr.Sanik speak of the height of the top of the VFD's being too high up for him; not realizing that he'd given a written confession of not being able to perform his duties to complete his apprenticeship. Though he wouldn't need a ladder to reach the height of 3 1/2ft while naturally standing close to 7ft tall, throughout his career he should be capable of climbing a ladder above 1ft. The minimum requirement is 1000ft (Exibit _12_).

pg 4
section
D

The top of **the de-energized panel** we were working on stood at a height of about 5'5"-5'6", it's length from front to back is about 1-1 ½ feet. Mr. Sanik natural height stands an inch or two shy from 7ft. tall, he was able to look down on top of the panel without the use of a ladder. I stand at the height of 5'3.5". Because of Mr. Sanik's height and reach, I simply implied that if he stood on a 10ft ladder which would give him more stability, without climbing above 4ft he could easily reach the kindoff strap and coupling to tighten the screw. A skill I knew he did not need assistance, nor visual demonstration, or verbal instructions on how to do. I never told him to get on top of any panel, nor did I tell him to make any measurements for an offset.

pg 4
section
D

**In Five Star's Rebuttal, to be misleading in Exhibit 6 and it's description, they show pictures of a panel that was energized after the offset and wires were installed, what's worst is that this panel wasn't even the panel we were working on. In addition to their deceit, they conveniently left out the height of the panels to give the illusion that the height of the panel is much higher than they really are, all in order to support Mr.Sanik lies.** To give an idea to Mr. Sanik's height without standing on a ladder, he would be eye level to the top of the condulet that has the offset in it, shown a few inches below the light in the picture condulet (another example of what a condulet looks like is shown in Exibit _12_). If he would have climbed a ladder 3ft high, he probably would have been able to look down on the box that was going to be installed. **Also in Exhibit 6 is an example of the installion that we were actually going to be doing, which was to install a box about 1.5 feet above the panel. This example is shown in the picture on the far left of these pictures.** There was no reason to tell Mr.Sanik to get a measurement for an offset because we weren't even bending an offset. To further support Mr.Sanik lies, Mr. Messineo agreed with Mr. Sanik's statement saying that he didn't agree with me telling Mr. Sanick to work on top of live gear and jumped in and did the task himself (as shown in his statement in Exibit _12_) not realizing he'd made a false confession of getting on top of live gear and endangering the lives of everyone in the room.

pg 4
section
D

Again I never told Mr. Sanik to work on top of any panel I simply implied that he could easily reach to tighten the screws of the kindoff of straps and couplings. Mr. Sanik's response was very disrespectful and insubordinate. He used profanity saying that he wasn't going to be doing anything I said and that I was going to be doing what he told me to do. Though the general foreman and foreman didn't like me and after seeing Mr. Messineo laughing at how Mr. Sanik was talking to me I wondered if Mr. Sanik was related to either someone high up in supervision in the company, or in the local.

pg 4
section
D

His confidence in knowing how disrespectful he could be towards me without being disciplined or corrected led the way for the lies he constructed to defame my character; Part of the plot to ruin my career and reputation knowing he had the support of all who had made it clear how they already felt about me as a person of gender transition experience. As I walked away from him he followed and

P 8



(cont')
pg 4
section
D

spewed the lies from his lips that I told him to stand on top of a live panel. In shock, I defended myself and said "I never." All the while Mr. Messineo was standing there laughing. Mr. Valerio approached and said that I was yelling and being loud, while totally ignoring Mr. Sanik's yelling and screaming as if the bass of his voice was a low and soft as a kitten's purr. Mr. Valerio then asked what was the problem, knowing my words would fall upon deaf ears, I answered him anyway and told him what happened. Mr. Valerio then told the both of us to go see Mr. Greci, the general foreman. As we were walking towards the room Mr. Valerio led us to Mr. Greci and told him that we were having a problem. There was no foreman on the site. While explaining to Mr.Greci what had happened in a calm manner. Mr. Sanik stood by his side laughing and smiling.  Mr. Greci interrupted and told me I was being unprofessional, that I was yelling, and that I was ratting the apprentice out.

I was being humiliated for telling supervision about the insubordinate, harassing, and malicious behavior of Mr. Sanik. Mr. Greci added that he shouldn't have even be the one the issue was brought to with him being the general foreman. We were presented to him by the sub foreman, maybe he was referring to the absence of a foreman on the job, if in fact he was actually speaking of a chain of command.

pg 4
section
D

In the presence of Mr.Valerio, Mr.Greci told both Mr. Sanik and I to keep our distance from each other. And told Mr.Sanik to go get a delivery outside. After Mr. Sanik left the room, Mr. Valerio told me to go help with the delivery. I told him that Mr. Sanick was going to get the delivery and Mr. Greci just said he wanted us to keep our distance from each other. **While standing in the same room that Mr. Greci had just walked into. Mr.Valerio then replied saying that Mr.Sanik was doing something else and to go get the delivery. Mr Greci did not object. I followed the orders that I was given, however as soon as I saw Mr. Sanik behind the delivery truck I immediately turned around to avoid further confrontation.**

I came back in the building through the loading, and waited for the freight elevator. In a taunting manner, Mr.Sanik reentered the building staring at me, and came within my personal space unnecessarily. Not knowing what he had brewing in his mind, I looked back at him. He then asked why was I staring at him, then I asked him why was he staring at me. He did not respond. Not wanting his attention, I moved from the front of him to the back of him about 10 to 12 feet away. He then turned around and said that I was staring at him as if I wanted to kill him. Figuratively speaking, I said "if I wanted to kill you, you would already be dead, and there you stand alive and well." Meaning I did not want to kill him. He twisted my words and said I threatened his life.

pg 4
section
D

**Giving another example of the comment I made in response, if someone said "you're looking at me as if you want to marry me" and I reply "if I wanted to marry you I would have put an engagement ring on your finger, yet there you stand hands bare" Does that response mean I want to marry the person who made the initial comment? No, it does not. The comment I made to Mr. Sanik was self-explanatory.**

pg 5
section
B &
pg 4
section
D

There were two other journeymen in the area who were present. Out of curiosity one of them asked what happened as we got on the elevator. Not wanting to include Mr. Sanik, I avoided giving an explanation directly, instead I asked him how would he respond giving a particular scenario. In his guilt, Mr. Sanik stated that I was talking about him. I then told him I wasn't speaking to him and had no interest in speaking to him. He proceeded to stir up an argument. After all that had happened up to that point I made the comment that he was trying to provoke me to hit him. He then bent down from almost 7 feet in height to put his face in mine, standing at 5'3.5 and started screaming "punch me in my face, punch me in my face, punch me in my face."

p 9



## KEY POINTS

I was being lied on and accused of being disruptive when trying to defend myself. I felt like I was being held prisoner in a hostile work environment. During break I went to the security office.

Mr. Valerio was present when Mr. Greci told Mr. Sanik to get the delivery, and agreed that we should keep our distance from each other, but when Mr. Greci walked into the next room. While standing inside the same room, Mr. Valerio told me to go get the same delivery in order to give Mr. Stanik more opportunities to harass me.

They acknowledge that Mr. Stanik went to go get the delivery but conveniently left out the fact that I turned away from doing the task upon seeing Mr. Sanik behind the loading dock to avoid further interaction

Upon re-entering the building Mr. Stanik tried to provoke me in several ways into a confrontation. They conveniently left out the next task I was given and the reason why I was on the first floor and loading dock, as well as Mr. Deenihan's statement.

To further try to make me out to be a bad guy, they state that I had left the work area and went to the MTAs security office when in fact I had went during breakfast break and had not been given another work assignment after the problem with Mr. Stanek occurred in the elevator after the delivery.

The MTA's security office that I went to is of the highest level of security in the build.

In their statement it says that the officer found my requests "odd", but conveniently leaves out the fact that it was the security officer/clerk was the one who told me that it was the building manager was the one who had access to the records I inquired about, had given me his name, and directions on where I could find his office. I had absolutely no knowledge of this previous to him telling me.

I'd went to the security office because I knew they provided the ID entry cards to enter all locations throughout the building and also on the same floor is the room where the security screens are monitored, they show the view of each security camera.

If I had threatened someone's life and was the only one late or absent from work, would I asked the highest office of security to prove my guilt? After being directed to the building manager would I ask if he would be the right point of contact to give my shop steward upon their arrival so that they can review the records and surveillance of audio and visual to prove my guilt? No it's quite obvious I needed to prove my innocence against those who had conspired against me.

what's alarming is that after hearing my concern the officer/clerk and the building manager notified and redirected me to my offending employers instead of adhering to the safety of every person throughout the building they were obligated to secure. **2 Broadway contains the main controls, data, and intel technology that controls The entire subway system throughout New York City.**

The security officer/clerk failed to report to his superior officer and failed to investigate the evidence properly which would have proven my innocence, instead they falsely accused me, posted my name and picture throughout the building, and labeled me as a threat to further humiliating me. All upon the simple request of my offending employer.



pg5
Section
C

After being redirected to Mr. Greci by the building manager Michael Brady, Mr. Greci told me to meet him in the shanty. I went to the shanty and waited for Mr. Greci. The time was between 9:15-9:30am. When Mr. Greci arrived he asked me why I'd went to security. As I was explaining he interrupted and told me to continue to wait. Shortly after. Mr. Thurston shoved an envelope which contained a black-and-white copy of a layoff slip, into my reaching hand. After I had read it, in shock I asked him about the reasons I was being laid off and an explanation what was written on the layoff slip, he said that I would find out if I decided to grieve it. I asked him if he was aware that Mr. Greci had recently praised me for my work and work ethics. He said that I could just file with the employment office or I could grieve the termination. He then said that I could get my tools and stuff, and that my check would come in the mail. I told them I had my tools already, then handed him my security ID badge, and left.

At no time after coming from the security office building manager's office do I recall seeing Mr. Valerio or Mr. Sanik again. Five Star falsely states that Mr. Sanik broke down in tears. Security footage in the freight elevator would have shown his true emotional state.

What they conveniently left out is that Five Star Electric installs, repair, and maintain all of the security cameras that would have proven my innocent; which include the cameras surrounding the perimeter of the building that would have shown me immediately turning around to avoid Mr.Sanik, the loading dock where I was falsely accused of threating the life of Mr.Sanik, and the freight elevator that would have shown Mr. Stanik who stands at a height close to 7 feet tall, bending down to my height of 5 foot 3 ½ inches, with dry eyes, spitting in my face while screaming "punch me in my face, punch me in my face" as I stood against the wall telling him to leave me alone. **Because of the importance of the technology in the build that could cripple the City of New York, and because of the terroristic threat that has been posed on the area after the fall of the World Trade Center on September 11, 2001, the perimeter of the building, loading dock, records of all who enter and exit the building and elevator and the monitoring thereof are of the highest of security concerns at 2 Broadway NYC. See exhibit __13__ for more details.**

pg5
section
3

All of the false statements made by my accusers were written and sign by them. Oddly, Mr. Greci wrote Mr. Shatilla's statement and his signature appears on the bottom as I have proven in exhibit __12__ that forgery has played a factor in this case which was executed by the Assistant Super, Jeff Thurston himself. The possibility of forging Mr. Shatilla's name should not be dismissed. Be advised that Mr. Missineo's statement was greatly influenced by the friendship he has had with Mr. Greci since childhood. Mr. Missineo even mentioned his sister had just moved in the house next door to Mr. Greci.

pg6
section
3

I did give statement to all harassment, and discrimination issues during my grievance. It's the reason Why there was a grievance, they were the factors stated in my actual request. See exhibit __7__

3.b
action
4

Five Star did not bring attention to the one sentence letter saying the termination was "justified" by the grievance board, but had the audacity to consider the one sentence letter of the appeal judgment stating that the termination was "not justified" a typographical error. Five-star didn't consider the termination a typographical error or a technicality when the Asst. Super Mr. Jeff Thurston claimed he'd written it and gave the reasons why he wrote it that way, nor when the grievance committee initially found the termination "Justified" as the way it was written.

P



*pg 8*
*Section*
*H*

Five-star Had every intention of trying to ruin my career by wrongfully terminating me with every known negative reason for layoff unjustly. They have provided statements containing false testimony were to humiliate me, embarrass me, discredit me and my work skills and work ethics. They intended to build a case against me by any means necessary from the time I walked in the door. They disregarded the fact that I was entitled to the emergency personal/sick days that I took, and had used on the days that I was absent. I was entitled to these personal/sick days by the collective bargaining agreement in which Five-Star vehemently claim to uphold. See Exhibit 5,7,8

*pg 9*
*sec H*
*pg 4*
*sec B*
*pg 7*
*sec C*

I had gotten a warning for being absent after I had arrived on time and ready to work, but was told I couldn't start because of reasons that were no fault of my own, but because of a clerical error, and the union hall could not process a card for me that day. As he had done with others Mr. Greci was unwilling to confirm that the union dues error was corrected on said date. Five Star ignored the fact that I was entitled to a personal/sick day to excuse me for this day as well. I was given a warning for leaving early when I was told to do so by supervision to resolve the Union Dues clerical error. If I would not have left, it would have been reason to accuse me of being insubordinate. This is a direct act of sabotage. I was late twice one which I had no excuse for.

In the argument of their rebuttal, Five star claim I left my work area to pursue a personal issue when throughout all statements they acknowledge that myself, the security clerk/officer, and Building Manager informed them that my reasons were far from being personal. I was being accused of threatening someone's life.

*pg 2*
*section*
*A*

Upon being hired to Five Star Electric in Feb 2017, I was told to fill out a new hire packet. Because there was so much that was contained within the packet I did not recall specifically all of its contents however I did inform those who inquired that I knew of my locals policy in general in addition to common sense concerning harassment, discrimination, and retaliation. Knowing this to the extent that I did, I did not violate the policy regardless whether or not I recalled Five Star's policy itself.

*pg 2*
*Section*
*A*

If entry records were checked they would show where guys have come to work later than 9AM and was allowed to work without warning or disciplinary notice for lateness. They would also show that other guys were absent more than I was and weren't giving any disciplinary warnings or notices. Five-star on the other hand did not abide by their own policy nor did they abide by the collective bargaining agreement. (Exhibit 3 __).

Never was I insubordinate, nor did I harass anyone. Because I had proof that the Assistant Super Jeff Thurston lied to the Grievance Committee that Granted Five Star the "justified" judgement, and had requested that the entire committee to be summoned as witnesses to Mr. Thurston's forgery, lies, and deceit in my appeal, Five Star did not appear.

I was not absent, late, nor did I leave early after having been given the warning, but because it is by due process that a warning must be given first, they added the items to the termination in desperation that they could be used for cause. The warning that I was given does not accuse me of being insubordinate, uncooperative, not suitable for work, unproductive, or in need for excessive supervision on or before it's date. It wasn't until after the fact when I called for a shop steward and had went to security to prove my innocence that they produced their statements giving false testimony which claimed that all said above applied on and before the date of the warning. They included in the warning that I had left the job early after being directed to do so; surely if I had done half of what they accused me of, it would have been

*P₁₂*

(13)

listed as well. After submitting, forging, and reconfirming the reasons for termination, Five Star left the termination slip as it stood when they were granted a judgement of a "justified" layoff. Thinking the judgment would remain in their favor as its stated, they never made any implications that there were any typographical errors made on the termination. It wasn't until after that fact when I submitted my complaint to the Department of Human Rights, further away from their influence in the electrical industry, that they attempt to change and submit an entirely different layoff slip in which I received a copy of in July. As they state in the introduction of their rebuttal, Five Star Electric Corp employ 955 electricians who are members of Local Union #3 IBEW, which makes up a very large portion of the overall total of electrician in the membership who work in the field.

The Union verbally informed me that they were not honoring any new layoff slip that added to or took away from the original one filed, in addition the Union gave me an updated letter in July of their judgement stating that the termination was "Not Justified".

In an earlier act of further harassment, Five Star had told the investigating officer from the Department of Labor, that the Appeal Committee had changed their decision from the termination being "Not Justified" back to "Justified". After the Department of labor did an investigation, they too found the termination to be "Not Justified".

Five Star have provided proof of their malice, deceit, and lack of integrity, within the pages of their own rebuttal, false statements they provided to the Department of Labor, and to the Joint Industry Board's Grievance and Appeal Committee.

In their false statements, Five Star state that I never reported any issues of harassment as shown in Exhibit   17   which is dated April 14, 2017. However I did not file my grievance until April 17, 2017. If I had not given them notice of harassment prior it would've been unnecessary for them to make the claim that I didn't.

In an attempt to cover up the neglected responsibilities on the behalf of the Building Manager of 2 Broadway, in their rebuttal Five-Star state that **a representative of** the building manager Michael Brady pulled Mr. Greci out of a job meeting, when in fact it was actually Mr. Michael Brady himself. (exhibi   1 ).

Included in five stars rebuttal it states that Mr. Thurston advised Mr. Greci that I should be terminated for cause, told him that he would come to 2 Broadway to address the issue in person, and that upon his arrival Mr. Thurston met with me and terminated me for cause. It also includes that the termination slip was produced at the office. The evidence will show that Mr. Thurston left the office with the termination slip given to him by his superior, and fabricated the termination slip to forge his name on the document as its original author. (Exhibit   7, 8, 1 ).

In their rebuttal five-star states that I left my work area during work hours to pursue **a personal issue with the MTAs security office when in fact I was on break.** the personal issue that they claim I went to pursue was not a personal issue. **They had accused me of threatening the life of a coworker on the property of 2 Broadway** and was an issue that would have been a **concern of the MTA's security office, Five Star electric, Myself, and all parties involved.** (Exhibit   1, 13 ).

Five-star electric failed to adhere to the collective bargaining agreement regulations for the ratio between apprentices and journeymen. They failed to adhere to the safety regulations of the NFPA 70E

(14)

to protect all workers from ARC flashes and electrical hazards. They failed to adhere to the collective bargaining agreement that permits members of local 3 to take personal/sick days in which they should not be penalized or disciplined for taking. They have only conveniently used the collective bargaining agreement when they feel it can be used in their favor, while ignoring the rights of the workers. (Exhibit 5, 1 ).

At no time did I inform five-star electric the gender of the MTA worker who asked me if I was a male or female, included in their rebuttal it is revealed that this was made aware to them, and indeed it was a female worker. (Exhibit  1  ).

In a hand written letter by Mr. Thurston clearly states that before April 13, 2017 did he hear any harassment issues against me. (Exhibit 7 ).

They did not respect me as a man, nor did they respect me as an experienced "A" Journeymen. Though they claim to employ 955 Union electricians, to my knowledge as of my last date of hire, they don't have not one female in a foreman's or Sub foreman's position. Most of the females in the Union have 15-20 years of electrical experience. (Exhibit 1,7,8,12

They labeled me as a female, and disrespected me for my gender transition. I am a person who transitioned from being recognized as a female to a male in 2011. In his hand written statement Mr. Valerio, added quotation marks on my name to insinuate that my name was not so, this also was one of the things he'd told the elevator operator. (Exhibit  1  ).

in the argument of five stars rebuttal it is stated "Mr. Thomas further alleges that respondents engaged in unlawful discriminatory practices **by** retaliating against him for asking the MTA securities office for a point of contact..." . Be advised of the wordplay, the statement should read "... Respondents engaged in unlawful discriminatory **practices and retaliating** against him for asking MTA security office for point of contact.


### A SYNOPSIS OF MY WORK HISTORY

I completed certifications at the Communications and Electronics School in 29 Palms Ca. in 1998. I was attending the College of Aeronautics to become an Airplane Mechanic in 2001, and was there the day of September 11th. I had volunteered my time to learn the basics of electrical work from 2001-2003 with non-union companies, and I have been a local Union #3 Electrician for 10 years, adding up to 14 years of experience in the electronics and electrical field. I was wrongfully terminated, harassed, falsely accused, sabotaged, and conspired against.

Five Star Electric had the means to provide irrefutable truth, by including in there evidence the surveillance of visual and audio of my conduct proving my guilt, and the entry records showing there was no discrimination involved. They did neither.



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of<br><br>CAZE THOMAS,<br><center>Complainant,</center><br><center>v.</center><br><br>FIVE STAR ELECTRICAL CO., JEFF THURSTON, DANIEL GRECI, FELIX VALERIO,<br><center>Respondents.</center> | DETERMINATION AND ORDER AFTER INVESTIGATION<br><br>Case No.<br>10188276 |

Federal Charge No. 16GB702949

On 6/1/2017, Caze Thomas filed a verified complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of sex, sexual orientation, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

After investigation, and following opportunity for review of related information and evidence by the named parties, the Division has determined that there is NO PROBABLE CAUSE to believe that the respondents have engaged in or are engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

Complainant worked for Respondent as an electrician for about six (6) weeks. Complainant is transgender and stated that he was discriminated against because of his sex and sexual orientation (he is heterosexual but was perceived to be homosexual) when rumors and lies were spread about him to his coworkers and other building employees because of his assumed sexual gender and sexual orientation. He said that he was falsely accused of causing safety hazards, disturbances, and making violent threats when he followed all possible safety methods, and avoided all confrontations. He said that he was retaliated against when Respondent fired him because Complainant went to the MTA Head Security Office to ask for a point of contact so that his shop steward could review surveillance that would prove Complainant was innocent regarding the conflict with apprentice Marcin Sanik.

pg 78

Respondent denied it discriminated against Complainant and stated that Complainant engaged in unsafe work practices, repeatedly failed to adhere to the hours of work by showing up late, leaving early, or taking unscheduled absences; he engaged in insubordinate and disruptive conduct, including leaving his work area and disturbing clients, culminating in his threat to hurt

2 Broadway to ask about access to the building's turnstile access records and whether the building's security cameras have audio capabilities. Finding the requests odd, the MTA Security Officer asked him if he had discussed these issues with his boss, Mr. Greci. Complainant ignored the question and then asked for the identity and location of the Building Manager. He then proceeded to the Building Manager's office to ask for the same information. At this point, a representative of the Building Manager, Michael Brady, pulled Mr. Greci out of his job meeting to advise him that Complainant was seeking details about the building's security features. Mr. Greci then contacted Mr. Valerio to inquire about Complainant's disruptive conduct.

Shortly thereafter, Mr. Valerio, Complainant and Mr. Sanik went to Mr. Greci's office to address the ongoing situation between Complainant and Mr. Sanik. (By this time, Mr. Greci had been notified by the MTA Security Office about Complainant's request for building security information.) Complainant angrily told Mr. Greci that he felt like Mr. Sanik was disrespecting him by not following his directives and constantly asking questions. Mr. Sanik told Mr. Greci that he was very upset with the situation and broke down in tears. He stated that he believed Complainant had anger issues, and that Complainant constantly screamed at him, demeaned him and threatened him. Mr. Sanik then provided a written statement regarding the day's events (see Rp. Exh. 7), including details about the threat made by Complainant. (A written witness statement signed by Mr. Shatilla supports Mr. Sanik's version of the events; see Exh. 8.)

At this point, Mr. Greci telephoned his supervisor Mr. Thurston to advise him of the situation. Upon his arrival, Mr. Thurston met with Complainant and terminated him for cause. Mr. Valerio then escorted Complainant from the building. A termination slip was prepared by Five Star's Superintendent's Office on the standard form issued by JIB's Employment Department (see Rp. Exh. 9), listing the reason for Complainant's termination for cause ("disruptive to job") along with the other issues involving him which preceded his termination ("lateness", "absenteeism", "leaves job early", "insubordination").

Prior to his termination on April 13, 2017, Complainant never reported to Mr. Thurston, Mr. Greci or Mr. Valerio any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience".

On the date of his termination, April 13, 2017, Complainant filed a grievance with Local 3, followed by a hearing held on April 17, 2017. During his approximately 45 minute presentation at the hearing, Complainant did not testify about any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience". Rather, he testified about a single incident in which a female elevator operator employed by a contractor hired by the MTA asked him whether he was a man or a woman.

Respondents state that by letter dated April 18, 2017 (See Rp. Exh. 10), Local 3's Grievance Committee determined Complainant's termination to be "justified." Complainant appealed that determination to Local 3's Grievance Appeal Committee, which held a hearing on May 9, 2017. No representative from Five Star attended the appeal. In a one-sentence letter dated April 25, 2017 (obviously a typographical error) and mailed on May 11, 2017 (see Rp. Exh. 11), Local 3's Grievance Appeal Committee reversed the Grievance Committee's determination and found that Complainant's termination was "not justified." Five Star was later advised by Local 3 that the

or kill a co-worker. Respondent stated it terminated Complainant's employment for cause immediately following statements made by Respondent employees that Complainant threatened his co-worker Marcin Sanik, along with Complainant's aggressive behavior on that day.

*Pg 1B*

The Division's investigation does not support Complainant was discriminated against because of his sex and/or perceived sexual orientation. In an effort to identify underlying harassing behavior, the Division gave Complainant the opportunity to list all comments and/or behavior of others towards him because of his transgender status. Complainant listed two incidents. The first one was when he overheard Valerio refer to Complainant as a female in a conversation with a male elevator operator; saying to the operator how Valerio does not like Complainant; that he has Complainant work in the basement alone; that Valerio related details of previous disagreements Valerio had with Complainant; and that Valerio told the elevator operator that Complainant's real name was not Caze. Accepting all of the above as true, it does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough. At most, it is gossiping that, although it could very well be in poor taste, it does not rise to the level to abusive workplace environment.

*Pg 2b*

The other instance Complainant identified is again a scenario where the speakers were not aware Complainant was overhearing them. Two unidentified journeymen were talking about how they caught a glance at Complainant's telephone screen and saw a topless guy who, they said, must be Complainant's lover. Complainant did not identify who these individuals are and it is not clear whether they are even Respondent employees. Complainant stated that one of them sounded like Mr. Messineo. This example, too, does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough.

*Pg 2 B*
*Pg 3B*

During the Division initiated interview, Complainant stated that he was written up for lateness when others were not. As an example, he stated that Messineo missed several days of work consecutively because of dental reasons and was not written up, whereas Complainant missed a day of work because he needed to help his grandmother with her radiator and was written up. Another example Complainant gave was that Carlos Santiago missed at least four consecutive days because he had marital issues and he was not written up.

Both examples above clearly show that the situations are dissimilar; one was related to medical/dental and the other to familial status, whereas, complainant's time off denial was related to his grandmother's radiator; the situations are not comparable and neither is sufficient to illustrate differential treatment.

*P4 B*

The third example Complainant gave was that Felix Valerio, who is a supervisor, missed work and was not written up.  Complainant stated that he knows about this because he was part of team. Besides lacking in detail, Complainant and Valerio are not similarly situated employees, thus, an insufficient and inadequate example of differential treatment.

Moreover, Respondent provided a list of employees between September 1, 2016 to the present

who were disciplined for similar wrongdoings as Complainant[1]. Out of a list of 28 employees, seven (7) had time docket and received verbal warnings, most for leaving work early and one for arriving late.

Another example of differential treatment provided by Complainant was regarding his union card issue. He stated during the interview with the Division that there were other employees who, too, did not have their union card with them but were not sent home. He stated that like all others, Complainant showed Greci the money order receipt in lieu of the card and Greci called the union about all the guys who presented the money order receipts. Greci then told Complainant to go and take care of the issue with the Union and marked Complainant as absent. That same day Complainant went to the Union who told Complainant that there was a clerical error with Complainant's name. Once everything was resolved, Complainant went back to work the next day and told Greci to call the union and that it was all a clerical error. Greci told him that he would not call and sent Complainant home. Complainant stated that he did not know if others who presented money order receipts also had clerical errors.

The example above shows, as Complainant admits, that there was an error occurring on the union's side and cannot be said that Greci was targeting Complainant for some ulterior motive. And thus, is not an example of differential treatment.

The Division's investigation does not support Complainant's employment was terminated in retaliation for engaging in protected conduct. Complainant alleged that his job was terminated after he asked the MTA building security for a point of contact so that Complainant's shop steward could review video surveillance. This conduct does not constitute protected conduct under New York State Human Rights Law.

Moreover, during the Division initiated interview, Complainant was asked if prior to filing with the Division he complained of discrimination. He stated that he expressed to Greci concerns about discrimination/harassment and that he wanted to speak to a shop steward. He then said that he spoke with Greci on April 5, 2017 (the date Greci wrote him up because of lateness, absences and leaving work early) and told him that he felt harassed and discriminated against because he was over-supervised and treated differently from his peers and punished for things others were not, such as lateness. Respondent denied Complainant has ever made any complaints of discrimination or perceived discrimination. The Division investigation found no evidence to support Complainant complained to Respondent and/or Greci about being discriminated against based on his transgender status, his sex, sexual harassment and/or or any other protected class.

Based on the foregoing, the Division's investigation does not support a discrimination occurred in violation of the New York State Human Rights Law.

---

[1] Respondent provided copies of Complainant's write ups. On April 5, 2017, he was written up for absences, leaving early, and lateness. On April 13, 2017, he was written up for lateness, absences, leaving early, insubordination and disruptive behavior.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC). You have the right to request a review by EEOC of this action. To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112. Otherwise, EEOC will generally adopt our action in your case.

Dated: 12/5/17
        Brooklyn, New York

                                        STATE DIVISION OF HUMAN RIGHTS

                        By: _____
                            Joyce Yearwood-Drury
                            Director O.S.H.I.

- 4 -

In his statement describing the incident in the mechanical room with Mr. Sanik, Mr.Messino (though he falsely stated that _the Petitioner_ instructed Mr. Sanik to work unsafely) he also states that "the Journeymen and the Apprentice began to argue." He continues saying that he tried to stop it from escalating but had no such luck. Mr. Stanik, in his statement falsely accusing me _the Petitioner_ of telling him to work unsafe, he also states that he was arguing with me _the Petitioner_ his "defense". Mr. Sanik and _the Petitioner_ are not similarly situated employees. Mr. Sanik was told to stop his argumentative behavior and continued. Mr.Sanik's statement is attached.

Mr. Greci asked me _the Petitioner_ what the problem was with Mr. Stanik. I _the Petitioner_ calmly explained what the problem was and he in turn accuse me _the Petitioner_ of being a (_the Petitioner_) professional and said that I was "ratting the kid out" I _the Petitioner_ told him that I _the Petitioner_ was simply answering his question and letting him know about what had happened. In his statement, Mr. Greci accused me _the Petitioner_ of yelling at him, my _the Petitioner's_ defense of Mr. Sanik's offensive and disrespectful actions towards me _the Petitioner_. What is being implied is that though (I _the Petitioner_ didn't yell, scream, or express any unprofessional behavior after being told to calm down unnecessarily) I _the Petitioner_ spoke my _the Petitioner's_ defense in answering Mr. Greci, I _the Petitioner_ was perceived as having an argumentative behavior. Should.

Mr. R. Purrini failed to recognize that if it was rightfully so that I _the Petitioner_ had been accused of causing a disturbance for continuing to express my _the Petitioner's_ defense of Mr. Sanik offensive and disrespectful actions towards me _the Petitioner_ (though I _the Petitioner_ did not continue), then upon receiving Mr. Sanik's statement Mr. Greci should've disciplined Mr.Sanik for the same actions he accused me _the Petitioner_ of.

In his statement Mr. Sanik said that I _the Petitioner_ told him to do something unsafe and that **WE** argued. His argument being to defend himself of the false accusation he accused me _the Petitioner_ of. Again and Mr. Messino stated in his testimony that both "journeymen and apprentice" argued. This situation too is comparable and sufficient to illustrate differential in treatment.

Mr. Valerio expressed his dislike for me _the Petitioner_ because I _the Petitioner_ is a person of transgender experience and he took actions to persuade other people in my _the Petitioner's_ work environment to do the same. He called me _the Petitioner_ a female, he slandered me _the Petitioner_ to others to depict me _the Petitioner_ in a negative light in an attempt to cause other people to dislike me _____ for his reasons. He disclosed my _the Petitioner's_ private vital record information that's only to be used between employee and employer to other entities who were not entitled to such information he did so without my _the Petitioner's_ permission. His behavior was abusive

1 B

and negligent. he instigated and caused a hostile work environment for me _the Petitioner_ to be subjected to, by those who were and were not Five Star's _the Respondents_ employees. Mr. _R. Purrini_ had accepted as truth of what Mr. Valerie said to the elevator operator a non-five-star employee concerning my _the Petitioner's_ gender, his dislike for me _the Petitioner_, along with disclosing my _the Petitioner's_ vital record information. Instead of identifying the seriousness of the harassment against me _the Petitioner_ Mr. _R. Purrini_ simply viewed all of these offenses as either gossip or poor taste when in fact these offenses rise to the requisite level to constitute a hostile work environment as they were pervasive and severe.

I _the Petitioner_ did tell Mr. _R. Purrini_ that I _the Petitioner_ overheard two unidentified journeymen talking about how they caught a glimpse of my _the Petitioners_ cellphone's screen saver and saw a picture of a topless guy. They said he must've been my _the Petitioners_ lover. One of them sounded like Mr. Messino. Mr. _R. Purrini_ dismissed this because I _the Petitioner_ could not identify the men, and it wasn't clear if the men were Five-Star's _the Respondant's_ employees. However it did not matter whether the men were Five Star's _the Respondents_ employees, the fact that it had happened is self evident that I _the Petitioner_ was being subjected to a hostile work environment created by Five Star's _the Respondant's_ employees, and that the matter was no longer isolated within Five Star _the Respondant_ because of said behavior.


Mr. Messineo's situation was comparable because _the Petitioner_ family emergency was because of a medical reason, and though a dental/medical reason is excusable they are still unscheduled absences.

Mr. Santiago's marital problems though understandable are not excusable absences under our collective bargaining agreement, and is also considered unscheduled absences.

I _the Petitioner_ had called the foreman Mr. Greci two hours before work and informed him that _the Petitioners_ very sick grandmother had a radiator problem, and that _the Petitioner_ needed to be present to allow them on the premises because she was unable to walk and could not open the door for them. Because it was snowing and the low temperatures were detrimental to her health, _the Petitioners_ concerns for her were high. Once the radiator was fixed, _the Petitioner_ came to work, it was around 9 AM **the same** morning. When _the Petitioner_ arrived Mr. Greci told me _the Petitioner_ that he couldn't start _the Petitioner_ for the day and instructed _the Petitioner_ to go home. Though _the Petitioner_ followed his instructions, he in turn marked _the Petitioner_ absent and included said absence in a warning given to _the Petitioner_. _the Petitioner_ had a family emergency that would've been fatal had _the Petitioner_ not taking care of the matter. Meanwhile Mr. _R. Purrini_ showed great sympathy towards the two the journeyman. The

only thing that lack and comparison is the fact that both of the journeyman took **four days** each, opposed to the **one hour** and **45 minutes,** *the Petitioner* took the time needed to ensure *the Petitioners* family's safety. The differential in treatment is sufficiently illustrated. 3

In the grievance review and in Five Star's *the Respondent* rebuttal the account Mr. Greci gave of my *the Petitioners* actions of being insubordinate towards him (along with a host of other false statements he made accusing me *the Petitioner* of working unsafe, arguing with others, and causing disturbances), was said to have occurred before the date of the warning. None of the incidents were included in the warning because they simply did not happen as falsely stated.

I *the Petitioner* was told by Mr. Greci (**THE FOREMAN**) to leave work in the middle of the day. He instructed *the Petitioner* to go to the union hall to correct a clerical error. He then accused *the Petitioner* of leaving work early after *the Petitioner* followed his instructions.

After correcting the clerical errors and returning to work the next day again I *the Petitioner* was instructed by Mr. Greci to leave. After I *the Petitioner* had followed his instructions he then added the offense to the warning dated April 5, 2017.

After I *the Petitioner* was given the warning April 5, 2017, for following Mr. Greci's instructions, none of the offenses occurred again yet Mr. *R. Purchi* included them as if they were repeated offenses and reasonable cause for termination and determination of his investigation to support his decision.

All "A" Journeyman of Local Union #3 under the collective bargaining agreement, who for whatever reason filled the need to take an unscheduled day off from work are allotted five personal days a year to do so. *The Petitioner* used my *the Petitioners* entitled Personal days, for both said days of absences. documented proof is attached.

Mr.Greci called the union hall to check the payments for everyone who didn't have a union card. I *the Petitioner* was not the only one who didn't have one, there were at least three others. Mr. Greci was then told that there was a clerical error concerning my *the Petitioners* union dues payment. The rule is that you cannot work on the job unless you have a valid union card in your possession, if you do not have one you get sent home until you are able to do so. Mr. Greci sent me *the Petitioner* home to take care of the clerical error. Though I *the Petitioner* showed him a receipt showing that the dues were paid, as well as a few of my *the Petitioners* coworkers who paid their dues but did not recieve their cards had done, *the Petitioner* was the only one he told to leave to resolve the matter. Even after the clerical error was corrected, Mr. Greci did not extend the same courtesy to me *the Petitioner* as he

did my *the Petitioner's* peers. All of my *the Petitioner's* coworkers who did not have a union card was allowed to continue to work, I *the Petition* on the other hand was instructed to leave, and then accused of leaving the job early for following those instructions. The following day after the correction was made, I *the Petitioner* was instructed to leave again after arriving to work on time. While my *the Petitioner's* coworkers who still did not have a union card in their possession was allowed to work. I *the Petitioner* on the other hand was given an absence, and a warning for following a supervisors instructions. This demonstrates a sufficient differential in treatment between me *the Petitioner* and my *the Petitioner's* peers.

In his dismissal Mr. *R. Purrini* make excuses for Five Star's *the Respondants* lack of courtesy for *the Petitioner* as if *the Petitioner* were not entitled to the same treatment as my *the Petitioner's* peers because of a clerical error that was of no fault of *the Petitioners* own.

This is also included in *the Petitioner's* rebuttal in which Mr. *R. Purrini* complained of reading because of its lengthliness. The Department of Human Investigator, Mr. *R. Purrini* did not put the same importance towards the nature of my *the Petitioner* emergencies as he did my *the Petitioner's* peers, even after seeing that the grievance board of my *the Petitioner's* Union did not honor, or accept the accusations for reasons of my *the Petitioner's* termination April 13, 2017.

In his explanation Mr. *R. Purrini* gives false testimony. *The Petitioner* never told him that *the Petitioner* was a part of **"THE TEAM"**. If *the Petitioner* was a part of said **"TEAM"**, it **would have been unnecessary to submit a complaint.** What was told to Mr. *R. Purrini* was that the day after Mr. Greci gave *the Petitioner* the warning letter, Mr. Valerio came in late after 9 AM and was not sent home or written up. Later on, on the same day, Mr. Greci had a talk with *the Petitioner* about him wanting me *the Petitioner* to be on **"THE TEAM"**. **Mr. Greci did not show this type of interest prior.**

In his investigation decision, Mr. *R. Purrini* states "Moreover, Respondent provided a list of employees between September 1, 2016 to the present who were disciplined for similar wrongdoings as Complainant[1]. Out of a list of 28 employees, seven (7) had time and receive verbal warnings, most for leaving work early and one for arriving late." **[In this statement Mr. *R. Purrini* accuses me *the Petitioner* of wrongdoing without sufficient evidence of such. He implies that I *the Petitioner* was disciplined for similar wrongdoings as if he weren't speaking "allegedly".]**

[1] respondent provided copies of complainant's writeups. On April 5, 2017, he was written up for absences leaving early and lateness. On April 13, 2017 he was written up for lateness absences leaving early insubordination and disruptive behavior.

4B

There are only four forms of discipline when it comes to work-related incidents and those are: having time docked, given verbal warnings, given written warnings, and termination of employment. I _the Petitioner_ was subjected to all. Mr. _R. Purrini_ explains that "out of 28 employees (7) had time docked, and received were **Verbal** warnings as the Complainant." Out of the seven, (6) of them were docked and given verbal warning for leaving early, and one of them were docked and giving verbal warning for arriving late. Out of 28 employees on the list Mr. _R. Purrini_ compared the disciplines I _the Petitioner_ was subjected to (7) of those employees, 21 of the employees listed were not given verbal or written warning nor were they fired, the offenses and disciplines were conveniently excluded in Mr. _R, Purrini_ determination. It is not stated whether or not if it had been found that these (7) employees were discriminated against based on their assumed gender, sexual orientation and/or if they were either persons of transgendered experience, or female.

_Pg 9, 10_

Though Mr. _R. Purrini_ mentioned the absences above, he failed to include that _the Petitioner_ Mr. Jeff Thurston (Five Star's Assistant Supervisor) **Forged** his name to a copy of the **Original Termination** that was issued to me _the Petitioner_ April 13, 2017. He later then cleaned that he in fact was its original author to the grievance board. Threatening the life of a coworker was not included in the termination. Mr. _R. Purrini_ was given copies of the original termination with the signature of its original author as well as a copy of the termination after it was fraudulently altered by Mr. Thurston. Ultimately proving Mr. Thurston's lack of integrity, lack of professionalism, and his lack of respect towards his superior, Mr Kenetth Benfante. The original author of the termination slit dated April 13, 2017. Yet Mr. _R. Purrini_ defended Mr. Thurston's fraudulence and accept that the termination as a "Technical Error". I _the Petitioner_ was not issued a **WRITE UP** on April 13, 2017. Five-Star _the Respondant_ tried to submit fraudulent disciplinary documents dated April 13, 2017, **including an entirely different termination to the Union SEVERAL MONTHS AFTER the Appeal Board determined that the termination was "Not Justified". After proving indisputable truths during the Appeal, against the many lies that surfaced on Five Stars, _the Respondant_ behalf, the "Not Justified" decision was made .**The Union had informed _the Petitioner_ that it had rejected Five Star's _the Respondant_ attempt to submit the documents and that no further proceedings would progress concerning the termination, and as far as the Union was concerned the case was closed. I _the Petitioner_ included written documentation by the union confirming these facts in my _the Petitioner's_ rebuttal which Mr. _R. Purrini_ complained of reading because he said it was too lengthly. I _the Petitioner_ also informed Mr. _R. Purrini_ of such and telephone calls. Knowing these facts Mr. _R. Purrini_ ignored five stars _the Respondant_ fraudulence and lack of integrity. Instead he accepted the above, implying the provided information given to him by the Respondent were indeed factual without requiring the evidence of validity that they had actually taken place, and/or were rightfully issued (for he had more than enough reasons to inquire further). In their rebuttal five-

5 _B_

star _the Respondant_ actually accused me of disturbing a client on the premises who they later claim in the same rebuttal was it even in the building on the date that the offense occurred.

After the termination was deemed "NOT JUSTIFIED" in the appeal, Five Star _the Respondant_ made false statements to A New York State Department of labor investigator in which they stated that the Union had reversed its decision of the termination being "NOT JUSTIFIED" back to being "JUSTIFIED". This false information given prevented me _the Petitioner_ from receiving unemployment benefits until myself and The Union informed the investigator that the claims that Five Star _the Respondant_ had made were in fact false. Again proving the lack of integrity on five Star's _the Respondants_ behalf. Mr. _R. Purrini_ did not include these vital facts in his determination.

Mr. _R. Purrini_ stated how he agreed that my _the Petitioner's_ response to Mr. Sanik's remark could have been taking as a threat and not sarcasm. When I _the Petitioner_ pointed out the fact that Mr. Sanik remark itself was irrational and could not be responded to logically, and that my _the Petitioners_ response was sarcastic yet complexed enough for me _the Petitioner_ to feel the need to further explain myself by way of common sense. A factor that should have been taken into consideration in making his decision. In the incident by the freight elevator, Mr. Stanek and his witness both made the claim that I _the Petitioner_ simply stared at Mr. Stanek in recalling their account of the false accusation that I _the Petitioner_ threatened his life. Failing to realize that in order to make such accusations that they in turn would've had to been staring at me _the Petitioner_ to even make such allegations.

When I _the Petitioner_ went back to ask security about a point of contact not only was I _the petitioner_ not assigned to a work area at the time but I _the Petitioner_ made my _the Petitioners_ inquiry during our breakfast break. During breakfast break no one in the work crew is obligated to stay in a specific area. Some guys go for smoke, some may go to the shanty to watch the news, or some may go outside for fresh air, or to make a private phone call. We are given 30 minutes for breakfast break. Break starts at 9 AM, at 9:05 AM I _the Petitioner_ had made the inquiry with security concerning a point of contact for my _the Petitioner's_ shop steward. At 9:12 AM is when I _the Petitioner_ was redirected to my _the Petitioner_ employer. And it was at that point that Mr. Greci told me _the Petitioner_ to meet him in his office. As I _the Petitioner_ had done so many times previously, I _the Petitioner_ followed his instructions. I _the Petitioner_ hadn't gotten to the shanty

6β

around 9:15 AM while it was still break.

Mr. R. Purrini   assured me the Petitioner   that he would take the necessary steps to see if he could get the surveillance footage from the building to prove my the Petitioners innocence. He later informed me the Petitioner   that he had inquired but would be unable to acquire said footage. Later I the Petitioner   found out that the NTA's legal department would have provided this information per FOIL requests. When I the Petitioner   told Mr. R. Purrini   about it and asked that he makes such requests for the investigation, he said that he would not do so.

Mr. R. Purrini   include in his dismissal that the Petitioners   complaint that his job was terminated **AFTER** he asked the NTA building security for a point of contact so that the Petitioners   shop steward could review video surveillance and determined that this conduct in itself did not constitute protected conduct under New York State Human Rights Law. (see attached copy of dismissal) Page 3

When in fact the Petitioner   complaint was that his job was terminated **BECAUSE** he asked the MTA building security for a point of contact so that the Petitioner   shop steward could review video surveillance, which is in fact a conduct that is constitute protected conduct under New York State Human Rights Law. (See attached copy of dismissal) Page 1

7 B

Mr. Thomas Medical



March 11, 2013

Patient Name: **THOMAS, CAZE**
Patient dob:   **12/16/1977**

Dear Dr. Garramone:

Thomas Caze has been followed at our practice since April 2011 for a condition known as Gender Identity Disorder. Mr. Thomas although born physically female, is actually psychologically male. As a result of his continuing treatment to resolve this conflict, we have determined that his psychological gender (i.e. male) predominates over his physical gender.

Mr. Thomas is successfully transitioning from female to male through a treatment program of gender reassignment.  In April 2011, Mr. Thomas met with a Callen Lorde mental health professional and was deemed able to give full consent for gender reassignment .

Mr. Thomas does not have any medical contraindications for general anesthesia. He is at low cardiac risk for this surgical procedure.  Attached are his most recent labs, per your request. I fully recommend that Caze Thomas be considered for chest reconstruction surgery.  I am open to discussing this further at 212-271-7200 x7622.

Thank you,


EDDIE  MERAZ FNP



Additional Entrys

where plaintiff had not engaged in "protected activity," because he "failed to allege that he complained about statutorily prohibited discrimination"). Here, Petitioner did not exercise his protected rights but took matters into his own hands and improperly sought out information from the MTA Building Security Office thereby interfering with Five Star's business relationship with the MTA. Clearly, it was inappropriate on Petitioner's part to go directly to the MTA and ask to review their video surveillance, especially in this day and age.[5] By Petitioner's own account, he did not tell an official of Five Star he was being discriminated against or harassed because of his transgender status, sex or any other protected class. Rather, he said he only told a supervisor he felt harassed or discriminated against because he was over-supervised and treated differently with no tie to his transgender status or sex. The Respondent denied he made any complaints.

In sum, the SDHR conducted a fair and comprehensive investigation that gave Petitioner ample opportunity to provide sufficient evidence of the discrimination against him because of his transgender status or making proper complaints of violations of the Human Rights Law. Despite such opportunity, the SDHR found he did not provide sufficient proof to warrant a finding of Probable Cause to hold a hearing on his claims. Not only was the determination a proper

---

[5] It should be noted that the Investigator gave the Petitioner the benefit of the doubt and accepted his allegation that he was terminated for what he characterized as the protected activity of requesting video surveillance from MTA Security. In fact, the final straw that resulted in his termination was him threatening another employee with physical harm. The threatened employee, Sanik, wrote a report that Petitioner yelled and screamed at him about not doing exactly what Petitioner told him to do and asked if Sanik "wanted to take it to the hood." Sanik asked Petitioner why he was looking at him like he wanted to hurt him to which Petitioner responded "if he wanted to kill me, he would kill me." (Attachment C to Stolzer Aff.). This threat was witnessed by another Five Star employee who recalled in a written statement that Sanik asked Petitioner "why are you staring at me, you look like you wanted to kill me." Petitioner responded "if I wanted to kill you, I would kill you. Petitioner continued to stare at Sanik and said "this kid is going to make me punch him." (Attachment C to Stolzer Aff., Exhibit 8). In one of his written submissions to the SDHR Thomas wrote, "[Sanik] then turned around and said that I was staring at him as if I wanted to kill him. Figuratively speaking, I said if I wanted to kill you, you would already be dead, and there you stand alive and well." (Attachment D to Stolzer Aff., Page 9).

Facts: I was given two termination slips, one signed by Kenneth ___ after And one signed by Jeff. One which is an original document and another which was fraudulently doctored by Mr. Thurston It is a fact that Mr. Thurston forged his name and claimed to be

*Refer to said Entrys*

attached to the Affirmation of Ernest R. Stolzer submitted in support of Five Star's Answer and

Objections in Point of Law as Attachment C")[1]

Jeff Thurston is employed by Five Star as an Assistant Superintendent. In that capacity,

Mr. Thurston manages the field labor assigned to eight (8) projects, including at all relevant

times the electrical maintenance work for the headquarters of the Metropolitan Transportation

Authority located at 2 Broadway in downtown Manhattan New York (hereinafter referred to as

the "MTA Project"). The field labor for each project is directly supervised by either a General

Foreman or Foreman or, in some instances, both. (Attachment C to Stolzer Aff., Page 1).

Daniel Greci was employed by Five Star as a General Foreman. Mr. Greci was assigned

to the MTA Project and supervised approximately twelve (12) electricians. He reported to

*Refer to Attachment showing the original and the Forged copy*

Thurston. (*Id.*) *of the termination issued to Plantiff / Complaintant*

*Mr. Greci signs as a Gen.Foreman and as a Foreman*

Felix Valerio was employed by Five Star Electric as a Foreman. Mr. Valerio was also

assigned to the MTA Project and supervised approximately eleven (11) electricians who

performed work on the MTA Project. Mr. Valerio reported to Mr. Greci. (*Id.*)[2]

*Mr. Valerio was promoted to a Foreman for his Role in*

*~~Sexually harrasing~~ sexually harrasing / harrasing the Plantiff*

On or about February 27, 2017, Petitioner Caze Thomas, an electrician, was assigned to

work at Five Star by the Employment Department of the Joint Industry Board of the Electrical

Industry ("JIB") which, among other things, facilitates the placement of unemployed members of

the union, Local 3, I.B.E.W. with union-affiliated contractors such as Five Star. Thomas was

directed by Five Star to report to the MTA Project. (Attachment C to Stolzer Aff., Page 2). At

---

[1] References hereinafter to attachments to the Affirmation of Ernest R. Stolzer shall be designated as "Attachment ____ to Stolzer Aff." with the letter of the referenced attachment.

[2] On or about January 1, 2018, the MTA awarded the MTA Project to another electrical contractor, Nead Electric. As is sometimes customary in the industry, both Greci and Valerio have transferred to Nead Electric to continue working on the MTA Project.

*throughout the Complaintant / Plantiff's employment*
*on the project he was Assigned to at 2 Broadway*
*Mr. Greci was refered to and introduced ~~himself as~~ as both*
*                                        himself*
*                           and Gen. Foreman. Mr. Valerio introduced himself*

118 A.D. 3d 391, 987 N.Y.S. 2d. 217 (2d Dep't 2014) ("NYSDHR's Determination [of no probable cause] "entitled to considerable due deference to [NYSDHR's] expertise in evaluating discrimination claims); *Matter of Smith v. New York State Division of Human Rights & SKF USA Inc.*, 142 A.D. 3d 1362, 38 N.Y.S. 3d 651 (4th Dep't 2016) ("Courts give deference to [the Division] due to its experience and expertise in evaluating allegations of discrimination… and such deference extends to the Division's decision whether to conduct a hearing"); *Matter of Camp v. New York State Division of Human Rights*, 300 A.D. 2d 281, 751 N.Y.S. 2d 564 (2d Dep't 2002); *Matter of Curtis v. New York State Division of Human Rights*, 124 A.D. 3d 117, 3 N.Y.S. 3d 138 (3d Dep't 2015).

**B.    SDHR'S Determination of No Probable Cause Should Not Be Disturbed**

1.    Petitioner Was Provided a Full and Fair Opportunity to Present Evidence of His Claim of Discrimination

It is clear the Petitioner was provided a full and fair opportunity to present evidence in support of his claims of discrimination. Petitioner submitted his charge of discrimination with attached pages articulating his claims, was interviewed in person by the SDHR representative investigating the charge, given the opportunity to provide the SDHR with a list of alleged comments and/or behaviors toward him because of his transgender status, and submitted a fourteen-page, single-spaced typed writing rebutting the evidence provided by Five Star and providing support for his case. (*See* Attachments A and D to Stolzer Aff.).

*[handwritten: Both Respondants Five Star Electric Corp And the SDHR failed to acknowledge the sexual harrassment on Page 4 of Complaintant/Plantiff's Rebuttal, As well As all other specifically stated violations.]*

As noted earlier in this Memorandum of Law, the SDHR has broad discretion in determining the method to be employed to investigate each particular case.   There is no reasonable argument that Petitioner was not provided ample opportunity to present evidence in support of his claim of discrimination, no less that the SDHR acted arbitrarily or capriciously to his disadvantage in the way it gathered evidence.

*[handwritten: The Complaintant/Plantiff never was interviewed in person by the SDHR, however the Respondant Five Star Electric Corp was likely Interviewd, James Cronin, Micheal Malinowski, And Ashley Castro in person]*

*Refer to entry 4 Heal Remand pages 1-24*

terminated for cause and told him that he would come to MTA Project building to address the issue in person. Upon his arrival, Thurston met with Thomas and terminated him for cause. Valerio then escorted Thomas from the building. (Attachment C to Stolzer Aff., Page 5).

### B. Petitioner Filed His Verified Petition To Review SDHR's Determination

Petitioner filed a Verified Complaint of Discrimination with the SDHR on or about June 1, 2017. (Attachment A to Stolzer Aff.). In his complaint to the SDHR, Petitioner alleged he was discriminated against by Five Star because of his sex, sexual orientation and retaliated against because of opposition to discrimination. He alleged that because of his sex and perception of him being homosexual and transgender, he was subjected to rumors, lies and was falsely accused of "causing safety hazards, disturbances and making violent threats"; was given a warning for being late twice, absent once and leaving work early, while several co-workers were absent or late but not disciplined. He further alleged that after being accused of threatening a co-worker, he went to the Security Office of the MTA and requested to view the building security surveillance tapes and entry records for the Headquarters Building. He complained he was ignored by the MTA and redirected to his employer. Petitioner claimed he was terminated because he went to MTA Security about the security tapes. He further alleged he was innocent of threatening fellow employee Sanik.

The SDHR conducted a thorough investigation of the Petitioner's claims of discrimination. The SDHR held an in-person interview of the Petitioner, provided him an opportunity to list all alleged comments and/or behaviors of others toward him because of his transgender status. (*See* Determination and Order After Investigation dated December 5, 2017 attached as Attachment B to Stolzer Aff.).



I the Complaintant have never met with any investigator in person. This is a FAlse Statement, a lie.



Refer to Entry Titled Reasons pg. 133
Refer to State Dept of Human Rights Request to Remand
And Resons thereof.

New York courts have consistently held that SDHR "has broad discretion in determining the method to be employed in investigating a claim." *Matter of Bal v. N.Y. State Div. of Human Rights*, 202 A.D.2d 236 (1st Dep't 1994), *lv. to app. den.* 84 N.Y.2d 805 (1994). SDHR's Rules of Practice provide that SDHR's investigation "may be made by field visit, written or oral inquiry, conference, *or any other method or combination thereof deemed suitable in the discretion of the regional director* or the director of regional affairs." 9 N.Y.C.R.R. §465.6(b) (emphasis added). Thus, as long as a complainant has a full and fair opportunity to present his claims, SDHR may use whatever method or methods it deems appropriate in its discretion to investigate the claim. These methods often include requesting written position and rebuttal statements from the parties, reviewing documents submitted by the parties, and interviewing witnesses at one-party or two-party fact-finding conferences. *See Matter of Cappuccia v. New York State Div. of Human Rights*, 140 A.D.3d 750 (2d Dep't 2016).

To establish that SDHR's investigation was "arbitrary and capricious" requires evidence that the administrative agency's examination was "so abbreviated and one-sided that it resulted in a record which did not afford a reasonable basis for an administrative determination." *Matter of Verderber v. Roechling Steel, Inc.*, 110 A.D.2d 705 (2d Dep't 1985); *Matter of Bal*, 202 A.D.2d at 237.

Petitioner does not assert in his Petition to this Court he was denied a full and fair opportunity to present evidence in support of his complaint of discrimination. Rather, Petitioner simply disagrees with the conclusions reached by the SDHR regarding the allegations in his Complaint.

However, the courts must afford great deference to SDHR of Human Rights in reviewing a determination of the agency. *Matter of Knight v. New York State Division of Human Rights*,

m

The SDHR's Determination of No Probable Cause properly addressed this dispositive issue of motivation at the outset of its decision and found "[t]he Division's investigation does not support Complainant was discriminated against because of his sex and/or perceived sexual orientation." (Attachment C to Stolzer Aff., Page 2). The SDHR asked Petitioner to provide a list of "comments and/or behavior of others toward him because of his transgender status." (*Id.*) Petitioner provided just two (2) alleged incidents: (1) claims he overheard a single conversation by a third level supervisor with an elevator operator about his transgender status; and (2) heard on one occasion two individuals, neither of whom he could even identify as Five Star employees, in a conversation about seeing on telephone screen showing a topless male and one individual stated he thought he was Petitioner's lover. (*Id.*)

The SDHR found that neither incident was pervasive or severe enough to constitute a hostile work environment. The agency was not only within its discretion in reaching that conclusion, it was correct as a matter of law. Whether considered individually or together the incidents did not constitute sufficient proof of discriminatory intent or hostile work environment. *Khalil v. State of New York*, 17 Misc. 3d 777, 784 (N.Y. Sup. Ct., 2007) (dismissing plaintiff's hostile work environment claim because "[i]solated, minor acts or occasional episodes are generally insufficient to meet the threshold requirement of a hostile work environment . . . conduct must be extreme to amount to a change in the terms and conditions of employment") (internal quotations omitted).

*[handwritten: None of the violations, offenses, and or abuses experienced by the plaintiff, which was caused by the Defendants/Respondance were isolated, minor, or occasional]*

During an in-person interview by the SDHR Representative Petitioner complained about being written up for lateness when other employees were not. The SDHR found the examples of other employees given by Petitioner were not comparable to his situation and therefore insufficient to establish differential treatment. The Investigator did not simply dismiss

*[handwritten: Again, never has the Petitioner ever had an in-person interview with any SDHR Representative.]*

SDHR For Five Star Electric Corps



**NEW YORK STATE** **Division of Human Rights**

**ANDREW M. CUOMO**
Governor

**HELEN DIANE FOSTER**
Commissioner

## INFORMATION FOR RESPONDENTS
### CONCERNING COMPLAINT PROCEDURES OF
### NEW YORK STATE DIVISION OF HUMAN RIGHTS

The New York State Division of Human Rights is a State agency mandated to receive, investigate and resolve complaints of discrimination under N.Y. Executive Law, Article 15 ("Human Rights Law"). The Division's role is to fairly and thoroughly investigate the allegations in light of all evidence gathered.

### WHAT TYPES OF COMPLAINTS ARE HANDLED BY THE DIVISION OF HUMAN RIGHTS?

The Human Rights Law forbids discrimination in employment, apprenticeship and training, purchase and rental of housing and commercial space, places of public accommodation, certain educational institutions, and credit transactions. If a person feels that he or she has been discriminated against by of reason of race, color, creed, sex, age (not public accommodation), disability, national origin, marital status, familial status (housing only), conviction or arrest record (employment only), genetic predisposition (employment only), military status, or sexual orientation, or because he or she has opposed any practices forbidden under the Human Rights Law, that person may file a complaint with the State Division of Human Rights.

### HOW DOES A PERSON FILE A COMPLAINT?

Persons wishing to file a complaint of discrimination may contact the nearest regional office of the Division of Human Rights. The Human Rights Law requires that they must file such a complaint within one year of the alleged unlawful discriminatory act.

### WHAT IS THE INVESTIGATIVE PROCEDURE?

The Division represents neither the Complainant nor the Respondent. The Division pursues the State's interest in the proper resolution of the matter in accordance with the Human Rights Law. Complainant and Respondent can retain private counsel to represent them during the investigation, but such representation is not required.

Upon receipt of a complaint, the regional office will:

- Notify the Respondent(s). (A Respondent is a person or entity about whose action the Complainant complains. An employer must have four or more employees, with certain exceptions, for the Human Rights Law to apply.)
- Resolve issues of questionable jurisdiction.

**Protection of personal privacy:** In most cases, you will be expected to submit documents in support of your response to the complaint. The Division observes a personal privacy protection policy consistent with Human Rights Law § 297.8 which governs what information the Division may disclose, and the N.Y. Public Officer's Law § 89 and § 96-a, which prohibit disclosure of social security numbers and limit further disclosure of certain information subject to personal privacy protection. Please redact or remove personal information from any documentation submitted to the Division, unless and until the Division specifically requests any personal information needed for the investigation. The following information should be redacted: the first five digits of social security numbers; dates of birth; home addresses and home telephone numbers; any other information of a personal nature. The following documentation should not be submitted unless specifically requested by the Division: medical records; credit histories; resumes and employment histories. The Division may return your documents if they contain personal information that was not specifically requested by the Division. If you believe that inclusion of any such personal information is necessary to your response, please contact me to discuss before submitting such information.

If you have any questions about the process generally, or how to submit your response, please call me at (718) 722-2060.

Very truly yours,

Joyce Yearwood-Drury
Director O.S.H.I.

Enclosures:
Verified Complaint
Respondent Contact Information Form
Information for Respondents

*Ironically, the SDHR never sent this protection of privacy to the Complaintant/Plaintiff Mr. Thomas, And in their investigation, considered the Respondants act of sharing the Complaintants/Plaintiff's vital information As simply, non-pervasive, and not good tasted. Not A violation of law*

*This entire Entry/page along with others of the State Dept of Human Rights Investigation and determination is Arbitrary and capricious, And or lack rational basis*

has Complainant work in the basement alone; that Valerio related details of previous disagreements Valerio had with Complainant; and that Valerio told the elevator operator that Complainant's real name was not Caze. Accepting all of the above as true, it does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough. At most, it is gossiping that, although it could very well be in poor taste, it does not rise to the level to abusive workplace environment.

**12(a)**

The other instance Complainant identified is again a scenario where the speakers were not aware Complainant was overhearing them. Two unidentified journeymen were talking about how they caught a glance at Complainant's telephone screen and saw a topless guy who, they said, must be Complainant's lover. Complainant did not identify who these individuals are and it is not clear whether they are even Respondent employees. Complainant stated that one of them sounded like Mr. Messineo. This example, too, does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough.

**12(b)**

During the Division initiated interview, Complainant stated that he was written up for lateness when others were not. As an example, he stated that Messineo missed several days of work consecutively because of dental reasons and was not written up, whereas Complainant missed a day of work because he needed to help his grandmother with her radiator and was written up. Another example Complainant gave was that Carlos Santiago missed at least four consecutive days because he had marital issues and he was not written up.

**12(c)**

Both examples above clearly show that the situations are dissimilar and insufficient to illustrate differential treatment.

**12(d)**

The third example Complainant gave was that Felix Valerio, who is a supervisor, missed work and was not written up. Complainant stated that he knows about this because he was part of ← *False Senten* team. Besides lacking in detail, Complainant and Valerio are not similarly situated employees, thus, an insufficient and inadequate example of differential treatment. *As per Five Star Electric Cor the rules Apply to All employed by the company.*

**12(e)**

Moreover, Respondent provided a list of employees between September 1, 2016 to the present who were disciplined for similar wrongdoings as Complainant[1]. Out of a list of 28 employees, seven (7) had time docket and received verbal warnings, most for leaving work early and one for arriving late.

**12(f)**

Another differential treatment example Complainant gave was regarding the absenteeism over the union card issue. He stated during the interview with the Division that there were other employees who, too, did not have their union card with them but were not sent home. He stated that like all others, Complainant showed Greci the money order receipt in lieu of the card and Greci called the union about all the guys who presented the money order receipts. Greci then told Complainant to go and take care of the issue with the Union and marked Complainant as absent. That same day Complainant went to the Union who told Complainant that there was a clerical

**12(G)**

---

**12(H)** [1] Respondent provided copies of Complainant's write ups. On April 5, 2017, he was written up for absences, leaving early, and lateness. On April 13, 2017, he was written up for lateness, absences, leaving early, insubordination and disruptive behavior. *Fraudulent document*

Respondent can retain private counsel for the hearing, and, if Respondent is a corporation, is required to be represented by legal counsel. The Complainant can retain private counsel for the hearing, but is not required to do so. If Complainant is not represented by private counsel, the Division's counsel prosecutes the case in support of the complaint. Attorneys for the parties or for the Division may issue subpoenas for documents and to compel the presence of witnesses.

At the conclusion of the hearing sessions, a proposed Order is prepared by the Administrative Law Judge and is sent to the parties for comment.

A final Order is issued by the Commissioner. The Commissioner either dismisses the complaint or finds discrimination. If discrimination is found, Respondent will be ordered to cease and desist and take appropriate action, such as reinstatement, training of staff, or provision of reasonable accommodation of disability. The Division may award money damages to Complainant, including back pay and compensatory damages for mental pain and suffering, and in the case of housing discrimination, punitive damages, attorney's fees and civil fines and penalties. A Commissioner's Order may be appealed by either party to the State Supreme Court within 60 days. Orders after hearing are transferred by the lower court to the Appellate Division for review.

## WHAT IS A COMPLIANCE INVESTIGATION?

The compliance investigation unit verifies whether the Respondent has complied with the provisions of the Commissioner's Order. If the Respondent has not complied, enforcement proceedings in court may be brought by the Division.

## NOTICE PURSUANT TO PERSONAL PRIVACY PROTECTION LAW

Pursuant to the Human Rights Law, the Division collects certain personal information from individuals filing complaints and from those against whom a complaint has been filed. The information is necessary to conduct a proper investigation; failure to provide such information could impair the Division's ability to properly investigate the matter. This information is maintained in a computerized Case Management System maintained by the Division's Director of Information Technology, who is located at One Fordham Plaza, Bronx, New York, (718) 741-8365.

## PENAL PROVISION OF THE HUMAN RIGHTS LAW

The Human Rights Law contains the following penal provision:

"Any person, employer, labor organization or employment agency, who or which shall willfully resist, prevent, impede or interfere with the division or any of its employees or representatives in the performance of duty under this article, or shall willfully violate an order of the division or commissioner, shall be guilty of a misdemeanor and be punishable by imprisonment in a penitentiary, or county jail, for not more than one year, or by a fine of not more than five hundred dollars, or by both; but procedure for the review of the order shall not be deemed to be such willful conduct." Human Rights Law § 299.

## GENERAL INFORMATION

For a more detailed explanation of the process, see the Division's Rules of Practice (9 N.Y.C.R.R. § 465) available on our website www.dhr.ny.gov. If you have any additional questions about the process, the investigator assigned to the case will be available to answer most questions.

Additional lack of
Integrity



NEW
YORK
STATE | **Division of
Human Rights**

ANDREW M. CUOMO
Governor

HELEN DIANE FOSTER
Commissioner

September 27, 2017

Five Star Electric Corp.
Attn: Robert J. Saville, President, CEO, General Counsel
101-32 101st Street
Ozone Park, NY 11416

  Re: Caze Thomas v. Five Star Electrical Co., Jeff Thurston, Daniel Greci, Felix
     Valerio
     Case No. 10188276

Dear Mr. Saville:

   The above-captioned complaint has been assigned to me for investigation.  Toward that
end, the following information is currently required:

    1. List of employees in the same work location as Complainant between September
      1, 2016 to the present who were disciplined for similar wrongdoings as
      Complainant. Provide their full name, gender, date of hire, title, type of
      wrongdoing, date, and type of discipline.

    2. List of Respondent electricians between January 1, 2017 to the present in the
      same work location as Complainant. Provide full name, gender, date of hire, title,
      current employment status and telephone number. If no longer employed, date of
      separation, reason, and the last known telephone number.

    3. Confirm who wrote the statement on exhibit 8 and whose signature appears at the
      bottom of that statement.

    4. Confirm if Complainant, besides filing with the Division, has filed or otherwise
      complained about discrimination or perceived discrimination either with
      Respondent or with the Union. If yes, inform if an internal investigation was
      conducted and provide copy of investigation including witness statements.

   Please provide this information by **October 6, 2017.**

   You may transmit the information to me by e-mail at **Rodlind.Purrini@dhr.ny.gov**.  Please
note, however, if you are submitting any documentary evidence, photocopies must be delivered
to our office in addition to any e-mail submission of those documents.





# FIVE STAR ELECTRIC CORP.
### LICENSED ELECTRICAL CONTRACTORS

October 6, 2017

**VIA US MAIL AND EMAIL**

Rodlind Purrini
Office of Sexual Harassment Issues
New York State Division of Human Rights
55 Hanson Place, Room 900
Brooklyn, New York 11217

Re:   **Caze Thomas v. Five Star Electrical Co., et al.**
       **Case No. 10188276**

Dear Rodlind:

This is in response to your September 27, 2017 letter. Please see the attached documents in response to your requests numbered 1 and 2. In response to your request numbered 3, the statement was written by Daniel Greci based on his conversation with <u>Ronald Shatilla, who signed the statement at Mr. Greci's request.</u>

In response to your request numbered 4, as mentioned in our response to the initial complaint (page 6), Five Star did not receive any complaint from Mr. Thomas regarding discrimination. We do not know whether Mr. Thomas has filed or otherwise complained about discrimination or perceived discrimination to the Union.

As tragically demonstrated by yesterday's fatal shooting of a NYC construction worker by a co-worker, threats such as the one involved here cannot be taken lightly.

Please let me know if the Division has further questions.

Sincerely yours,

Robert J. Saville
President & CEO/General Counsel
RS/la
Enc.

## DISCRIMINATION COMPLAINT FORM

Date _4/13/17_

I, _Cazé Thomas  6004976_, make this Complaint of Discrimination.
(Name & Card Number)

The member who discriminated against me is _Felix, Danny, Mullin, Lenny, James_

(or) the Contractor who discriminated against me is _Five Star Electric_

I feel that the discrimination was because of my race/color _____, sex _✓_, age _____,

religion _____, national origin _____, disability _____, sexual orientation _✓_,

marital status _____, other reason _____, (state reason) _____

The date I was discriminated against was _Start date to Present_

The time and place were _2 Broadway NY NY_

The act or words that I think were discriminatory were _Penalized me for times I was late and not subjecting other workers to the same degree for the same actions. harrassment because I didnt disclose my experience in the USMC, with a co-worker harrassed about my gender; subforman told Elevator operators that I was a female. Retaliation because I had a disagreement with an insubordinate Apprentice._

The persons who saw what happened were _MTA Security, MTA Domestic employees, other Five Star workers_

This is what I want the Union to do _Investigate, Advise, And File a grievence on my behalf. In the investigation Security Official Mike Brandon is on the Mezz. And Frieght workers And Janitors._

_Cazé Thomas_
_Yofredt.E.C.F08_
_____
Member

_____
Business Representative

_* Copy of EEOC + DIV Human Rights Information Provided_
_(J)_

Additional Rebuttal

Refer to Entry titled "Remand" pages 1-21
Attached also are additional entrys made by Respondant/Defendant Five Star Electric Corp

Numerous references to Petitioner's transgender status are made throughout the Division's final investigation report, in addition to several investigatory steps that the Division undertook in order to flesh out whether or not Petitioner was treated any differently by Five Star because of his transgender status.  For example:

- At page 10 of the report, the Division explained how it specifically asked Petitioner to provide any comments and/or actions that he believed were said or taken because of his transgender status: "The Division sent a written request to Complainant to relate all the comments and/or behavior of others towards him because of his transgender status."  (Division Answer Ex. A, Final Investigation Report and Basis of Determination at p. 10).

- Also at page 10 of the report, the Division explained that as part of its investigation, it required Five Star to respond to Petitioner's allegations of discrimination based on his transgender status: "The Division asked Respondent to address Complainant's rebuttal since in the rebuttal Complainant more fully talks about him being transgender, which was not clear from the initial complaint."  (Division Answer Ex. A, Final Investigation Report and Basis of Determination at p. 10).

- The Division also described several investigatory interviews of Five Star employees that it conducted with regard to Petitioner's claims, and references Petitioner's transgender status as something that was included as part of these interviews.  Indeed, at page 10 of the report, the Division summarizes its interview of Andrezej Malinowski and specifically notes that Mr. Malinowski spoke with the investigator about Petitioner's transgender status and indicated that

SDHR allowed Respondant Five Star Electric Corp to Rebute Complaintants Rebuttal and Speak for the Plantiff/Complaintant, and on the Complaintants/Plantiff's behalf, Instead of speaking to Plantiff/Complaintant. This was the tactic




# FIVE STAR ELECTRIC CORP.

### LICENSED ELECTRICAL CONTRACTORS

October 23, 2017

**VIA US MAIL AND EMAIL**
Rodlind Purrini
Office of Sexual Harassment Issues
New York State Division of Human Rights
55 Hanson Place, Room 900
Brooklyn, New York 11217

Re:   **Caze Thomas v.  Five Star Electrical Co., et al.**
     **Case No. 10188276**

Dear Rodlind:

This is in response to the so-called "rebuttal" from Caze Thomas that was attached to your October 16, 2017 email and which apparently was received by your office on August 21, 2017.

In the response to the subject complaint, we pointed out that Mr. Thomas (1) had failed to cite a single specific fact to support his assertion that he was subjected to unlawful discriminatory practices relating to his employment based on his sex and sexual orientation and (2) had failed to assert that he had complained to a Five Star supervisor about alleged unlawful discriminatory practices relating to his employment based on his sex and sexual orientation.  Mr. Thomas' "rebuttal" fares no better, failing to remedy either deficiency from his original complaint.  We again submit that Mr. Thomas has failed to demonstrate any probable cause to support his complaint of unlawful discrimination and urge the Division to dismiss the complaint against all Respondents.

On page 1 of his "rebuttal", Thomas generally states that Respondent Felix Valerio "harassed" him ("possible that Valerio was promoted for the part he played in harassing me"; in fact, Mr. Valerio was a foreman prior to Mr. Thomas' employment with the company) without citing a single specific instance of any such harassment.

On page 2 of his "rebuttal", Thomas states that Marcin Sanik "harassed" him "because I didn't accept his next suggestion" on how to do a certain task.  The "harassment" amounted to a "disgruntled" or "negative" "attitude" which allegedly manifested itself in criticism or argumentative comments.  Thomas fails to assert that such "harassment" from a co-worker (an apprentice) related to his sex or sexual orientation and fails to allege that he complained about

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CAZE D. THOMAS,

                         Petitioner,

                v.

FIVE STAR ELECTRIC CO., AND NEW YORK
DEPARTMENT OF HUMAN RIGHTS,

                         Respondents.

**AFFIRMATION OF
ERNEST R. STOLZER**

JUSTICE JOAN MADDEN

Index No. 100141/18

ERNEST R. STOLZER, under penalty of perjury, affirms pursuant to CPLR 2106 as follows:

1.     I am an attorney admitted to practice of law in the courts the State of New York, and a member of the law firm of Bond, Schoeneck & King, PLLC, counsel for Respondent, Five Star Electric Corp. ("Five Star"). As such I am familiar with the facts and circumstances stated in this affirmation.

2.     Five Star is the largest unionized electrical contractor in the City of New York. Five Star employs approximately 1,300 employees, including approximately 950 electricians. (See Five Star's Response to the State Division of Human Rights dated July 14, 2017, appended hereto as **Attachment C**).

3.     On or about February 27, 2017, the Petitioner Caze D. Thomas, ("Petitioner"), an electrician, was assigned to work at Five Star by the Employment Department of the Joint Industry Board of Electrical Workers ("JIB") which, among other things, facilitates the placement of unemployed members of the Union, Local 3, I.B.E.W. with union-affiliated contractors such as Five Star. (**Attachment C** to this Affirmation, Page 2).

4.     On or about April 13, 2017, Petitioner was terminated from employment.

109022.1 4/26/2018

5.      Petitioner thereafter filed a complaint of discrimination with the New York State Division of Human Rights ("SDHR") alleging he was discriminated against by Five Star. (Attachment A to this Affirmation).

6.      Respondent in this court proceeding, Five Star, filed a comprehensive response with the SDHR. (Attachment C to this Affirmation).

7.      Petitioner in this proceeding filed a written rebuttal received by the SDHR on August 21, 2017. (Attachment D to this Affirmation).

8.      In a letter dated September 27, 2017, the SDHR requested additional information from Five Star. (Attachment E to this Affirmation).

9.      Five Star responded to the SDHR with the requested information in a letter dated October 6, 2017. (Attachment F to this Affirmation).  Please note the telephone numbers requested by the State Division were provided to the agency in Five Star's submission.  The telephone numbers have been redacted in this public court filing to protect the privacy of the individuals.

10.     Five Star also submitted a response to Petitioner's rebuttal. (Attachment G to this Affirmation).

11.     By Determination and Order After Investigation dated December 5, 2017, the Director of SDHR determined there was "No Probable Cause to believe the Respondent has engaged in or are engaging in the unlawful discriminatory practice complained of "and dismissed the complaint. (Attachment B to this Affirmation).

12.     By Decision dated January 25, 2018, the U.S. Equal Opportunity Commission adopted the findings of the SDHR. (Attachment H to this Affirmation).

109022.1 4/26/2018

Discrimination and Harrassment
in general but not limited to

# 1

Refer to Entry titled "Remand" pages 1-21

Petitioner's allegations at that point but, rather, required Five Star to provide information about discipline of other employees for similar conduct.  (Attachment E to Stolzer Aff.).  Five Star provided the required information which showed other employees were docked or disciplined for lateness or leaving early. (Attachment F to Stolzer Aff.).

Petitioner also told the SDHR Investigator about a circumstance when he let his Union card expire and therefore was not allowed to work until he acquired a valid card.  The card was

*This is False. The Petitioner/complaintant/Plantiff never Allowed his Union Card expire. ➤ Attached is a Reciept of Union Dues Paid.*

necessary to work on the MTA Project worksite for which Five Star utilized only Local 3 IBEW union electricians who had to possess a valid Local 3 membership card.  Petitioner did not have a valid union card and, as a result, was not allowed to work and told to contact his Union.  The Union office made a mistake which prevented Petitioner from reinstating his membership for an additional day which prevented him from working at the MTA Project jobsite.  However, once the issue was resolved, Petitioner was allowed to work.  Petitioner told the investigator he did not know if other employees were affected by Union clerical errors.  The SDHR determined that Five Star could not have been acting against him for improper motivations when it was the Union's mistake that caused the delay in in him returning to work.  The SDHR's determination was not only within its discretion but correct as well, since he did not establish that as a transgender employee, he was treated differently than employees in the same or similar situation who are not transgender.

Finally, Petitioner complained he was terminated in retaliation for engaging in protected activity.  The problem is Petitioner did not engage in activity protected under the Human Rights Law.  Protected activity under the Human Rights Law is complaining to the State Division or his employer about violations of the law against himself or other employees. *Brunache v. MV Transp., Inc.*, 151 A.D.3d 1011, 1013 (2d Dep't 2017) (dismissing plaintiff's retaliation claim

Mr. Greci discriminated against Mr. Thomas, The petitioner/complaintant /Plantiff by order him to leave the Job For not having a new Union Card while he allowed others who didn't have a Union card to continue to work. Yet the SDHR accuse Complaintant/Plantiff

**DEFERRED SALARY PLAN**
**JOINT INDUSTRY BOARD OF THE ELECTRICAL INDUSTRY**
**158-11 HARRY VAN ARSDALE JR. AVENUE, FLUSHING NY 11365**
**PHONE: 718-969-4040**

.....................................................................................................................

**APPLICATION FOR WAGE REPLACEMENT DAY AND PICKET DUTY BENEFITS**

*PLEASE PRINT*

NAME _____*Caze*_____   _____*Lomas*_____
          First                              Last

ADDRESS __*c/o 65-45 Persons Blvd 1M*__   SOC SEC. # _068-62-688_
                  Number and Street

_*Fresh Meadows*_                              LOCAL UNION# _3_
      Town or City

                              *11365*
_*NY*_      _*Domestic Republic*_   DIV. _A_   UNION CARD # _600496_
  State          Zip Code

                              PHONE NUMBER: _347-262-5434_

Please answer below:

1- Are you (check one): ☑ Unemployed  ☐ Employed
    Name of employer: _____

I am applying for:

2-  ☑ Wage Replacement Day Benefit (Includes Election Day):
      Indicate date(s): _2/6/17_
      **Please attach paystub(s).**

3-  ☐ Picket Duty Benefit ("A" Rated Journeypersons Only):
      Indicate date(s): _____
      **The attached form must be completed and returned with this application.**

*I understand that all distributions for these benefits may be made only from the employer contribution portion of my Deferred Salary Plan account and are subject to the applicable taxes under IRS regulation as indicated on the back of this form.*

Date: _4/11/17_                    Signature: _____

---

*For Office Use Only*

| Code | Amount | Date | TB Amount | TB Date |
|------|--------|------|-----------|---------|
|      |        |      |           |         |
|      |        |      |           |         |

**READ INSTRUCTIONS ON REVERSE SIDE**

DS-14

⑬

FIVE STAR ELECTRIC CORP.
LICENSED ELECTRICAL CONTRACTORS
101-32 101ST STREET, OZONE PARK, N.Y. 11416
718-641-5000

45598 THOMAS,CALE

| CLOCK NO | IDENT. | EMPLOYEE NAME | | | | | |
|----------|--------|---------------|---|---|---|---|---|
| SINGLE | 9 | 1 | 423 | 908762 | 03/02/17 -03/08/17 | 03/10/17 |
| MARITAL STATUS | DEPENDENTS | DEPARTMENT | UNION | CHECK NO | PAY PERIOD | CHECK DATE |

| EARNINGS STATEMENT THIS PAY | | | |
|---|---|---|---|
| TYPE | HOURS | RATE | EARNINGS |
| RG MIJ&M ELECTR | 28.00 | 54.000 | 1,512.00 |
| (PREV WAGE RATE) | | 28.000 | |
| | | | |
| TOTALS | 28.00 | | 1,512.00 |

| DEDUCTIONS THIS PAY | |
|---|---|
| FEDERAL TAX | 83.00 |
| F.I.C.A. TAX | 115.67 |
| STATE TAX (NY ) | 60.88 |
| CITY TAX (NYC) | 37.96 |
| UNION-(K) | 151.20 |
| EMPLOYER PAID UNION BENEFITS: | |
| ANNUITY HOURLY | 56.00 |
| HEALTH REIMB | 112.00 |
| 401K FICA CONTRB | 115.67 |
| 401K HR%DAY CNTRB | 268.80 |

| YEAR TO DATE | |
|---|---|
| GROSS PAY | 2,646.00 |
| FEDERAL GROSS | 2,381.40 |
| FEDERAL TAX | 115.00 |
| F.I.C.A. TAX | 202.41 |
| STATE TAX | 99.82 |
| CITY TAX | 62.65 |
| 401K PLAN | 264.60 |
| | |
| NET PAY | 1,063.29 |

(14)

LOAD THIS DIRECTION, THIS SIDE UP

MONEY ORDER RECEIPT · NON NEGOTIABLE

There's a better way to send cash!
Download the Western Union app and click pay in cash!

AGT 1003738 LOC 000430 DT 032017 $200.00 TWOHUNDREDDOLLARS AND
NO CENTS

* 1 7 5 1 8 6 6 5 0 3 1 *

Dues Payment that was
Submitted before deadline

LOAD THIS DIRECTION, THIS SIDE UP

12

termination For
Cause

# EMPLOYMENT TERMINATION REPORT

Name of Journeyman
or Journeywoman  **Caze Thomas**

Date **4/3/17**

SS# **6831**
Card Number

CHECK TYPES OF WORK INSTALLED

☐ Fiber Optic
☐ Street Lighting
☐ Traffic Lighting
☐ Data
☐ School
☐ Fire Alarm
☐ Telephone
☐ Bx Cable
☐ Oil Burner
☐ Subway

Please note other type of work or job:

Reason for Termination of Employment
**Lateness**
**Absenteeism**
**Leaves Job early**
**Insubordination**
**Disruptive to Job**

Please state type of work on which employee excels

Supervision Experience:
Foreman: **Jeff Thurston**
Sub-Foreman:

Contractor: **Five Star Electric**

By: **Kenneth Benkale**    Title

TO BE FORWARDED, WITHOUT DELAY, TO THE JOINT INDUSTRY BOARD
158-11 HARRY VAN ARSDALE JR. AVENUE, FLUSHING, NY 11365-3095
**EMPLOYEE'S COPY**

---

# EMPLOYMENT TERMINATION REPORT

Name of Journeyman
or Journeywoman  **Caze Thomas**

Date **4/3/17**

SS# **6831**
Card Number

CHECK TYPES OF WORK INSTALLED

☐ Fiber Optic
☐ Street Lighting
☐ Traffic Lighting
☐ Data
☐ School
☐ Fire Alarm
☐ Telephone
☐ Bx Cable
☐ Oil Burner
☐ Subway

Please note other type of work or job:

Reason for Termination of Employment
**Lateness**
**Absenteeism**
**Leaves Job early**
**Insubordination**
**Disruptive to Job**

Please state type of work on which employee excels

Supervision Experience: Gen/line
Foreman: **Daniel Grei**
Sub-Foreman:

Contractor: **Five Star Electric**

By: **Jeff Thurston**    Title

TO BE FORWARDED, WITHOUT DELAY, TO THE JOINT INDUSTRY BOARD
158-11 HARRY VAN ARSDALE JR. AVENUE, FLUSHING, NY 11365-3095

---

FORM J-80 • 100M • 2/11 • HH
H & H GRAPHIC PRINTING COMMUNICATIONS (201) 369-9700   214246

---

Caze Thomas
SS# 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

Notice everything but
the signatures are the same.
And that Jeff Thurston handwritten
is not withen the writing the termination
but to further harass me to
make me look bad he lied and said
he wrote it. His lack of integrity
is self evident.

The grievance review board did Not
find reason of Lateness, absenteeism, or
Leaves Job early Justified, but they
expressed that they felt personally
offended because I spoke with security
before they got there. They did not
transfer but considered accused

X _Potreekina C. Got_

5/08/2017

NAYYAR M. RAJA
Notary Public, State of New York
No. 01RA6055552
Qualified in Queens County
Commission Expires May 14, 20_19_



Invalid Document

Apparently Mr. Greci
has been demoted from
Gen. Foreman

Rejected Document
And Invalid.

FORM J-80 • 100M • 2/11 • HH

H & H GRAPHIC PRINTING COMMUNICATIONS (201) 369-9700

214246

**EMPLOYMENT TERMINATION REPORT**

Name of Journeyman
or Journeywoman: _Caze Thomas_

Date _4/13/17_

SS# _-6-831_

Card Number _____

CHECK TYPES OF WORK INSTALLED

☐ Fiber Optic
☐ Street Lighting
☐ Traffic Lighting
☐ Data
☐ School
☐ Fire Alarm
☐ Telephone
☐ Bx Cable
☐ Oil Burner
☐ Subway

Please note other type of work or job:

Supervision Experience:
Foreman _Dan Greci_
Sub-Foreman _Super Jeff Thurston_
Asst.-Foreman

Please state type of work on which employe excels

Reason for Termination of Employment: _Disruptive
to the job by harassing and
threatening the wellbeing of
Additional Notes a fellow employee
apprentice which is a violation
of Five Star Company Policy_

Contractor: _Five Star Electric_
By _Kenneth Bentante_
Title

TO BE FORWARDED, WITHOUT DELAY, TO THE JOINT INDUSTRY BOARD
158-11 HARRY VAN ARSDALE JR. AVENUE, FLUSHING, NY 11365-3095

# EMPLOYMENT TERMINATION REPORT

Name of Journeyman or Journeywoman _Caze Thomas_   Date _4/13/17_

SS# _____

**CHECK TYPES OF WORK INSTALLED**

Please state type of work on which employee excels

Card Number _____

- ☐ Fiber Optic
- ☐ Street Lighting
- ☐ Traffic Lighting
- ☐ Data
- ☐ School
- ☐ Fire Alarm
- ☐ Telephone
- ☐ Bx Cable
- ☐ Oil Burner
- ☐ Subway

Reason for Termination of Employment _____

_Lateness_
_Absenteeism_
_Leaves Job early_

Additional Note _Insubordination_
_Disruptive to job_

Please note other type of work or job: _____

Supervision Experience: _Dan Greco_
Foreman _Jeff Thurston_

Contractor _Five Star Electric_
By _Kenneth Berkente_   Title _____

TO BE FORWARDED, WITHOUT DELAY, TO THE JOINT INDUSTRY BOARD
158-11 HARRY VAN ARSDALE JR. AVENUE, FLUSHING, NY 11365-3095

FORM J-80 • 100M • 2/11 • HH

H & H GRAPHIC PRINTING COMMUNICATIONS (201) 368-9700

214246

*(handwritten annotations:)*
Said offenses did occur again after Plumber/Complaintto was given written war

→ States Reason for termination

→ States additional notes

*(handwritten at bottom:)* Original Termination Document



2 Broadway to ask about access to the building's turnstile access records and whether the building's security cameras have audio capabilities. Finding the requests odd, the MTA Security Officer asked him if he had discussed these issues with his boss, Mr. Greci. Complainant ignored the question and then asked for the identity and location of the Building Manager. He then proceeded to the Building Manager's office to ask for the same information. At this point, a representative of the Building Manager, Michael Brady, pulled Mr. Greci out of his job meeting to advise him that Complainant was seeking details about the building's security features. Mr. Greci then contacted Mr. Valerio to inquire about Complainant's disruptive conduct.

Shortly thereafter, Mr. Valerio, Complainant and Mr. Sanik went to Mr. Greci's office to address the ongoing situation between Complainant and Mr. Sanik. (By this time, Mr. Greci had been notified by the MTA Security Office about Complainant's request for building security information.) Complainant angrily told Mr. Greci that he felt like Mr. Sanik was disrespecting him by not following his directives and constantly asking questions. Mr. Sanik told Mr. Greci that he was very upset with the situation and broke down in tears. He stated that he believed Complainant had anger issues, and that Complainant constantly screamed at him, demeaned him and threatened him. Mr. Sanik then provided a written statement regarding the day's events (see Rp. Exh. 7), including details about the threat made by Complainant. (A written witness statement signed by Mr. Shatilla supports Mr. Sanik's version of the events; see Exh. 8.)

At this point, Mr. Greci telephoned his supervisor Mr. Thurston to advise him of the situation. Upon his arrival, Mr. Thurston met with Complainant and terminated him for cause. Mr. Valerio then escorted Complainant from the building. A termination slip was prepared by Five Star's Superintendent's Office on the standard form issued by JIB's Employment Department (see Rp. Exh. 9), listing the reason for Complainant's termination for cause ("disruptive to job") along ← States with the other issues involving him which preceded his termination ("lateness", "absenteeism", terminated "leaves job early", "insubordination"). For cause

Prior to his termination on April 13, 2017, Complainant never reported to Mr. Thurston, Mr. Greci or Mr. Valerio any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience".

On the date of his termination, April 13, 2017, Complainant filed a grievance with Local 3, followed by a hearing held on April 17, 2017. During his approximately 45 minute presentation at the hearing, Complainant did not testify about any harassing or discriminatory conduct by a Five Star employee towards him based on his sex, sexual orientation or "transgendered experience". Rather, he testified about a single incident in which a female elevator operator employed by a contractor hired by the MTA asked him whether he was a man or a woman.

Respondents state that by letter dated April 18, 2017 (See Rp. Exh. 10), Local 3's Grievance Committee determined Complainant's termination to be "justified." Complainant appealed that determination to Local 3's Grievance Appeal Committee, which held a hearing on May 9, 2017. No representative from Five Star attended the appeal. In a one-sentence letter dated April 25, 2017 (obviously a typographical error) and mailed on May 11, 2017 (see Rp. Exh. 11), Local 3's Grievance Appeal Committee reversed the Grievance Committee's determination and found that Complainant's termination was "not justified." Five Star was later advised by Local 3 that the

See Entry of Five Star's Electric Corp.
See Rebuttal to the SDHR
See Entry titled "Remand" pages 1-21

argument, he intervened to diffuse the situation.  Mr. Valerio then brought both electricians up to speak with Mr. Greci, who was leaving the shanty to attend a job meeting. Mr. Greci spoke with both men, then sent Mr. Sanik downstairs to accept a delivery of materials.

After completing his task of accepting the material delivery, Mr. Sanik saw Mr. Thomas on the first floor near the freight elevator.  Also present at the time were two Five Star electricians working on the MTA DBM/2 Broadway Project, Ronald Shatilla and Patrick Deenihan. According to Mr. Sanik, Mr. Thomas appeared angry, was breathing heavy and was staring at him.  Mr. Sanik asked Mr. Thomas why he was staring at him and commented that it looked like Mr. Thomas wanted to hurt or kill him.  In response, Mr. Thomas told Mr. Sanik that "if I wanted to kill you, I would kill you."  At that point, Mr. Shatilla intervened to diffuse the situation.  Mr. Thomas continued to stare at Mr. Sanik and make threats to him after they entered the elevator, stating that "this kid is going to make me punch him."

Mr. Thomas then left his work area and went to the MTA's Security Office at 2 Broadway to ask about access to the building's turnstile access records and whether the building's security cameras have audio capabilities.  Finding the requests odd, the MTA Security Officer asked Mr. Thomas if he had discussed these issues with his boss, Mr. Greci.  Mr. Thomas ignored the question and then asked for the identity and location of the Building Manager.  Mr. Thomas then proceeded to the Building Manager's office to ask for the same information.  At this point, a representative of the Building Manager, Michael Brady, pulled Mr. Greci out of his job meeting to advise him that Mr. Thomas was seeking details about the building's security features.  Mr. Greci then contacted Mr. Valerio to inquire about Mr. Thomas' disruptive conduct.

*The Building Manager, Michael Brandon was present and carried out these actions himself.*

Shortly thereafter, Mr. Valerio, Mr. Thomas and Mr. Sanik went to Mr. Greci's office to address the ongoing situation between Mr. Thomas and Mr. Sanik.  (By this time, Mr. Greci had been notified by the MTA Security Office about Mr. Thomas' request for building security information.)  Mr. Thomas angrily told Mr. Greci that he felt like Mr. Sanik was disrespecting him by not following his directives and constantly asking questions.  Mr. Sanik told Mr. Greci that he was very upset with the situation and broke down in tears.  He stated that he believed Mr. Thomas had anger issues, and that Mr. Thomas constantly screamed at him, demeaned him and threatened him.  Mr. Sanik then provided a written statement regarding the day's events (attached hereto as **Exhibit 7**), including details about the threat made by Mr. Thomas. (A written witness statement signed by Mr. Shatilla supports Mr. Sanik's version of the events; attached hereto as **Exhibit 8**.)

*Mr. Greci had Emailed the Security Office after I had been terminated And inquired himself About what I was express as my concerns and Request*

At this point, Mr. Greci telephoned his supervisor Mr. Thurston to advise him of the situation. Upon hearing that Mr. Thomas had threatened to harm or kill a fellow employee, Mr. Thurston advised Mr. Greci that Mr. Thomas should be terminated for cause and told him that he would come to 2 Broadway to address the issue in person.  Upon his arrival, Mr. Thurston met with Mr. Thomas and terminated him for cause.  Mr. Valerio then escorted Mr. Thomas from the building. A termination slip was prepared by Five Star's Superintendent's Office on the standard form issued by JIB's Employment Department (attached hereto as **Exhibit 9**), listing the reason for Mr. Thomas' termination for cause ("disruptive to job") along with the other issues involving Mr. Thomas which preceded his termination ("lateness"; "absenteeism"; "leaves job early"; "insubordination").

*states terminated for cause*

5

*The termination for cause is said to be for Reasons that did not include threatening the life of anyone*

*At no point did I disclose my Identity to the Security Office OR the Building Manager, yet they knew who I was, And the Employer I worked for.*

Grievence of
Retailiation

4/17/17

## Grievence of Retaliation

I was terminated as a result of retaliation for the complaints of harrassment, humiliation, discrimination, and over supervision I experienced, which was motivated by the personal dislike/hate of my assumed sexual orientation, and sexual genitalia. by certain co-workers with malicious agendas to sabotage my employment. This led to my natural reation to defend myself in the hostile environment created for me.

I also have reason to believe that one of my harrassers is related to the owner of the company or someone high up in supervision, and that the building manager of the building I was working in had a part in conspiring in the harrassment I experienced.

This is a statement I submitted to my union on 4/17/17. I included it along with this added note in any Rebuttal was submitted to the Dept of Human Rights Mr Aurelli doesn't address having investigated these concerns

Jofred GEET 308
[ Cazé Thomas ]

347-262-3434
65-45 Parsons Blvd 1m
Fresh Meadows, NY
Domestic Republic / 11365
card.# 6004976

Refer to Entry titled "Grievance of Retaliation"

The Division sent a written request to Complainant to relate all the comments and/or behavior of others towards him because of his transgender status. Again, Complainant related the two incidents described above and no other comment and/or behavior.

The Division asked Respondent to address Complainant's rebuttal since in the rebuttal Complainant more fully talks about him being transgender, which was not clear from the initial complaint. Respondent stated that Complainant failed to offer any specific factual support to the alleged unlawful discriminatory practices. Respondent states that Complainant's exhibit 7, "Grievance of Retaliation," provides no specific facts to support his assertion that he made "complaints of harassment, humiliation, discrimination and over supervision [he] experienced."

Complainant stated to the Division that there are no witnesses that could corroborate his allegations of discrimination because his workers protect one another and would not come forth.

The Division requested from Respondent a list of employees in the same work location as Complainant between September 1, 2016 to the present. The Division spoke to Ashley Castro, the only female in the list. She stated that she worked with Respondent over the summer months of 2017 as a helper electrician through a union program for children of union members. She stated she does not know who Complainant is and that she was not working during the time he was there. She stated that the work environment with Respondent was good and that she had no issues with anyone and that she was treated with respect.

The Division also spoke to James Cronin, an electrician who has worked with Respondent for about three years. He stated that he never worked with Complainant but that he had met Complainant about 2-3 times. He described the work environment with Respondent as "very friendly," "all colleagues, no problems." He described Complainant as "not very friendly," that when he first saw Complainant he greeted Complainant but Complainant ignored him. At other times, he stated that Complainant would just come in and not acknowledge Cronin.

The Division also spoke to Andrzej Malinowski who works for Respondent as an electrician for over three years. He described the work environment as "pretty good, probably the best so far." He stated that he has been on the same job as Complainant but never worked with Complainant. He stated that he had never witnesses people making comments or teasing Complainant but that Complainant would get very upset over little things and "looked like a person who was looking for a law suit." He described Complainant as a person who would not talk. He said that others told him that Complainant threatened Marcin Sanik that he would beat him up. He said that everyone laughed at Complainant because Marcin is very tall and Complainant is short. He also said that he has heard Complainant go on a rage, for something not related to anything. He stated that he was not aware Complainant was transgendered but that Complainant "definitely appeared to be female but wanted to be a male." He added that at his work, they come across all kinds of people but that this presents no problems.

Complainant stated to the Division that video and audio recordings at the building he worked at would show that he was innocent and that in fact it was Sanik who kept provoking him. The Division asked Complainant to identify specific recordings and made a request with Respondent. Respondent informed that it does not have any in its possession or control and is not aware of the

Discrimination And Harrassment
in general but not limited to
#2

3/7/2017

Issue with Caro & Vincent working together. They were working on 9th Floor and Caro became anger because he felt like Vincent was treating him like an apprentice. Caro Approached Felix about issue and was yelling in his face. Felix spoke to both of them and they continued.

Felix Valerio

3-15-17

ON WEDNESDAY MARCH 15, 2017 Approximately Around 10:30 AM I receive a phone call to notify me THAT CAZE was yelling and screaming to THE apprentice using profanity language. I went down to THE basement approach THE situation were I learn THAT CAZE was Getting offend over THE question ask by THE apprentice on way THE work was being perform THAT way and Apprentice Try TO Give out He's opinion and apparently THE Journeyman "CAZE" Didn't like it.

Mr. Valerio Violations
And Sexual harrasments

*This entire Entry/page along with others of the State Dept of Human Rights Investigation and determination is Arbitrary and capricious, And or lack rational basis*

has Complainant work in the basement alone; that Valerio related details of previous disagreements Valerio had with Complainant; and that Valerio told the elevator operator that Complainant's real name was not Caze. Accepting all of the above as true, it does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough. At most, it is gossiping that, although it could very well be in poor taste, it does not rise to the level to abusive workplace environment.

12(a)

The other instance Complainant identified is again a scenario where the speakers were not aware Complainant was overhearing them. Two unidentified journeymen were talking about how they caught a glance at Complainant's telephone screen and saw a topless guy who, they said, must be Complainant's lover. Complainant did not identify who these individuals are and it is not clear whether they are even Respondent employees. Complainant stated that one of them sounded like Mr. Messineo. This example, too, does not rise to the requisite level to constitute a hostile work environment as it is not pervasive or severe enough.

12(b)

During the Division initiated interview, Complainant stated that he was written up for lateness when others were not. As an example, he stated that Messineo missed several days of work consecutively because of dental reasons and was not written up, whereas Complainant missed a day of work because he needed to help his grandmother with her radiator and was written up. Another example Complainant gave was that Carlos Santiago missed at least four consecutive days because he had marital issues and he was not written up.

12(c)

Both examples above clearly show that the situations are dissimilar and insufficient to illustrate differential treatment.

12(d)

The third example Complainant gave was that Felix Valerio, who is a supervisor, missed work and was not written up. Complainant stated that he knows about this because he was part of *←False Senten* team. Besides lacking in detail, Complainant and Valerio are not similarly situated employees, thus, an insufficient and inadequate example of differential treatment. *As per Five Star Electric Cor the Rules Apply to All employed by the company.*

12(e)

Moreover, Respondent provided a list of employees between September 1, 2016 to the present who were disciplined for similar wrongdoings as Complainant[1]. Out of a list of 28 employees, seven (7) had time docket and received verbal warnings, most for leaving work early and one for arriving late.

12(f)

Another differential treatment example Complainant gave was regarding the absenteeism over the union card issue. He stated during the interview with the Division that there were other employees who, too, did not have their union card with them but were not sent home. He stated that like all others, Complainant showed Greci the money order receipt in lieu of the card and Greci called the union about all the guys who presented the money order receipts. Greci then told Complainant to go and take care of the issue with the Union and marked Complainant as absent. That same day Complainant went to the Union who told Complainant that there was a clerical

12(G)

---

12(H)  [1] Respondent provided copies of Complainant's write ups. On April 5, 2017, he was written up for absences, leaving early, and lateness. On April 13, 2017, he was written up for lateness, absences, leaving early, insubordination and disruptive behavior. *←Fraudulent document*

- 12 -

3/7/2017

Issue with Caze & Vincent working together. They were working on 9th Floor and Caze became anger because he felt like Vincent was treating him like an apprentice. Caze Approached Felix about issue and was yelling in his face Felix spoke to both of them and they went to work

---

Felix Valerio

3-15-17

On Wednesday March 15, 2017 approximately Around 10:30 AM I receive a phone call to notify me that Caze was yelling and screaming to the apprentice using profanity language. I went down to the basement approach the situation were I learn that Caze was getting offend over the question ask by the apprentice on way the work was being perform that way and Apprentice Try To Give out He's opinion and apparently the Journeyman "Caze" Dionst like it.