```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:_____       │
│ DATE FILED:_5/5/2022___     │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

CAZÉ D. THOMAS,                                 :          18-CV-3691 (AT) (RWL)
                                                :
                             Plaintiff,         :
                                                :          **AMENDED**[1]
            - against -                         :          **REPORT AND RECOMMENDATION**
                                                :          **TO THE HON. ANALISA TORRES:**
FIVE STAR ELECTRIC, DEPARTMENT OF               :          **MOTION TO DISMISS**
EEOC, DEPARTMENT OF HUMAN RIGHTS,               :
and METROPOLITAN TRANSPORTATION                 :
AUTHORITY,                                      :
                                                :
                             Defendants.        :

-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Cazé D. Thomas ("Thomas"), proceeding *pro se*, brings this action against

Defendants Metropolitan Transportation Authority ("MTA") and Five Star Electric Corp.

("Five Star").   Thomas alleges, *inter alia*, that both Defendants have violated the New

York State Human Rights Law, the New York City Human Rights Law, 42 U.S.C. § 2000e-

2 *et seq*. ("Title VII"), and the Equal Protection Clause of the Fourteenth Amendment.

Both Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6), and Five Star additionally moves for dismissal pursuant to Federal

---

[1] This Report and Recommendation ("R&R") amends the R&R issued at Dkt. 74 on
August 23, 2019.  Since issuing the R&R, but before being passed upon by the District
Judge, two noteworthy events have occurred.  First, the case has been reassigned to
Judge Torres from Judge Nathan (who has been elevated to the Second Circuit Court of
Appeals).  Second, on March 10, 2022, Defendant Five Star informed the Court that the
New York State Division of Human Rights (the "Division") issued a final order dismissing
the complaint Thomas filed with the Division and annulling Thomas's administrative
election of remedies.  (Dkt. 107; *see also* Dkt. 101 at 8-9 (January 24, 2022 decision of
the Division recommending that, at Thomas' request, his administrative complaint be
dismissed and his election of an administrative remedy be annulled).)  Based on that final
order, Five Star has withdrawn its arguments addressed to Thomas's election of
remedies.  It is the occurrence of that event that informs this amended R&R.

Rule of Civil Procedure 12(b)(1).   For the reasons that follow, I recommend that both motions be granted and that the action be dismissed with prejudice.

Factual Background[2]

Plaintiff Thomas is a person of gender transition experience who identifies as male.[3]   (Complaint at p. 111, 131.)   The MTA is a New York State public benefit corporation.   N.Y. Pub. Auth. Law § 1263.   Five Star is the largest union electrical contractor in the City of New York; all electricians are members of Local Union #3, IBEW (the "Union").   (*See* Affidavit of Ernest R. Stolzer in Support of Five Star's Motion to Dismiss dated October 1, 2018 (Dkt. 27) ("Stolzer Aff."), Ex. 2 at 4.).   Jeff Thurston ("Thurston") is employed by Five Star as an assistant superintendent.   (*Id*.)   Daniel Greci ("Greci") is employed by Five Star as a general foreman.   (*Id*.)   Felix Valerio ("Valerio") is employed by Five Star as a foreman.   (*Id*.)

On February 27, 2017, Five Star hired Thomas as a journeyman electrician for jobsite located at 2 Broadway, New York, 10004.   (Complaint at 104-06.)   On or about March 15, 2017, Thomas was assigned to work with an apprentice named Marcin Sanik ("Sanik").   (*Id.* at 105.)   After completing part of a project, foreman Valerio inspected their

---

[2] In accordance with the standard for assessing a motion to dismiss, and unless otherwise noted, the facts are derived from the operative complaint, Plaintiff's Second Amended Complaint ("Complaint"), dated January 28, 2019 (Dkt. 63), and accepted as true.   *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013).   In addition to the Complaint, the Court also draws upon statements and documents attached or incorporated into the Complaint by reference.   *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

[3] *See generally*, Jessica A. Clarke, *They, Them, and Theirs*, 132 HARVARD L. REV., 894, 896-930 (2019) (discussing the multitude of ways biological sex, gender identity, and sexual orientation can intersect).

work and did not like the way it aesthetically looked.  (*Id.*)  While redoing the project to make it more visually attractive, Thomas attempted to calm Sanik's worries that they were repeating work and getting behind.  (*Id.*)  But when Thomas asked Sanik to complete other assignments, Sanik became "disgruntled," and when Thomas rejected a suggestion by Sanik, Sanik became critical of Thomas and insubordinate.  (*Id.*)  Thomas told Sanik to see Valerio.  (*Id.* at 105-06.)  Sanik refused but his attitude seemed to settle down.  (*Id.* at 106.)

Later that day, another confrontation occurred between Thomas and Sanik that was unrelated to work.  (*Id.*)  After the confrontation, Valerio inquired about what had transpired and attempted to defuse the situation.  (*Id.*)  In response, Valerio assigned Sanik to another task, leaving Thomas to work alone.  (*Id.*)

Following that, Thomas and another journeyman electrician were assigned to a project.  (*Id.* at 107.)  Thomas determined that more electrical conduit was required for the project and went to the 30th floor to retrieve more.  (*Id.*)  While picking up the materials, Thomas overheard Valerio telling a male elevator operator details about previous times where other workers referred to Thomas as a "female."  (*Id.*)  On turning a corner, Valerio was shocked to see Thomas standing there.  (*Id.*)  Thomas left, avoiding a conversation with Valerio.  (*Id.*)  Thomas alleges that after this incident some building workers started referring to him as female or asking him what his gender was.  (*Id.*)

Afterwards, Thomas began keeping to himself as much as possible.  (*Id.*)  Thomas alleges Valerio noticed this and told Thomas that he was always to stay with his assigned work partner (excluding lunch and breaks).  (*Id.*)  Thomas further alleges Valerio stated that if either Thomas or his partner had to use the restroom, they "were to use the same

stall." (*Id.*)  In addition to feeling a violation of personal space, Thomas felt that an MTA security guard was at times following him into the restroom "as if he was ordered to do so." (*Id.*)

At some later point, Thomas overheard two coworkers discussing Thomas' phone screen saver, which was a picture of a shirtless male. (*Id.*)  The two coworkers assumed that it was Thomas' "lover," but in reality it was a picture of one of Thomas' best friends who had recently passed away. (*Id.*)

On or around March 21, 2017, Thomas asked general foreman Greci if he could leave work 15-20 minutes early to attend a set of weekly classes of continuing education for electricians. (*Id.* at 108.)  Thomas offered to come in early to make up the time difference, but Greci said that was unnecessary and Thomas could leave at 2:00 p.m. without having his pay docked. (*Id.*)  Thomas alleges that when Greci said that, Valerio gave Greci a "funny look." (*Id.*)  The following week, Thomas thought he would be able to leave at 2:00 p.m. for his class and went to the shanty to let Greci know that he was leaving. (*Id.*)  Greci informed Thomas that he was not going to let Thomas leave early every week. (*Id.*)  Thomas attempted to explain that was why he had previously offered to come in early, but Greci told Thomas that his pay would be docked if he left early. (*Id.*)  Thomas stated that he was "willing to make the sacrifice for [his] education." (*Id.*)  Greci then told Thomas that if he left early the following week, Greci would lay Thomas off for leaving. (*Id.*)  Thomas decided to stay. (*Id.*)

At some later point, Greci summoned Thomas to his office and the two had a conversation where Greci let Thomas know that Thomas was welcome at work and that if Thomas ever felt uncomfortable working with someone, he should tell Greci. (*Id.*)

Nevertheless, Thomas' isolation grew, and he alleges that the MTA's building maintenance workers began to notice Thomas' isolation.  (*Id.* at 109.)

On another day, Thomas was late to work because the alarm set on his cellphone had not gone off.  (*Id.*)  Thomas assumed the alarm failed due to the recent daylight savings change but later found out it was due to a cell phone tower being down.  (*Id.*)  Thomas alleges that when he explained the situation, Greci seemed disinterested.  (*Id.*)

On or around April 4, 2017, a clerical error in processing Thomas' union dues resulted in his being marked a no show at work.  (*Id.* at 115, 126.)  Greci ordered Thomas to leave the jobsite so that he could resolve the problem with his dues.  (*Id.*)  The next day, Thomas was given a formal warning due to Thomas' late arrivals, early departure, and unscheduled absences.  (Stolzer Aff., Ex 2 at 7.)  Thomas alleges that Greci was later unwilling to confirm that the union dues error was corrected.  (Complaint at 115.)

On or around April 13, 2017, Thomas was again assigned Sanik as a partner for a project.  (*Id.* at 109.)  Thomas alleges that lies started to spread that he had told Sanik to work on top of an "energized switchgear with high currents."[4]  (*Id.* at 110, 113.)  According to Sanik, Thomas told Sanik to get on top of a "VFD."[5]  (*Id.* at 110.)  Thomas alleges that the main circuits to the VFD had been removed and that there was "no need to turn the

---

[4] Thomas alleges that these lies were intended to defame his character and part of a larger plot to ruin Thomas' career by "people" who had made it clear how they felt about Thomas being a person of gender transition experience.  (Complaint at 111.)

[5] A VFD, or variable-frequency drive, is a "device that can adjust the speed of an electrical motor by adjusting the frequency of alternating current reaching the motor, combined with the wiring and other connections necessary to couple the device to the motor."  *Armstrong Pump, Inc. v. Hartman*, No. 10-cv-446S, 2017 WL 3971296, at *4 n.3 (W.D.N.Y. Sept. 8, 2017).

power back on," and further that he only suggested that Sanik use a ladder and climb less than four feet to tighten some screws.  (*Id.* at 110-11.)  During this incident, Sanik and Thomas began to yell at each other.  (*Id.* at 112.)  Foreman Valerio intervened and sent them both to see Greci.  (*Id.*)  Thomas alleges that while he told Greci what had really happened, Greci criticized Thomas as being unprofessional, yelling, and "ratting the apprentice out."  (*Id.*)

Greci decided to separate Thomas and Sanik and sent Sanik to assist in picking up a delivery.  (*Id.*)  However, when Thomas left Greci's office, Valerio also told Thomas to help with the delivery.  (*Id.*)  Thomas followed orders and went to the loading dock.  (*Id.*)  When Thomas saw Sanik he immediately turned around to avoid any further confrontation.  (*Id.*)  Thomas hung back near the freight elevator, but the two again had an encounter.  (*Id.*)  At one point, Sanik told Thomas that Thomas' eyes looked as if he wanted to kill Sanik.  (*Id.*)  Thomas replied, "if I wanted to kill you, you would already be dead, and there you stand alive and well."  (*Id.*)  The two then got into an elevator where Thomas alleges Sanik goaded Thomas to hit him.  (*Id.*)

Afterward, Thomas went to the MTA's security office and inquired about obtaining security video that he hoped had captured the previous incident between Thomas and Sanik.  (*Id.* at 113.)  The MTA security officer told Thomas that he should direct his inquiry to the building manager.  (*Id.*)  Thomas went to the building manager who directed him to Greci.  (*Id.*)  Thomas and Greci met in the shanty, and Greci asked why Thomas had been to the security office.  (*Id.* at 114.)  As Thomas began to relay the saga between him and Sanik, assistant superintendent Thurston interrupted and handed Thomas a layoff slip.  (Complaint at 114; Stolzer Aff., Ex. 2 at 8.)  Thomas asked for clarification and was

told that he would find out more if he chose to file a grievance.   (Complaint at 114.)
Thomas turned in his security badge and left.   (*Id.*)

Thomas states that Defendants' actions have had a "negative impact in his life, and negatively [a]ffect his employment and business opportunities and deter[r]ed his business opportunity of fulfilling his childhood dreams and future employment," ultimately leading to the denial of "the right to his pursuit of happiness."   (*Id.* at 2.)   Thomas further states that Defendants' actions "triggered his [gender] dysphoria causing health related issues," that strangers now view him in a "negative light," and that he is unable to "defend himself."   (*Id.*)   Thomas believes Defendants referred to and labeled him as "a sexual orientation and/or sexual gender identity that he does not identify as."   (*Id.*)

Thomas' prayer for relief is extensive.   For example, Thomas asks the Court to: 1) reverse a decision made by the Equal Employment Opportunity Commission ("EEOC"); 2) enforce the False Claims Act, 31 U.S.C. § 3729 *et seq.*; 3) enforce all laws pertaining to harassment based on gender and sexual orientation, retaliation, [defamation] of character, slander, wrongful termination, falsifying legal documents, abuse of power, neglect of duties, and conspiracy; 4) remove any restrictions that would prevent Thomas from entering 2 Broadway, New York, NY 10004; 5) grant Thomas the fair opportunity to take advantage of the procurement procedures and programs that the MTA offers, "should one day the complainant decide to apply to fulfill the complainant's childhood dream of becoming an electrical contractor"; and 6) direct defendants to give Thomas a sincere and public apology that can be reduced to writing so that it may be posted throughout the 2 Broadway building.   (*Id.* at 23-25.)

Procedural Background

**A.    Union Grievance**

On April 13, 2017, Thomas filed a grievance with the Union.  (Stolzer Aff., Ex. 2 at 9.)  Four days later, a hearing was held before the Union's grievance committee where Thomas was able to give a statement that included the harassment and discrimination he felt while on the job.[6]  (Complaint at 114.)  Thomas' testimony related to a single incident where a contractor, hired by the MTA, asked Thomas if he was a man or a woman. (Stolzer Aff., Ex. 2 at 9.)  On April 18, 2017, the grievance committee determined that Thomas' termination had been justified.  (Stolzer Aff., Ex. 2 at 41.)  Thomas appealed that determination on May 9, 2017.  (*Id*. at 45.)  The Union's appeals committee reversed Thomas' termination as justified because Thomas' termination slip was not congruent with his previous warning slips.  (*Id*.)  The reason for this reversal was a technicality; the Union required Five Star's termination slip to list the same issues as listed in its previous warning slip to Thomas.  (*Id.* at 9.)  To remedy the technicality, the Union reissued Thomas' termination slip on June 29, 2017, which complied with Union protocol.  (Stolzer Aff., Ex. 2 at p. 48.)  The final termination slip indicated that Thomas had harassed and threatened another employee.[7]  (*Id.*)

---

[6] Thomas alleges assistant superintendent Thurston lied to the grievance committee, which led the committee to find that Thomas' termination was "justified."  (Complaint at 115.)  Thomas claims that he was never absent nor late, which Five Star asserted as the justification for terminating Thomas.  (*Id.*)

[7] During this time, Thomas applied for unemployment insurance benefits with the New York State Department of Labor ("DOL").  During the DOL's investigation, it contacted Five Star inquiring about the issue of whether Thomas' termination was justified or not. Five Star told the investigator about the technicality and the outcome of the Union appeal. (Stolzer Aff., Ex. 2 at 9.)

**B.    Administrative Complaint**

On June 1, 2017, Thomas filed a complaint with the New York State Division of Human Rights (the "Division" or the "Division of Human Rights") alleging Five Star had engaged in unlawful employment discriminatory practices based on sex and sexual orientation in violation of New York State's Human Rights Law ("NYSHRL").  (Complaint at 119-123; *see* Stolzer Aff., Ex. 1.)  The Division found no probable cause to believe Five Star had engaged in an unlawful discriminatory practice under NYSHRL.  (Complaint at 119-123; Stolzer Aff., Ex. 8.)  The Division gave a thorough analysis and dismissed the complaint.  (Complaint at 123; Stolzer Aff., Ex. 8.)  The Division informed Thomas that he had the right to appeal the Division's dismissal in the New York State Supreme Court and have his case, along with Title VII claims, reviewed by the EEOC.  (Complaint at 123; Stolzer Aff., Ex. 8.)  On January 25, 2018, the EEOC adopted the findings of the Division. (Stolzer Aff., Ex. 14.)

On or about January 31, 2018, Thomas appealed the Division's dismissal by commencing a NY CPLR Article 78 proceeding in the New York Supreme Court of New York County.  (Stolzer Aff., Ex. 9.)  Subsequently, the Division requested that the New York Supreme Court remand the matter back to the Division for further investigation. (Affidavit of Ernest R. Stolzer in Support of Five Star's Reply in Support of the Motion to Dismiss ("Stolzer Reply Aff.") dated February 12, 2019 (Dkt. 68), ¶ 9.)  By written decision, the court remanded the matter back to the Division.  (Stolzer Reply Aff. ¶ 9, Ex. 5.)

**C.    The Instant Action**

On April 26, 2018, Thomas filed his complaint in this Court.  (Dkt. 1.)  In late September 2018, the MTA moved to dismiss the complaint, and in early October 2018,

Five Star moved as well.  (Dkt. 20, 25.)  In late November 2018, Thomas filed a 215-page opposition to the motions to dismiss.  (Dkt. 41.)  Before a determination on the motions was made, however, the Court allowed Thomas to amend his complaint, and on January 28, 2019, Thomas filed the operative 192-page Complaint.  (Dkt. 63.)  To facilitate motion practice, the Court determined that the previous motions to dismiss were not moot and directed Defendants to reply to the operative Complaint.  (Dkt. 64.)  The MTA and Five Star replied and renewed their motions to dismiss the Complaint.  (Dkt. 65, 67.)  The Court gave leave to Thomas to file a sur-reply, which he did.  (Dkt. 64, 71.)  On February 20, 2019, both motions became ripe.

This Court issued its initial R&R on the motions to dismiss on August 23, 2019.  (Dkt 74.)  Before the District Judge ruled on the R&R, however, a material development occurred in Thomas' administrative proceeding filed with the Division.  At Thomas' request, the Division annulled his election of an administrative remedy and dismissed his administrative complaint.  (Dkt. 107.)

Legal Standards

A.     Standard for Reviewing *Pro Se* Pleadings

Thomas proceeds *pro se* in this litigation, as he has in his all of his previous proceedings.  As an initial matter, the Court notes the well-settled principle that "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however, inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Erickson v. Pardus,* 551 U.S. at 94 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)).  A court must interpret such complaints "to raise the strongest arguments they suggest," the idea being that "[i]mplicit in the right of self-representation is an

obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006) (per curiam) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983)).

That said, "even *pro se* plaintiffs cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Martinez v. Ravikumar*, 536 F. Supp. 2d 369, 370 (S.D.N.Y. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Nor does *pro se* status excuse a party from meeting deadlines.  *Santos v. General Electric Co.,* No. 10 Civ. 6948, 2011 WL 5563544, at *7 (S.D.N.Y. Sept. 28, 2011) ("plaintiff's *pro se* status does not excuse [his] noncompliance with statutory deadlines"); *Lobaito v. Chase Bank*, No. 11 Civ. 6883, 2012 WL 3104926, at *5 (S.D.N.Y. July 31, 2012), *affirmed*, 529 F. App'x 100 (2d Cir. 2013) (summary order) (same).

B.    Standards for Motion to Dismiss

Defendant MTA moves to dismiss based on one provision of the Federal Rules of Civil Procedure: Rule 12(b)(6); Defendant Five Star moves to dismiss based on two provisions:  Rules 12(b)(1) and 12(b)(6).

On a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction, a court must dismiss a claim if it "lacks the statutory or constitutional power to adjudicate it."  *Morrison v. National Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *affirmed*, 561 U.S. 247 (2010).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  *Aurecchione v. Schoolman Transportation System, Inc.,* 426 F.3d 635, 638

(2d Cir. 2005).  In deciding a Rule 12(b)(1) motion to dismiss, the Court "'must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.'"  *Morrison,* 547 F.3d at 170 (quoting *Natural Resources Defense Council v. Johnson,* 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted)). Additionally, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue . . . ." *J.S. ex rel. N.S. v. Attica Central Schools,* 386 F.3d 107, 110 (2d Cir. 2004); *see also Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings").

To survive a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.  A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).  In considering a motion to dismiss for failure to state a cause of action, a district court "accept[s] all material facts alleged in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted).   However, this tenet is "inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  "[R]ather, the complaint's

factual allegations must be enough to raise a right to relief above the speculative level . . . *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quotations and brackets omitted).  A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

For the purposes of considering a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint.  *Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  A court may, however, consider additional materials, including documents attached to the complaint, documents incorporated into the complaint by reference, public records, and documents that the plaintiff relied upon in bringing the suit.  *See Kleinman*, 706 F.3d at 152 (quoting *ATSI Communications, Inc.*, 493 F.3d at 98).  In that regard, if "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *Poindexter v. EMI Record Group Inc.*, No. 11 Civ. 559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012) (citing *Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y.1994)). As relevant here, the Court may consider the pleadings and filings relating to Thomas' previous litigation, including his grievance hearing, Thomas' case in the Division of Human Rights, and the Article 78 proceeding in the New York State courts.  They are matter of public record and referenced in Thomas' Complaint and opposition papers, and Five Star attached all such documents to an Affidavit in Support of its Motion to Dismiss.  (Stolzer Aff., Ex. 1-14.)

C.   Legal Standards for Substantive Claims

    1.   Title VII

        a.   Discrimination and Disparate Treatment

Title VII proscribes employment discrimination against individuals on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  Title VII claims for discrimination and disparate treatment are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  To establish a prima facie case, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination" based on her membership in the protected class.  *Ruiz*, 609 F.3d at 492.  The Second Circuit has held that discrimination based on sexual orientation is a "subset of sex discrimination."  *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112 (2d Cir. 2018) (en banc), *cert. granted*, 139 S. Ct. 1599 (April 22, 2019) (No. 17-1623).

At the pleading stage, however, a plaintiff "must plausibly allege that (1) the employer took an adverse action against him and (2) his . . . sex . . . was a motivating factor in the employment decision."  *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 86 (2d Cir. 2015).  The plaintiff must allege enough specific facts to "give plausible support to a minimal inference of discriminatory motivation" in order to state a claim of employment discrimination sufficient to survive a motion to dismiss.  *Id*. at 84.  To meet this standard, a plaintiff must plead "facts that directly show discrimination" or "facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."

*Frederick v. United Brotherhood of Carpenters*, 665 F. App'x 31, 33 (2d Cir. 2016) (quoting *Vega*, 801 F.3d at 87).

An adverse employment action is an action by which a plaintiff "has suffered 'a materially adverse change in his employment status' or in the terms and conditions of his employment." *See Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir.2004)). Examples of adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.* (quotations and citation omitted). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Kassner v. Second Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (quoting *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000)). "[B]eing yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of . . . employment." *Smalls v. Allstate Insurance Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (quotations and citations omitted).

    b. <u>Retaliation</u>

Title VII also makes it unlawful for an employer to take adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge. . . . in an investigation, proceeding,

or hearing under this subchapter.'" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir.2010) (quoting 42 U.S.C. § 2000e-3(a)).  This is known as a claim for retaliation.

To establish a *prima facie* case of retaliation, the plaintiff must show: "(1) that [he] participated in an activity protected by Title VII; (2) that [his] participation was known to h[is] employer; (3) that h[is] employer thereafter subjected h[im] to a materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action."  *Kaytor*, 609 F.3d at 552 (citing *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir.2007)); *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 431 (S.D.N.Y. 2010) (same).  "The governing standard is an objective one: "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 312 (S.D.N.Y. 2016) (alterations in original) (quoting *Burlington North & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)).

### c.  Hostile Work Environment

Title VII prohibits employers from, among other conduct, "requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 64 (1986)). "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex."

16

*Johnson*, 224 F. Supp. 3d at 306 (quoting *Patane v. Clark*, 508 F.3d at 113).  "Ultimately, to avoid dismissal under [Rule] 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that []he was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of h[is] employment altered for the worse.'"  *Id*. (alterations in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

### 2.  New York State Human Rights Law

The NYSHRL provides, in relevant part, "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . because of an individual's age, race . . . national origin . . .  [or] sex . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).

Courts in this Circuit have long noted that "[f]or most purposes . . . the law under the [NYSHRL] is coextensive with or substantially the same as that under Title VII."  *Koke v. Baumgardner*, No. 15 Civ. 9673, 2016 WL 93094, at *2 (S.D.N.Y. Jan. 5, 2016); *see also Kwan v. Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*"); *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for evaluating hostile work environment and retaliation claims are identical under Title VII and the NYSHRL").

### 3.  New York City Human Rights Law

The New York City Human Rights Law ("NYCHRL") provides, in relevant part: "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent

thereof, because of the actual or perceived age, race . . . national origin, [or] gender . . . of any person, to . . . discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." New York City Code § 8-107(1)(a).

Like discrimination claims under the NYSHRL, claims under the NYCHRL are "subject to the [same] burden-shifting analysis applied to discrimination claims under Title VII." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  However, the NYCHRL is generally considered to provide broader avenues of recovery to potential plaintiffs. *Loeffler v. Staten Island University Hospital*, 582 F.3d 268, 278 (2d Cir. 2009).

Federal courts reviewing claims under the NYCHRL must be guided by the following: (1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims; (2) the totality of the circumstances must be considered including the overall context in which the allegedly discriminatory conduct occurs; (3) the federal severe or pervasive standard of liability does not apply to NYCHRL claims, and the severity or pervasiveness of conduct is relevant only to the scope of damages; (4) the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives; and (5) while courts may still dismiss truly insubstantial cases, even a single comment may be actionable depending on context.  *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112-13 (2d Cir. 2013).  Still, there "nevertheless remains very substantial overlap, both factually and legally, between Title VII and NYCHRL claims despite the fact that the two statutes are not [entirely] coextensive."  *Koke*, 2016 WL 93094, at *2.

D.    New York's Human Rights Law and the Election of Remedies

Section 297(9) of New York State's Human Rights Law states in relevant part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate, unless such person had filed a complaint hereunder or with any local commission on human rights, . . . provided that, where the division [of human rights] has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed. . . .   No person who has initiated any action in a court of competent jurisdiction or who has an action pending before any administrative agency under any other law of the state based upon an act which would be an unlawful discriminatory practice under this article, may file a complaint with respect to the same grievance under this section. . . .

N.Y. Exec. Law § 297(9).  The Second Circuit has noted that the "first quoted sentence from § 297(9) specifies that, subject to the administrative convenience exception, a person who has filed an administrative complaint regarding discrimination is thereby deprived of his judicial cause of action.  The second quoted sentence makes clear that a person who has previously initiated a court action regarding alleged discrimination may not thereafter file a complaint regarding that discrimination with the Division of Human Rights."  *Moodie v. Federal Reserve Bank of New York*, 58 F.3d 879, 882 (2d Cir. 1995) (quotation marks omitted); *see also McAllister v. Quik Park*, 661 F. App'x 61, 63-64 (2d Cir. 2016) (quoting *Moodie*).  "Generally, the remedies of administrative review through the Human Rights Division or judicial review are mutually exclusive."  *Id.* (quoting *Pan American World Airways, Inc. v. New York State Human Rights Appeal Board*, 61 N.Y.2d 542, 548, 475 N.Y.S.2d 256, 259 (1984)); *accord Magini v. Otnorp. Ltd.*, 180 A.D.2d 476, 476-77, 579 N.Y.S.2d 669, 670 (1st Dep't 1992) ("Once a complainant elects the administrative forum by filing a complaint with the Commission on Human Rights, that becomes the sole avenue of relief, and subsequent judicial action on the same complaint

is generally barred, except in the one instance where dismissal is for 'administrative convenience'").

Moreover, this "election or remedies" provision applies regardless if the plaintiff sought relief under either the New York City Human Rights Law or the New York State Human Rights Law.  *Alston v. Microsoft Corp.*, No. 08 Civ. 3547, 2009 WL 1116360, at *4 (S.D.N.Y. April 27, 2009) ("Once City HRL or State HRL claims are filed with, respectively, the Commission or the N.Y.S. Division of Human Rights . . . those claims or claims based on the same incidents may not be brought again in another court"); *see also Rasmy v. Marriott International, Inc.*, No. 16 Civ. 4865, 2017 WL 773604, at *4 (S.D.N.Y. Feb. 24, 2017) (same) (collecting cases).  When a state law deprives its courts of jurisdiction over a state law claim, it also "operates to divest a federal court of jurisdiction to decide the claim."  *Moodie*, 58 F.3d at 884 (citing *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537-38 (1949)); *Rumsey v. Northeast Health, Inc.*, 634 F. App'x 318, 320 (2d Cir. 2016) (same).

E.     Municipal Liability

In *Monell v. Department of Social Services*, the Supreme Court held that municipalities are "persons" capable of being sued pursuant to 42 U.S.C.§ 1983; in order to establish municipal liability a plaintiff must demonstrate an injury caused by a municipal policy, custom, or practice.  436 U.S. 658, 690-91 (1978).  "But municipalities are not liable 'on a respondeat superior theory,' simply because an employee committed a tort." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (quoting *Monell*).  Accordingly, § 1983 imposes liability only for "action for which the municipality is actually responsible."  *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).

"In other words, to state a § 1983 claim against a municipality, the plaintiff must allege facts showing (i) the existence of a municipal policy, custom, or practice, and (ii) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights." *Price v. City of New York*, 15 Civ. 5871, 2018 WL 3117507, at *6 (S.D.N.Y. June 25, 2018) (citing *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997)).

F.      The *Younger* Abstention Doctrine

As first set forth in *Younger v. Harris*, 401 U.S. 37 (1971), the *Younger* abstention doctrine "generally requires federal courts to abstain from taking jurisdiction over federal . . . claims that involve or call into question ongoing state proceedings." *Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002). "This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, 'a state proceeding provides an adequate forum for the vindication of federal constitutional rights.'" *Id.* *Younger* abstention may apply to three types of cases: 1) federal intrusion into ongoing state criminal prosecutions; 2) certain "civil enforcement proceedings;" and 3) "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989)).

Discussion

The MTA and Five Star mostly advance different arguments for dismissal. Accordingly, the Court addresses them separately, first discussing the MTA's motion and then Five Star's motion.

A.    <u>The MTA's Motion to Dismiss</u>

The MTA argues that Thomas has failed to state a claim against it because Thomas has failed to allege that he and the MTA had an employment relationship.  (MTA's Memorandum in Support of its Motion to Dismiss ("MTA Mem.") (Dkt. 21) at 6, 9.)  Further, the MTA argues that even if the MTA controlled Thomas' terms and conditions of employment, the Complaint still fails to state a claim of employment discrimination.  (MTA Mem. at 6-7.)  The MTA also argues that the Complaint fails to state a claim regarding Thomas' allegation that the MTA, as a municipality, had a discriminatory practice, policy, or custom.  (MTA's Reply in Support of Its Motion to Dismiss ("MTA Reply") (Dkt. 65), at 3-4.)  Finally, the MTA argues that Thomas failed to exhaust his administrative remedies because he never named the MTA as a respondent in the charge filed with the EEOC or complaint filed with the Division of Human Rights.  (MTA Mem. at 9.)  Thomas' opposition and sur-reply include little rebuttal directly on these matters.[8]  Regardless, the MTA is correct as to all arguments.

1.    <u>Thomas Fails to Allege an Employment Relationship With the MTA</u>

As outlined above, "Title VII makes it unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals' race[,] . . . [sex,] or national origin."  *Brown v. Daikin America Inc.*, 756 F.3d 219, 225-26 (2d Cir. 2014) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "[T]he existence of an employer-employee relationship is a primary element of [a] Title VII claim[ ]."  *Id.* at 226 (citing *Gulino v. New York State Education Department*,

---

[8] *See generally,* Plaintiff's First Opposition to the Motions to Dismiss ("Pl. First Opp.") (Dkt. 41), Plaintiff's Second Opposition to the Motion to Dismiss ("Pl. Second Opp.") (Dkt. 70), and Plaintiff's Sur-reply ("Pl. Sur-reply") (Dkt. 72.)

460 F.3d 361, 370 (2d Cir. 2006)).   To determine whether there is an employment relationship between a plaintiff and a defendant, the Second Circuit looks to a non-exhaustive list of factors offered by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ("*Reid*").  The *Reid* factors include:

> the hiring party's right to control the manner and means by which the product is accomplished . . . .[;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

490 U.S. at 751-52.  While no one factor is dispositive, "the common-law element of control is the principal guidepost that should be followed."   *Gulino*, 460 F.3d at 371 (quoting *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 448 (2003)).

Before analyzing the *Reid* factors, courts first look to whether the plaintiff has alleged to have been hired in the first instance by the defendant.  In this Circuit "courts turn to common-law principles to analyze the character of an economic relationship 'only in situations that plausibly approximate an employment relationship.'"  *Id*. at 372 (quoting *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997)).  Thus, "a prerequisite to considering whether an individual is [an employee] under common-law agency principles [for Title VII analysis] is that the individual have been hired in the first instance."  *O'Connor*, 126 F.3d at 115.  In determining whether a person has been "hired," courts look primarily to "whether [a plaintiff] has received direct or indirect remuneration from the alleged employer."  *Pietras v. Board of Fire Commissioners of Farmingville Fire District*, 180 F.3d

23

468, 473 (2d Cir.1999).   "Where no financial benefit is obtained by the purported employee from the employer, no plausible employment relationship of any sort can be said to exist."  *O'Connor*, 126 F.3d at 115-16 (internal quotations omitted); *accord Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 535-36 (S.D.N.Y. 2013) (holding that like Title VII and the NYSHRL, NYCHRL requires a plaintiff to establish an employment relationship).

Nowhere in the Complaint does Thomas allege that he and the MTA had an employment relationship.  Rather, Thomas alleges that Five Star was Thomas' employer for a project relating to the MTA.  (*See, e.g.,* Complaint at 14, 104; *see also id.* at 58, 96-97.)  Thomas attempts to bolster his claim against the MTA by stating that the MTA "conspired" with Five Star "supporting [his] wrongful termination."  (Pl. Sur-reply at 5.)  To support this assertion, Thomas gives four examples.  First, Thomas refers to the time when foreman Valerio told Thomas that he was required to go with his partner everywhere, including the bathroom.  (*Id.*)  Thomas alleges that afterward he noticed that an MTA security officer repeatedly followed him into the restroom.  (*Id.*)  Second, Thomas alleges that MTA security personnel logged his entry on certain floors.  (*Id.* at 6.)  Thomas states that he believes Five Star directed the MTA to do so.  (*Id.*)  Third, Thomas alleges that the MTA denied him access to security video records.  (Complaint at 113.)  Fourth, Thomas alleges that on one occasion an MTA employee asked him if Thomas was male or female.  (*Id.* at 111.)

None of those allegations overcome the absence of any allegation that the MTA employed Thomas – a requirement for relief under Title VII, NYSHRL, and NYCHRL.  *See Wang*, 976 F. Supp. 2d at 535-36.  At no time does Thomas allege that he "received direct

or indirect remuneration from the [MTA]." *Pietras*, 180 F.3d at 473.  Even assuming that there was some renumeration between the MTA and Thomas, no allegations in the Complaint support finding any *Reid* factors in favor of an employment relationship (e.g., Thomas does not allege the MTA had control over his work product; Thomas does not allege the MTA paid him or what payment method was used; Thomas does not allege any employee benefits from the MTA or tax status; and so on).  Accordingly, "no plausible employment relationship of any sort can be said to exist" between Thomas and the MTA.  *O'Connor*, 126 F.3d at 115-16.  Thomas thus has failed to state a claim against the MTA under Title VII, NYSHRL, or NYCHRL.  *See Glaser v. Upright Citizens Brigade, Inc.*, 377 F. Supp. 3d 395-96 (S.D.N.Y. 2019) (for Title VII, whether plaintiff alleges compensation or remuneration is a threshold issue); *Brown*, 756 F.3d at 226; *Wang*, 976 F. Supp. 2d at 535-36.

2. The Complaint Fails to State an Employment Discrimination Claim Against MTA

Even if the MTA in some way controlled the terms and conditions of Thomas' employment so as to qualify as an employer, the Complaint still fails to state a claim for employment discrimination under Title VII, NYSHRL and NYCHRL.

a. Title VII and NYSHRL

At this pleading stage, Thomas must plausibly allege 1) he is a member of a protected class; 2) he is qualified for the position; 3) he suffered an adverse employment action; and 4) circumstances giving rise to an inference of discrimination.  *Vega* 801 F.3d at 83-86 (2d Cir. 2015) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000)); *accord Brown*, 756 F.3d at 226 ("The NYSHRL mirror these [Title VII] obligations").   Thomas successfully alleges that he is a member of a protected class and

is qualified for the job as journeyman electrician.[9]  He does not, however, allege facts that give plausible support, either directly or indirectly, to a minimal inference of discriminatory motivation to any action taken by the MTA.  None of the four alleged actions, either individually or in combination, by employees of the MTA lead to an inference of discrimination.

First, Thomas alleges that after being directed to go "everywhere" with his assigned partner, Thomas noticed that an MTA employee repeatedly followed him into the restroom.  Thomas then asserts that this conduct shows that the MTA conspired with Five Star.  Even construing (without deciding) being told to go with a partner everywhere as an adverse employment action, nothing in the Complaint connects an MTA employee following Thomas into the bathroom with a "discriminatory motivation." *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 66 (S.D.N.Y. 2015).  In other words, without more, this allegation does not lead to an inference of discrimination by the MTA employee, much less the MTA. *See, e.g., MacAlister v. Millenium Hotels & Resorts*, No. 17 Civ. 6189, 2018 WL 5886440, at *6 (S.D.N.Y. Nov. 8, 2018) (dismissing discrimination claim where plaintiff failed to connect an adverse employment action with her protected status); *Yan v. Ziba Mode, Inc.*, No. 15 Civ. 47, 2016 WL 1276456, at *4-5 (S.D.N.Y. March 29, 2016) (same); *Clarke v. Leading Hotels of the World, Ltd.*, 2015 WL 6686568, at *2 (S.D.N.Y. Oct. 29, 2015) (same).

---

[9] The Second Circuit has not had the occasion to opine on whether transgender people as a class are protected under Title VII.  *See Zarda*, 883 F.3d at 129 n.32.  However, Thomas alleges that people perceived him to be gay or homosexual (protected as a subset of sex) and that he at times did not conform with gender norms (protected because gender norms could be used as a proxy for sex discrimination).  *Id.* at 112 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

Second, Thomas alleges that an MTA employee denied him access to MTA security video records, and thereafter, he informed his employer that he had requested the records.  But Thomas fails to allege that the denial of access to security tapes was an adverse action or that Thomas' sex was a motivating factor in the denial.  This allegation does not lead to an inference of discrimination based on Thomas' sex.  *See, e.g., Alfaro-Flecha v. ORC International, Inc.*, 2016 WL 67722, at *6-7 (S.D.N.Y. Jan. 5, 2016) (dismissing discrimination claim where plaintiff did not adequately allege defendant's actions were an adverse action); *Butterfield-Bajinan v. City of New York*, No. 16 Civ. 5919, 2017 WL 4045175, at *5 (S.D.N.Y. Sept. 11, 2017) (same); *Coleman v. City of New York*, 2018 WL 5723133, at *4 (S.D.N.Y. Nov. 1, 2018) (same).

Third, Thomas alleges that the MTA began monitoring Thomas after he inquired about his security records.  Thomas again has failed to allege that the MTA monitoring of this sort was an adverse action or that Thomas' sex was a motivating factor in the decision to monitor.  This allegation too fails to allege facts giving rise to a plausible inference of discrimination.  *See Moore v. Verizon*, 2016 WL 825001, at *6 (S.D.N.Y. Feb. 5, 2016) (discussing that "excessive monitoring" may be an adverse employment action under certain circumstances but dismissing plaintiff's claim as not rising to the level of an adverse employment action); *see also Alfaro-Flecha*, 2016 WL 67722, at *6-7; *Coleman*, 2018 WL 5723133, at *5.

Fourth, Thomas alleges that one of the MTA's employees asked Thomas if he was male or female.  This incident too does not lead to an inference of discrimination based on sex.  While an isolated incident of tactlessly inquiring about one's sex and/or gender identity is uncouth, it does not rise to an inference of sex discrimination.  *See Carter v.*

*Verizon*, No. 13 Civ. 7579, 2015 WL 247344, at *6 (S.D.N.Y. Jan 20, 2015) (comments by manager did not give a reasonable inference that defendant discriminated against plaintiff on the basis of gender); *cf. Blair v. Brooklyn Transportation Corp.*, No. 17 CV 383, 2018 WL 1581974, at *5-6 (E.D.N.Y. March 30, 2018) (multiple inappropriate comments from plaintiff's manager about plaintiff's sex/gender identity in combination with an alleged adverse employment action sufficient to defeat motion to dismiss).

Because none of the actions taken by employees of the MTA, taken individually or in combination, give rise to an inference of sex discrimination, the Complaint fails to state a claim of employment discrimination against the MTA under Title VII and the NYSHRL. *See Weinreb v. Xerox Business Services, LLC Health and Welfare Plan*, 323 F. Supp. 3d 501, 516-17 (S.D.N.Y. 2018) (dismissing employment discrimination claim where plaintiff failed to allege discriminatory intent or motive), *appeal docketed*, No. 18-2809 (2d Cir. Sept. 21, 2018); *Grimes-Jenkins v. Consolidated Edison Company of New York, Inc.*, No. 16, Civ. 4897, 2017 WL 2258374, at *7 (S.D.N.Y. May 22, 2017) (dismissing employment discrimination claims where plaintiff failed to state an adverse employment action); *Day v. City of New York*, No. 15 Civ. 4399, 2015 WL 10530081, at *9 (S.D.N.Y. Nov. 30, 2015) (same).

b. NYCHRL

The Complaint also fails to state a claim of discrimination against the MTA under the NYCHRL.  Claims under the NYCHRL "are subject to the *McDonnell Douglas* burden-shifting" analysis just like Title VII and NYSHRL claims.  *Hill v. New York City Housing Authority*, 220 F. Supp. 3d 499, 509 (S.D.N.Y. 2016); *see also Doe v. Major Model Management Inc.*, No. 11 Civ. 6182, 2012 WL 763556, at *10 (S.D.N.Y. March 9, 2012)

(same).  As outlined above, more liberal standards are applied to NYCHRL claims when applying that framework.  *Kerman-Mastour v. Financial Industry Regulatory Authority, Inc.*, 814 F. Supp. 2d 355, 367 (S.D.N.Y. 2011).  "With respect to discrimination claims, NYCHRL's more permissive standard allows for liability to be 'determined simply by the existence of differential treatment.  To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that [he] has been treated less well than other employees because of h[is] gender.'"  *Isbell v. City of New York*, 316 F. Supp. 3d 571, 593 (S.D.N.Y. 2018) (quoting *Mihalik*, 715 F.3d at 110).  Accordingly, "[a] plaintiff under the NYCHRL is required only to 'show differential treatment—that [he][was] treated "less well"—because of a discriminatory intent.'"  *Carter*, 2015 WL 247344, at *8 (quoting *Mihalik*, 715 F.3d at 110).

This Court is guided by the multi-part analysis for NYCHRL claims delineated by the Second Circuit in *Mihalik*, 715 F.3d at 112-13.  First, NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims; the Court does so here.  *Mihalik*, 715 F.3d at 113.

Second, the totality of the circumstances – which includes the overall context in which the allegedly discriminatory conduct occurs – must be considered.  *Id*.  The Court concludes that the overall context and totality of circumstances presented here do not support a viable claim under NYCHRL.  Thomas has failed to allege that the MTA was his employer or that the MTA somehow controlled the terms and conditions of Thomas' employment.  Additionally, Thomas has failed to plausibly allege that any of the actions taken by MTA employees were caused "by a discriminatory motive."  *Id*. at 110.

Third, the federal "severe or pervasive" standard for conduct resulting in a hostile work environment does not apply to NYCHRL claims. *Id.* at 113. But, that does not change the outcome in this case. *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (explaining that under NYCHRL, conduct need not be "severe or pervasive" to constitute a hostile work environment, although "'petty, slight, or trivial inconvenience[s]' are not actionable" (quoting *Williams v. New York City Housing Authority*, 61 A.D.3d 62, 80, 872 N.Y.S.2d 27, 41 (1st Dep't 2009)). Thomas fails to plausibly allege that the MTA created a hostile work environment under the applicable standard.

Fourth, the *Mihalik* court recognized, just as with Title VII and the NYSHRL, that the NYCHRL "is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." 715 F.3d at 113. Thomas has failed to allege that the MTA's conduct was in any way discriminatory or retaliatory, only offering conclusory accusations that the MTA conspired with Five Star to commit wrongs against him.

Finally, "even a single comment may be actionable in the proper context." *Id*. But as discussed above, none of the actions of MTA employees lead to an inference of discrimination. *See Sletten v. LiquidHub, Inc.*, No. 13 Civ. 1146, 2014 WL 3388866, at *8 (S.D.N.Y. July 11, 2014) (motion to dismiss denied where plaintiff alleged that his sexual orientation was being negatively discussed by coworkers and supervisors).[10]

---

[10] The final *Mihalik* factor is not relevant to this discussion in light of the procedural posture of this case. *See Mihalik*, 715 F.3d at 113 (requiring a court to consider on a motion for summary judgment whether a reasonable jury could not find the employer liable under any theory). That said, no reasonable jury could find the MTA liable under any theory inasmuch as Thomas fails to state a claim for relief at this motion to dismiss stage.

Even under the broader NYCHRL standard, the Complaint fails to state a claim of employment discrimination.  *See Simon v. City of New York*, No. 17 Civ. 9575, 2019 WL 916767, at *5 (S.D.N.Y. Feb. 14, 2019) (dismissing NYCHRL claim where plaintiff failed to allege any facts that would lead to an inference that she was treated less well because of her sex); *Richards v. New York City Department of Education*, No. 13 Civ. 16, 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2019) (same); *Bliss v. MXK Restaurant Corp.*, 220 F. Supp. 3d 419, 424 (S.D.N.Y. 2016) (same).

### 3.   Thomas' *Monell* Claim Against the MTA Fails

While the MTA concedes that it is a "person" that can be held liable under *Monell*, the MTA argues that Thomas' *Monell* claim should be dismissed for three reasons: 1) Thomas has not alleged a discriminatory policy, custom, or practice; 2) Thomas bases his allegations on a *respondeat superior* theory; and 3) Thomas did not allege that any actions taken by MTA employees were under color of state law.  Thomas generally disputes these arguments.  The MTA is correct.

### a.   Thomas Fails to Identify a Discriminatory Policy, Custom, or Practice

In alleging a claim against a municipality under *Monell*, a plaintiff "'need not identify an express rule or regulation,' but can show that 'a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)).

The Complaint does not meet this standard.  As stated above, Thomas has alleged four actions by MTA employees.  Only two of the actions can be construed as happening with some level of frequency: an MTA security officer following Thomas into the bathroom, and the MTA monitoring Thomas' movements.  Neither of those actions individually or taken together imply a policy that was so persistent or widespread to constitute a custom or usage with the force of law or that the actions by the MTA employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.  *Patterson*, 375 F.3d at 226.  Indeed, the conduct alleged by Thomas was directed only at him.  This is fatal to Thomas' *Monell* claim against the MTA.  *See Carno v. United States*, No. 17 Civ. 7998, 2019 WL 2287966, at *5 (S.D.N.Y. May 28, 2019) ("it is not enough to allege simply that a municipal policy or custom exists"); *Goode v. Westchester County*, No. 18 Civ. 2963, 2019 WL 2250278, at *3 (S.D.N.Y. May 24, 2019) (same); *Washington v. City of New York*, No. 18 Civ. 12306, 2019 WL 2120524, at *15 (S.D.N.Y. April 30, 2019) (same).

### b.  Thomas' *Monell* Claim is Based Solely on a *Respondeat Superior* Theory

It is well settled that municipalities are "not liable 'on a *respondeat superior* theory' simply because an employee committed a tort."  *Nagle*, 663 F.3d at 116 (quoting *Monell*, 436 U.S. at 691).  Section 1983 "distinguish[es] acts of the municipality from acts of employees of the municipality," and imposes liability only for "action for which the municipality is actually responsible."  *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).

As stated above, the allegations against the MTA do not imply a policy, custom, or practice.  Rather, Thomas' *Monell* claim against the MTA essentially seeks to hold the

MTA liable for actions of its individual employees.  In other words, Thomas' allegations

are based on *respondeat superior*.  As *Monell* claims based on a *respondeat superior*

theory are not justiciable, Thomas' *Monell* claim cannot withstand the MTA's motion to

dismiss.  *See Doe v. City of New York*, No. 18 Civ. 12038, 2019 WL 1768966, at *6

(S.D.N.Y. April 12, 2019) ("It is well established that municipal liability cannot be based

on a theory of *respondeat superior*"); *Rosado v. Village of Goshen*, No. 7:16 Civ. 6916,

2019 WL 1437522, at *5 (S.D.N.Y. March 31, 2019) (same); *Meyers v. City of New York*,

No. 14 Civ. 9142, 2019 WL 1397186, at *3 (S.D.N.Y. March 28, 2019) (same).[11]

    4.  <u>Thomas Failed to Exhaust His Administrative Remedies as to the MTA</u>

The MTA argues that Thomas failed to exhaust his administrative remedies and

therefore the Complaint should be dismissed.  Thomas does not directly dispute this.  The

MTA again is correct.

---

[11]   The MTA also argues that Thomas fails to allege that the MTA acted under color of state law.  Under § 1983, a plaintiff must allege that a state actor acted under color of state law.  42 U.S.C. § 1983. "The traditional definition of acting under color of state law requires that the defendant in a section 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Oliveira v. Price Law Firm*, 14 Civ. 4475, 2014 WL 4088199, at *3 (S.D.N.Y. July 13, 2014) (quoting *Kia P v. McIntyre*, 235 F.3d 749, 755 (2d Cir. 2000)). "[M]ere employment by the state does not mean that the employee's every act can properly be characterized as state action." *Patterson*, 375 F.3d at 230.  Here, the allegations are that an MTA employee sometimes followed Thomas into the bathroom, the MTA began monitoring Thomas' comings and goings, an MTA employee denied Thomas access to its security camera records, and an MTA employee asked Thomas if he was male or female.  While some of these allegations clearly fall short of alleging that the MTA was acting under color of law, in this context and at this stage, Thomas has sufficiently alleged that certain actions taken by the MTA may have been done in the MTA's official capacity, thus under color of state law. *Pitchell v. Callan*, 13 F.3d 545, 547-48 (2d Cir. 1994); *Mejia v. New York City Health and Hospitals Corp.*, No. 16 Civ. 9706, 2018 WL 3442977, at *5 (S.D.N.Y. July 17, 2018) ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law").  Regardless, for the reasons discussed above, the *Monell* claim against the MTA should be dismissed.

Before filing a Title VII action, a plaintiff must file charges of employment discrimination with the EEOC or local state agency.  42 U.S.C. 2000e-5(e)(1); *Cortijo v. 1711 Davidson Ave HDFC*, 2019 WL 1988476, at *3 (S.D.N.Y. May 3, 2019).  "Exhaustion of administrative remedies is not, however, jurisdictional, but like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Id.* (citing *Fernandez v. Chertoff*, 471 F.3d 45, 58 (2d Cir. 2006) ("Because [the] failure to exhaust [one's] administrative remedies is not a jurisdictional defect, it is subject to equitable defenses").  A plaintiff is not required to plead exhaustion of administrative remedies because "the burden of pleading and proving exhaustion lies with defendants and operates as an affirmative defense."  *Hardaway v. Hartford Publishing Works Department*, 879 F.3d 486, 491 (2d Cir. 2018).  But in considering such an affirmative defense, "a court may consider or even dismiss a complaint where the existence of the affirmative defense is plain from the face of the pleading."  *Cortijo*, 2019 WL 1988476, at *3 (citing *Walters v. Industrial and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011)).

The MTA is not named as a party in either the Administrative Complaint filed in the Division of Human Rights or in the right to sue letter issued by the EEOC.[12]  (Stolzer Aff., Ex. 1, Ex. 14.)  It is therefore evident that Thomas did not pursue administrative remedies against the MTA.  Further, Thomas offers no allegations plausibly showing waiver, estoppel, or equitable tolling that would otherwise forestall application of the exhaustion

---

[12] The MTA did not include these documents in its Memorandum in Opposition or an affidavit; however, the documents were included with Five Star's moving papers. Because these are both public records and documents referenced in the Complaint that the Plaintiff would have known about, the Court incorporates them here. *Kleinman*, 706 F.3d at 152 (quoting *ATSI Communications, Inc.*, 493 F.3d at 98).

requirement.[13]   Accordingly, the Complaint should be dismissed against the MTA due to Thomas' failure to exhaust administrative remedies against the MTA.   *See Kane v. 24/7 Real Media*, No. 14 Civ. 2482, 2015 WL 1623832, at *2 (S.D.N.Y. April 7, 2015) (dismissing Title VII claims because plaintiff failed to exhaust administrative remedies); *see also Lopez v. Cipolini*, 136 F. Supp. 3d 570, 584 (S.D.N.Y. 2015) (same).

B.      Five Star's Motion to Dismiss

Defendant Five Star moves to dismiss the Complaint for primarily two reasons – abstention and failure to state a claim.[14]   Five Star argues that because there is an ongoing state court proceeding on these exact claims, the *Younger* abstention doctrine should apply and Thomas' Title VII claims should be dismissed.  (Five Star Mem. at 10-14.)  Five Star further argues that Thomas' claims pursuant to the NYSHRL and NYCRL should be dismissed for failure to state a claim.  (Dkt. 107 at 3-6.)  Thomas' responding papers generally oppose Five Star's challenges while reiterating facts alleged in the Complaint.  (*See* Dkt. 41, 70-72, 110.)  Although Five Star is incorrect that the *Younger* abstention doctrine applies to Thomas' Title VII claim, the Complaint fails to state a claim

---

[13] The MTA's filing a motion pursuant to Federal Rule of Civil Procedure 12 does not constitute waiver; rather, the MTA has asserted and moves on its affirmative defense of failure to exhaust and in the alternative argues that the Complaint fails to state a claim. *See Azkour v. Haouzi*, No. 11 Civ. 5780, 2012 WL 1681438, at *2 n.1 (S.D.N.Y. April 25, 2012).

[14] Five Star also argued in its motion papers that Thomas' NYSHRL and NYCHRL claims were barred in this Court pursuant to the election of remedies doctrine because Thomas previously sought relief from the Division of Human Rights on those same claims.  (Five Star's Memorandum in Support of Its Motion to Dismiss ("Five Star Mem.") (Dkt. 26), at 4-10.)  Since then, however, Thomas has obtained a final order from the Division annulling his election of remedies and dismissing his administrative complaint.  (Dkt. 107 at 1.)  As a result, Five Star has withdrawn its argument based on election of remedies.  (Dkt. 107 at 3.)

against Five Star under Title VII as well as under the NYSHRL and NYCRL and therefore should be dismissed.

    1.  <u>The Court Need Not Abstain From Considering Thomas' Title VII Claim</u>

This case does not fit neatly into any of the three categories of cases to which *Younger* abstention may be applied. The state court proceeding is not a criminal matter, and therefore the Court need not be concerned with intrusion into an ongoing state criminal prosecution. *See Sprint*, 571 U.S. at 78. Nor is this case a "civil enforcement proceeding." *See id*. The only potentially applicable category is the third one, namely "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id*. (quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (2013)); *see also Falco v. Justices of the Matrimonial Parts of Supreme Court of Suffolk County*, 805 F.3d 425, 427 (2d Cir. 2015)).

The Supreme Court has warned that "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Wilmington Trust, National Association v. Estate of McClendon*, 287 F. Supp. 3d 353, 361-62 (S.D.N.Y. 2018) (quoting *Sprint*, 571 U.S. at 78). In considering whether to abstain under *Younger*, federal courts consider multiple factors, including whether there is (1) "an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges." *Sprint*, 571 U.S. at 81 (citation omitted). "A state interest is 'important' for purposes of the second *Younger* abstention factor where 'exercise of the federal judicial power would disregard the comity between the States and the National Government.'" *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir.

2001); *see also In re Standard & Poor's Rating Agency Litigation*, 23 F. Supp. 378, 409-10 (S.D.N.Y. 2014) (quoting *Grieve*).  Five Star offers no basis to conclude that this court's exercise of its judicial power would disregard comity accorded the State of New York, and the Court discerns none.   Accordingly, *Younger* abstention is not a basis to dismiss Thomas' Title VII claims.   *Sprint*, 571 U.S. at 77 ("Jurisdiction existing, this Court has cautioned, a federal court's obligation to hear and decide a case is virtually unflagging.") (quotations and citation omitted); s*ee Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 537 (S.D.N.Y. 2018) (*Younger* abstention not warranted where there were two prior filed cases that remained ongoing that involved constitutional challenges to state law and declaratory relief against state agencies).

   2.  <u>The Complaint Fails to State a Claim Against Five Star Under Title VII</u>

   Thomas' Title VII claims against Five Star should be dismissed because they fail to state a claim.

   a.  <u>Thomas' Title VII Claims Against Five Star</u>

   As with Thomas' allegations against the MTA, his allegations against Five Star fail to state a claim because they do not "give plausible support to a minimal inference of discriminatory motivation."  *Vega*, 801 F.3d at 84-86.

   The bulk of allegations in the Complaint are interpersonal disputes, unrelated to potential discrimination, between Thomas and other employees of Five Star. Relevant here, however, are four allegations: that foreman Valerio told an elevator operator of times when Thomas had been referred to as a "female;" that Valerio ordered Thomas to go wherever his assigned partner went, including the bathroom; that two unidentified employees assumed a shirtless photo of a male on Thomas' phone was his lover; and

that Five Star terminated Thomas' employment.   The Court analyzes the relevant allegations under the three employment discrimination theories Thomas suggests under Title VII: discrimination and disparate treatment; hostile work environment; and retaliation.

      b.  <u>Discrimination and Disparate Treatment</u>

In order to successfully plead a claim of discrimination and/or disparate treatment under Title VII, Thomas "must plausibly allege that (1) the employer took an adverse action against him and (2) his . . . sex . . . was a motivating factor in the employment decision." *Vega*, 801 F.3d at 86.   An adverse employment action is an action by which a plaintiff "has suffered 'a materially adverse change in his employment status' or in the terms and conditions of his employment." *See Kessler,* 461 F.3d at 207 (quoting *Williams*, 368 F.3d at 128).   Examples of adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id*. (quotations and citation omitted).   "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Kassner*, 496 F.3d at 238 (quoting *Galabya*, 202 F.3d at 640).   "[B]eing yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of . . .  employment." *Smalls*, 396 F. Supp. 2d at 371 (quotations and citations omitted).

The only adverse action alleged in the Complaint is Thomas' termination; the other allegations do not demonstrate a material impact on the terms and conditions of Thomas' employment.  *Id*.  However, Thomas has failed to allege that sex was a motivating factor

in his termination.  By his own account, Thomas was late or absent to work multiple times (though Thomas denies he was responsible for these), and Thomas had interpersonal problems with multiple employees and supervisors.  (Complaint at 105-09.)  Thomas' allegation that Valerio stated that Thomas had been referred to as female, or that unidentified employees assumed a photo depicted Thomas' lover, hardly leads to an inference that sex was a motivating factor in Thomas' termination.  *See Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 519 (S.D.N.Y. 2010) (dismissing plaintiff's Title VII claims where defendant's actions, while unsavory, did not lead to an inference of discrimination by defendant because of sex); *Garcia v. Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 377-78, 380-85 (S.D.N.Y. 2017) (in summary judgment context, dismissing plaintiff's Title VII claims where supervisor referred to plaintiff's gender but plaintiff could not connect these statements about her gender to sex discrimination).

The Complaint fails to state a discrimination or disparate impact claim against Five Star under Title VII. *See, e.g., Williams v. Wellness Medical Care, P.C.*, 2013 WL 5420985, at *6 (S.D.N.Y. Sept. 27, 2013) (dismissing Title VII claim where plaintiff failed to cite facts that would support an inference of discrimination); *Maisonet v. Metropolitan Hospital and Health Hospital Corp.*, 640 F. Supp. 2d 345, 348-49 (S.D.N.Y. 2009) (same).

c.  <u>Hostile Work Environment</u>

"To state a claim for a hostile work environment in violation of Title VII, [Thomas] must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex."

*Johnson*, 224 F. Supp. 3d at 306 (quoting *Patane*, 508 F.3d at 113). "A workplace can be regarded as hostile if it is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Spence v. Bukofzer*, No. 15 Civ. 6167, 2017 WL 1194478, at *7 (S.D.N.Y. March 30, 2017) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "Ultimately, to avoid dismissal under [Rule] 12(b)(6), [Thomas] need only plead facts sufficient to support the conclusion that []he was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse.'" *Id*. at *8 (quoting *Patane*, 508 F.3d at 113).

Thomas does not meet that threshold. First, while Thomas overheard Valerio tell an elevator operator about times when Thomas had been previously referred to as female, second-hand comments, while relevant, "are not as impactful on one's environment as are direct statements [and,] consequently, they are less persuasive in stating a hostile work environment claim." *Lenart*, 131 F. Supp. 3d at 68-69 (quoting *Sletten*, 2014 WL 3388866 at *7 (collecting cases)). Beyond this isolated incident, Thomas only generally alleges that he felt that people at work began to call him female or ask what his gender was. The Complaint does not identify any such people or incidents. These allegations are too conclusory to state a claim for relief, and in any event at most assert "'isolated acts, [which] do not meet the threshold of severity or pervasiveness.'" *Lenart*, 131 F. Supp. 3d at 69 (dismissing hostile work environment claim under Title VII) (quoting *Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002)).

Similarly, Valerio ordering Thomas to go wherever his assigned partner went (including the bathroom) does not lead to an inference of discriminatory harassment by Five Star.  Thomas only alleges that Valerio made this statement, not that any assigned partner from Five Star actually went with Thomas anywhere, bathroom or otherwise. Indeed, the Complaint alleges that Thomas sometimes felt that an MTA employee, not Thomas' assigned partner from Five Star, followed him into the bathroom.  (Complaint at 107.)  Thomas does not provide specifics regarding the frequency, time, place, or what actually happened.  The Complaint is thus devoid of allegations showing that Valerio's comment, either alone or together with other events, would cause a reasonable employee to find the conditions of his employment altered for the worse.

Finally, the alleged incident of two unidentified Five Star employees assuming a photo of a shirtless male on Thomas' phone was his lover was also an isolated act that does not meet the threshold of severity or pervasiveness whether considered alone or with other alleged incidents.  *See Erasmus v. Deutsche Bank Americas Holding Corp.*, 2015 WL 7736554, at *5 (S.D.N.Y. Nov. 30. 2015) ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concentrated in order to be deemed pervasive.") (quoting *Alfano*, 294 F.3d at 374); *Murray v. Visiting Nurse Services*, 528 F. Supp. 2d 257, 278-80 (S.D.N.Y. 2007) (in the summary judgment context, male-to-male statements in the workplace such as "you're such a b****," "good morning ladies," "when are you going to come out of the closet," and "are you ladies going to the parade?" insufficient to support hostile work environment claim); *see also Lucas v. South Nassau Communities Hospital*, 54 F. Supp. 2d 141, 147-49 (E.D.N.Y. 1998) (denying hostile work environment claim where supervisor touched plaintiff multiple times, asked about the

color of plaintiff's underwear, said plaintiff wanted to "go to bed" with her, and said "f***
you" to plaintiff on two occasions).

Even considering all the allegations against Five Star together, the Court is unable
to infer that Thomas faced harassment of a quality or quantity that would cause a
reasonable employee to find the conditions of his employment altered for the worse. *See,
e.g., Erasmus*, 2015 WL 7736554, at *6 (alleged suggestive or offensive remarks or
gestures directed at plaintiff over the course of four years insufficient to allege hostile
work environment claim under Title VII); *Clarke v. InterContinental Hotels Group, PLC*,
2013 WL 2358596, at *10 (S.D.N.Y. May 30, 2013) (plaintiff's allegations that "her
supervisors snubbed her; spoke to her rudely to her and insulted her work ethic;
excessively scrutinized her work; and gave her more work to do than other employees"
did not constitute a hostile work environment claim); *Kremer v. New York State Insurance
Department*, No. 06 Civ. 9949, 2009 WL 777721, at *6 (S.D.N.Y. March 25, 2009) (alleged
incidents of isolated conduct insufficient to allege a hostile work environment claim under
Title VII); *Parekh v. Swissport Cargo Services, Inc.*, No. 08 CV 1994, 2009 WL 290465,
at *5 (E.D.N.Y. Feb. 5, 2009) ("Plaintiff's complaints concerning unfair disciplinary actions,
shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide
him with proper equipment, workplace transfers, failure to promote, and his termination"
together did not constitute a hostile work environment claim).

Because Thomas does not allege sufficient quality or quantity of harassment or
connect such harassment to the conditions of his employment, the Complaint fails to state
a hostile work environment claim under Title VII. *Terry*, 336 F.3d at 148; *Lenart*, 131 F.
Supp. 3d at 68-69; *Krasner*, 680 F. Supp. 2d at 502 (dismissing Title VII hostile work

environment claim where plaintiff failed to allege facts that allowed for an inference of sex discrimination even where plaintiff alleged an unpleasant work environment).

    d. <u>Retaliation</u>

Title VII makes it unlawful for an employer to take adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge. . . . in an investigation, proceeding, or hearing under this subchapter." *Kaytor*, 609 F.3d at 552 (quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, the plaintiff must show: "(1) that [he] participated in an activity protected by Title VII; (2) that [his] participation was known to [his] employer; (3) that [his] employer thereafter subjected her to a materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor*, 609 F.3d at 552 (citing *Patane*, 508 F.3d at 115). "[T]he Second Circuit has recognized that 'protected activity' includes 'informal protests of discriminatory employment practices, including making complaints to management.'" *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (citing *Kotcher v. Rosa & Sullivan Appliance Center*, 957 F.2d 59, 65 (2d Cir. 1992) and quoting *Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990)).

The Complaint fails to state a claim of retaliation under Title VII. Nowhere does Thomas allege he made a complaint, whether formal or informal, relating to discriminatory employment practices by Five Star. The only complaints appear to be informal ones to general foreman Greci regarding interpersonal problems with other employees. (*See e.g.*, Complaint at 112.) None of these complaints concern alleged discriminatory practices. Because Thomas has failed to allege a protected activity, the retaliation claim

against Five Star cannot stand. *Risco*, 868 F. Supp. 2d at 110; *Rojas*, 660 F.3d at 108; *Thomas*, 438 F. Supp. 2d at 365.

### 3. The Complaint Fails to State a Claim Against Five Star Under the NYSHRL

As explained above, and as relevant here, the law and analysis for Thomas' claims under the NYSHRL is "coextensive with or substantially the same as that under Title VII." *Koke*, 2016 WL 93094 at *2; *accord Kelly*, 716 F.3d at 14 ("The standards for evaluating hostile work environment and retaliation claims are identical under Title VII and the NYSHRL"). Accordingly, Thomas' NYSHRL allegations against Five Star fail to state a claim under NYSHRL for the same reasons they fail to state a claim under Title VII and should be dismissed.

### 4. The Complaint Fails to State a Claim Against Five Star Under the NYCHRL

Just as Thomas fails to state a NYCHRL claim against MTA, he fails to do so as against Five Star. The Court applies the same broader standard and multi-part analysis required for NYCHRL claims. *See Mihalik*, 715 F.3d at 112-13. In that regard, the Court has analyzed the NYCHRL claims against Five Star separately and independently from the federal and state discrimination claims against Five Star; considered the totality of circumstances; taken into account that a hostile work environment does not require statements that are "severe or pervasive;" and evaluated the actionability of each of the four alleged statements and actions of Five Star employees both together and separately. In short, for reasons stated earlier in this R&R, although Five Star, unlike MTA, was Thomas' employer, Thomas has not plausibly alleged that any of the statements made or actions taken by Five Star employees were discriminatory or retaliatory in any way, prompted by a discriminatory motive, or demonstrative of a hostile work environment.

5.   The Complaint Fails to State a *Monell* Claim Against Five Star

Five Star argues that Thomas' *Monell* claim against it should be dismissed because Five Star is not a state actor and therefore cannot be held liable.  (*See* Reply Memorandum of Law in Support of Defendant Five Star's Motion to Dismiss (Dkt. 67), at 5-6.)  Five Star is correct.

As stated above, § 1983 allows municipalities to be held liable for injuries caused by a municipal policy, custom, or practice.  *Monell*, 436 U.S. at 690-91.  A requirement for a § 1983 claim against a municipality is that it can only be asserted against a state actor, not private entities or individuals.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Torres v. Aramark Food*, No. 14 Civ. 7498, 2015 WL 9077472, at *4 (S.D.N.Y. Dec. 16, 2015) ("in order to survive a motion to dismiss, a plaintiff must allege he was injured by either a state actor or private party acting under the color of state law") (quotations and citation omitted).

The Complaint does not allege that Five Star is a state actor.  Further, there is nothing in the Complaint from which to infer that Five Star was working under color of state law with regard to any actions against Thomas.  The *Monell* claim against Five Star should be dismissed.  *See White v. City of New York*, No. 17 Civ. 2404, 2019 WL 1428438, at *5 (S.D.N.Y. March 29, 2019) (private entity not subject to liability under § 1983); *Xiao Qing Liu v. New York State Department of Health*, 2017 WL 3393944, at *11 (S.D.N.Y. Aug. 7, 2017) (same); *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 532-34 (S.D.N.Y. 2015) (same).

C.    Thomas' Other Claims

In a section of the Complaint labeled "Facts", Thomas lists in conclusory fashion other claims he is pursuing "including but not limited to . . . [defamation] of character, illegally disclosing private vital record information, slander, . . . falsifying legal documents, abuse of power and neglect of duties, and conspiracy including and in addition to any and all other laws, regulations, and statutes that may apply against the abuse and offenses that were done to the Complainant."  (Complaint at 22.)  These conclusory allegations, devoid of any factual basis, fail to "raise a right to relief above the speculative level . . . *i.e.*, enough to make the claim plausible."  *Arista Records, LLC*, 604 F.3d at 120 (2d Cir. 2010).  These additional claims should be dismissed.

## Dismissal With Prejudice

Thomas has already been given two opportunities to amend his complaint.  At this juncture, no further opportunities to amend are warranted.  *Brown v. Murphy*, No. 16 Civ. 710, 2019 WL 2325777, at *4 (S.D.N.Y. May 30, 2019) ("If, after a liberal reading and making every reasonable inference in the plaintiff's favor, a *pro se* plaintiff fails to state a claim upon which relief can be granted despite having received the opportunity to amend his complaint, the Court can dismiss the case under Rule 12(b)(6) with prejudice") (citing *Caddick v. Personnel Co. I LLC*, No. 16 Civ. 7326, 2018 WL 3222520, at *8 n.5 (S.D.N.Y. June 29, 2018)); *Felder v. Madison Square Garden*, No. 15 Civ. 4038, 2017 WL 9538169, at *11 (S.D.N.Y. Jan. 25, 2017) (recommending dismissal with prejudice appropriate where *pro se* plaintiff had been afforded two opportunities to amend), *report and recommendation adopted*, 2017 WL 1011493 (S.D.N.Y. March 15, 2017); *Ndremizara v. Swiss Re America Holding Crop.*, 93 F. Supp. 3d 301, 318-19 (S.D.N.Y. 2015) (dismissing

46

*pro se* plaintiff's complaint with prejudice because plaintiff failed to state a plausible claim and because the court had already twice granted plaintiff leave to amend his pleading).

<u>Conclusion</u>

For the foregoing reasons, I recommend that Defendants' motions to dismiss be granted and that this action be dismissed with prejudice.  The Court has considered all other arguments raised by Thomas, and to the extent they are not addressed herein, finds them to be without merit.  Pursuant to 28 U.S.C. §§ 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Alison J. Nathan, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  **Failure to file timely objections will preclude appellate review.**

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      May 5, 2022
            New York, New York

Copies transmitted this date to all counsel of record. The Clerk's Office is respectfully directed to mail a copy of this Report and Recommendation to Plaintiff pro se and note service on the docket:

Cazé D. Thomas
65-45 Parsons Blvd, #1M
Fresh Meadows, NY 11365